IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION


JACQUELYN ORR and WILLIAM ORR,)
                              )
        Plaintiffs,           )        CIVIL ACTION NO.
                              )
    vs.                       )        416-52
                              )
MACY'S RETAIL HOLDINGS, INC., )
                              )
        Defendant.            )


                    - - -


        Deposition of L. LAMAR BLOUNT, CPA/CFF,

FHFMA, taken on behalf of the Plaintiffs,

pursuant to Notice, in accordance with the

Federal Rules of Civil Procedure, before Louise

Nielson, Certified Court Reporter, at 555 North

Point Center East, Suite 403, Alpharetta,

Georgia, on the 19th day of September, 2016,

commencing at the hour of 9:05 a.m.

_____

EXHIBIT
3

1    APPEARANCES OF COUNSEL:

2         ON BEHALF OF THE PLAINTIFFS:

3              R. SCOT KRAEUTER, ESQ.
               Johnson, Kraeuter & Dunn, LLC
4              104 West State Street
               Suite 200
5              Savannah, GA  31401

6         ON BEHALF OF THE DEFENDANT:

7              LISA R. RICHARDSON, ESQ.
               Drew Eckl & Farnham, LLP
8              880 West Peachtree Street, N.W.
               Atlanta, GA  30308
9                             - - -

10             (Whereupon, disclosure as required by the

11        Georgia Board of Court Reporting was made by the

12        court reporter, a written copy of which is

13        attached hereto.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1          MR. KRAEUTER:  This will be the deposition

2     of L. Lamar Blount, CPA/CFF, FHFMA taken

3     pursuant to notice and agreement of counsel.  I

4     would propose that we stipulate to the time,

5     method and manner of the taking of the

6     deposition as well as our court reporter's

7     qualifications, if that's agreeable.

8          MS. RICHARDSON:  It's agreeable.

9          MR. KRAEUTER:  All right.  And I would

10     propose that we reserve objections except as to

11     the form of the question and the responsiveness

12     of the answer until such time as first use.

13          MS. RICHARDSON:  That's fine.

14          MR. KRAEUTER:  Okay.  Anything else to put

15     on the record?

16          MS. RICHARDSON:  I don't think so.

17          MR. KRAEUTER:  All right.  Why don't we

18     swear the witness, please.

19          L. LAMAR BLOUNT, CPA/CFF, FHFMA,

20     having been first duly sworn, was examined and testified

21     as follows:

22                    CROSS-EXAMINATION

23     BY Mr. Kraeuter:

24     Q    Mr. Blount, my name is Scot Kraeuter.  I'm

25     going to ask you some questions today.  If I ask you

Page 4

1      a question that you do not understand or you find

2      confusing in any way, will you let me know, please?

3           A    Yes, I will.

4           Q    All right.  Now, we had with your

5      deposition notice served a notice to produce asking

6      you to bring to the deposition in paper form a number

7      of documents.

8           A    It didn't say paper --

9           Q    Do you have that information?

10          A    It didn't say paper form.

11          Q    Yes, it did, sir.  It said "in paper form."

12          A    Well, I don't keep --

13          Q    I'm looking, I'm looking at the notice,

14     sir.  It said, "in paper form."

15              MS. RICHARDSON:  It does.

16              THE WITNESS:  Well, I'm not going to print

17          it out.  I brought, I brought my electronic file

18          of my electronic records.

19              MR. KRAEUTER:  All right.  Lisa?

20              THE WITNESS:  I brought paper records of my

21          paper records.

22              MR. KRAEUTER:  Lisa?

23              MS. RICHARDSON:  Yes.

24              MR. KRAEUTER:  I would like the materials

25          in paper form, please, as the notice required.

1        And there's been no objection to the notice.

2              MS. RICHARDSON:  How much is on there?

3              THE WITNESS:  I don't know.

4              MS. RICHARDSON:  Do we have -- can we print

5        something out here?

6              THE REPORTER:  I have no idea.

7              MS. RICHARDSON:  Okay.  Let's see if we can

8        get it printed here.

9              MR. KRAEUTER:  Okay.

10             MS. RICHARDSON:  I mean, I don't know how

11       much is on there or whether it's even feasible

12       to print, but --

13             MR. KRAEUTER:  Well, let's see.  But I

14       don't want to, I don't want to lose time in this

15       deposition because the witness didn't comply

16       with the notice.

17             MS. RICHARDSON:  Sure.  Let's see.

18             Okay.  Let's go off for a second.

19             MR. KRAEUTER:  Okay.

20             (Whereupon, a brief recess was taken.)

21       Q     (By Mr. Kraeuter) Okay.  I think when we left

22  off, Mr. Blount, we were talking about documents that

23  you were to bring to the deposition.

24       A     Yes.

25       Q     There was an issue in that you brought a

1    number of documents on a thumb drive of some kind,

2    but those are now being e-mailed to the office where

3    the deposition's being taken; is that correct?

4         A    Yes.

5         Q    Okay.  And they're being printed out; is

6    that correct?

7         A    That's what I understand.

8         Q    Okay.  All right.  Now, let's go through

9    the materials that you brought with you or are being

10   sent in, if we could.

11        A    Okay.

12        Q    If you look at your deposition notice, we

13   were asking for your entire file in this case.  Did

14   you bring your entire file between what's being sent

15   in and what's in front of you right now?

16        A    As far as I know.

17        Q    Okay.  A copy of all communications,

18   whether written, electronic, or otherwise -- received

19   or reviewed by you relating to the case.  Did you

20   bring that?

21        A    I don't think that's on the thumb drive.

22             MS. RICHARDSON:  What?

23        Q    (By Mr. Kraeuter) Sir?

24        A    The thumb drive does -- I inadvertently did

25   not put on there the Outlook files.

1            MS. RICHARDSON:  Are there any, are there

2      any written communications with us?

3            THE WITNESS:  Written communications?

4            MS. RICHARDSON:  Yeah.

5            THE WITNESS:  No.  I thought, I thought you

6      were asking about e-mail.

7            MS. RICHARDSON:  Do we even have --

8            MR. KRAEUTER:  Yes.

9            MS. RICHARDSON:  -- e-mails?

10           MR. KRAEUTER:  E-mail.

11           THE WITNESS:  I did not put the e-mail on

12      thumb drive by oversight.  I intended to, but --

13      Q     (By Mr. Kraeuter) All right.  Mr. Blount --

14      A     -- I'll be glad to send it to you.

15      Q     -- how do we get those documents?

16      A     Well, you can, you know, look up my Outlook

17      file.  I could send you the Outlook file.

18           MS. RICHARDSON:  Are they just e-mails with

19      us?

20           THE WITNESS:  No.  It's also e-mails with

21      the people that work with me on the case.

22           MS. RICHARDSON:  Ahh.  Okay.

23           MR. KRAEUTER:  Yeah.  Lisa, how are we

24      going to get those?

25           MS. RICHARDSON:  Well, Scot, I mean, the

Page 8

1    ones with our office to the extent that they're

2    discoverable -- and under the new rules they're

3    not all discoverable -- I can pull them and have

4    someone send them.  But his office -- is there

5    someone at your office who can pull your

6    Outlook?

7              THE WITNESS:  (Witness shakes head.)

8              MS. RICHARDSON:  Okay.

9              THE WITNESS:  Sorry.

10             MS. RICHARDSON:  Well, let's --

11             MR. KRAEUTER:  Lisa, I would agree that an

12     e-mail between your office and Mr. Blount about,

13     you know, drafting his report and drafts of his

14     report is not discoverable, I agree with that,

15     but anything else is.

16             MS. RICHARDSON:  I'm not arguing that's

17     it's not.  What I'm saying is I can get my

18     office to send our e-mails, but he's got e-mails

19     with his people that I obviously don't have

20     access to.  So we can do one of two things:  We

21     can stop the deposition and go get them, or we

22     can get them to you and we can reconvene the

23     deposition if you feel the need to ask questions

24     about them at a later date.

25             MR. KRAEUTER:  Yeah.  Let's, you know, get

Page 9

1          them to me.  I don't want to slow down today.  I

2          want to keep moving and get as much done as we

3          can.

4                  MS. RICHARDSON:  So get them and we can

5          reconvene if you want to.  Is that what you're

6          saying?

7                  MR. KRAEUTER:  Yes.

8                  MS. RICHARDSON:  Okay.

9                  MR. KRAEUTER:  Sure.

10                 MS. RICHARDSON:  Okay.  That's fine.

11                 THE WITNESS:  I'll get them sent down to

12         you --

13                 MS. RICHARDSON:  Sure.

14                 THE WITNESS:  -- this afternoon.

15                 MS. RICHARDSON:  That's fine.  Okay.

16         Q     (By Mr. Kraeuter) The next category is a copy

17    of all reports prepared by you or received by you which

18    relate in any way to the facts of this case.  Do we

19    have all those documents?

20         A     Yes.

21         Q     Okay.  And the next category is all

22    documents and records reviewed by you or considered

23    by you in conjunction with this case.  Do we have

24    those documents?

25         A     As far as I know.

1      Q     The next category is "all documents and

2      records reviewed by you or considered by you in

3      preparation for this deposition."  Do we have all

4      those documents?

5      A     As far as I know, yes.

6      Q     All right.  The next category is, "The

7      results of all research done by you or for you

8      relative to this case."  Do we have those documents?

9      A     I believe so.

10     Q     And the next category is "an up-to-date

11     resumé."  Do we have that?

12     A     Yes.  There's been no change since the

13     report.

14     Q     Okay.  The next category is all notes,

15     records or other materials maintained by you on

16     computer or other electronic means related to

17     Jacquelyn Orr, Macy's Retail Holding, or the incident

18     that is the subject of this lawsuit.  Do we have all

19     those documents?

20     A     Yes.  That's on the thumb drive being

21     printed out.

22     Q     Okay.  The next category is a copy of all

23     communications, whether written, electronic or

24     otherwise, sent or received from any attorney or

25     staff member of Drew Eckl & Farnham.

1          And I think we've covered that Lisa,

·2    correct?

3          MS. RICHARDSON:  Yes.

4          MR. KRAEUTER:  Okay.

5     Q    (By Mr. Kraeuter) The next is all billing

6     information, including engagement letters, invoices,

7     and payments regarding Macy's Retail Holding and Drew

8     Eckl & Farnham.  Do we have those documents?

9     A    Yes.  That's in the admin folder.

10    Q    All right.  K, a list of all -- let's see.

11    "A list of all cases in which you've testified at

12    trial or in deposition for the last five years."  Do

13    we have an updated list on that?

14    A    I think there's only one case maybe since

15    the one that's listed in the report.  I had a

16    deposition I believe last week that I've not put on

17    the list yet.

18    Q    And what case is that, sir?

19    A    Hang on just a minute.  Let me see if I can

20    find that.

21         MS. RICHARDSON:  Hang on just one second,

22    Scot.

23         (Whereupon, a brief recess was taken.)

24         THE WITNESS:  Okay.  Back to -- hang on

25    just a minute.  I got that.

1          MS. RICHARDSON:  Sure.

2          THE WITNESS:  May have that here.

3          Okay.  The case was Kimberly Blackmon,

4     B-L-A-C-K-M-O-N, versus Timothy Hairstin,

5     H-A-I-R-S-T-I-N, and Hobart Corporation,

6     H-O-B-A-R-T, in Clayton --- State Court in

7     Clayton County.  I testified in an August

8     deposition on my expert report regarding proper

9     billing and reasonable charges for ambulatory

10    surgery center and professional fees.  And I was

11    engaged by Nikolai Makarenko, M-A-K-A-R-E-N-K-O,

12    with Groth & Makarenko in Suwanee, Georgia.  So

13    that case -- that testimony is not on the list

14    that's contained in Appendix B in the expert

15    report for this case.

16         Q    (By Mr. Kraeuter) And who was opposing

17    counsel on that case?  Who was the plaintiff's lawyer?

18         A    I don't know.

19         Q    Okay.  All right.  The last category of

20    documents is a list of all case in which you've been

21    retained by Drew Eckl & Farnham, LLP.  Do you have

22    that, sir?

23         A    I apologize.  I just got back from a week

24    in Canada Sunday afternoon and just -- I thought this

25    stuff was ready to go, and it's not.  Let's see.

Page 13

1    Drew Eckl & Farnham.

2         Q    And I'm not talking, Mr. Blount, about

3    testifying in deposition or trial.

4         A    I understand.

5         Q    I'm talking much more broader than it.

6    Just being retained.

7         A    I think there's one other case.  Let me see

8    if I can find it.  Just one second.

9              Okay.  Last year I was retained by Drew

10   Eckl & Farnham -- oh, I'm sorry.  That's not --

11   that's another Drew.  Sorry.

12             All right.  Just -- I think it seems like

13   there is another case, but I don't see it on my list

14   right now.

15             MS. RICHARDSON:  It would probably be with

16        Jeff Ward.

17             THE WITNESS:  Yes.

18             MS. RICHARDSON:  Can you search Jeff Ward?

19             THE WITNESS:  Yes.  Let me.  Okay.  That's

20        good.

21             MR. KRAEUTER:  What was the case, Lisa?

22             MS. RICHARDSON:  I said it was probably

23        with Jeff Ward.  I suggested he search Jeff

24        Ward's name.

25             MR. KRAEUTER:  Thank you.

Page 14

1          MS. RICHARDSON:  He's going to do that.

2          THE WITNESS:  I've got other Wards in here

3     too.  I'm sorry.

4          All right.  I don't see it on my cumulative

5     list, but I know there was -- there has been

6     another case.  So it's just not posted to that

7     listing.  Let me look here in my Outlook.

8          Okay.  Yes.  The case was Huntoon versus

9     Wal-Mart.

10     Q    (By Mr. Kraeuter) And what court was it

11     pending in?

12     A    It doesn't say in the engagement letter.

13     Let me see if I can -- just a minute -- if I can find

14     an e-mail that might have a document in there with

15     it.

16          Here it is; the report.  That's the

17     outline.  Just one moment.

18          Okay.  I think I found the full text of the

19     report.  Okay.  This was in -- this was Case Number

20     4:15-CV-00319 in U.S. District Court for the Southern

21     District of Georgia, Savannah division.  Vivian --

22     Q    And what was the name of the plaintiff?

23     A    Vivian Huntoon, H-U-N-T-O-O-N, versus

24     Wal-Mart Stores, Inc.  That was back in -- the report

25     was issued April 2nd, 2016.  As far as I can recall,

1    that's the only other engagement that I've had with

·2    Drew Eckl & Farnham.

3        Q    Okay.  Now, Mr. Blount, are all of your

4    opinions contained in your expert witness report?

5        A    All of those that I've expressed.

6        Q    Well, do you have any other opinions in

7    this case that are not expressed in that report?

8        A    If asked, I might have an opinion.  I don't

9    know.

10       Q    All right.

11       A    But all the opinions that I've expressed

12    are in the report.

13       Q    All right.

14       A    I may be asked to express other opinions.

15    You may ask me to express an opinion, and Drew Eckl &

16    Farnham may ask me to express an opinion.  The judge

17    could ask me to express an opinion.

18       Q    Do you have any more work to do in this

19    case?

20       A    Not that I've been asked to do.

21       Q    Okay.

22            MS. RICHARDSON:  Hey, Scot.  This woman

23            just walked in with some printed stuff.  Can we

24            stop for a second and let him look at it?  I'm

25            not sure this is everything, but I want him to

```
 1      check.

 2              THE WITNESS:  Oh, no.

 3              MR. KRAEUTER:  Sure.

 4              MS. RICHARDSON:  That's not it?

 5              THE WITNESS:  There were --

 6              MS. RICHARDSON:  I didn't think this could

 7      possibly be it.

 8              THE WITNESS:  There was, like, 20 or more.

 9              MS. RICHARDSON:  Okay.

10              THE WITNESS:  All right.  Let me show you

11      the Word document.  I mean the --

12              MS. RICHARDSON:  Let's take a break, Scot,

13      and let him go show her what's on here.

14              (Whereupon, a brief recess was taken.)

15      Q     (By Mr. Kraeuter) Now, Mr. Blount, can we

16      agree that there is no definitive book, treatise, or

17      publication that says doctors and ambulatory surgical

18      centers must follow either Medicaid, Medicare, VA,

19      Physicians Fee Reference usual, customary, and

20      reasonable databases in setting their fees?

21      A     Yes.

22      Q     Okay.  Now, you used to work with a

23      gentleman by the name of Curt Udell; is that correct?

24      A     I still do.

25      Q     You still do.
```

1          Okay.  And he works in your company; is

2    that correct?

3          A    No.  He's an independent contractor.

4          Q    Okay.  Was there a time when he worked in

5    the same company as you did?

6          A    Yes.

7          Q    And what company was that, sir?

8          A    Healthcare Management Advisors.

9          Q    And were you the owner of that company?

10         A    Most of the time.

11         Q    Okay.  Was Mr. Udell an owner of the

12   company?

13         A    No.

14         Q    Okay.  He was an employee?

15         A    Yes.

16         Q    How long did he work for you at that

17   company?

18         A    I don't recall.

19         Q    A number of years?

20         A    Yes.

21         Q    Okay.  And you said you still work with him

22   now?

23         A    I don't know if he's current -- I think he

24   is currently working on a project for me, yes, right

25   now.

Page 18

1       Q      Okay.  So you --

2       A      Maybe not right now this minute, but he is

3    currently engaged to perform some professional tasks.

4       Q      Okay.  So from time to time you still hire

5    him as an independent contractor to work with you on

6    certain matters that you and your company handle; is

7    that fair?

8       A      Correct.

9       Q      Okay.  Now, were you aware that Mr. Udell

10    had a methodology of coming up with the

11    reasonableness of medical bills by looking at the

12    Medicare rate and multiplying it by 2.5 times?

13       A      He has used that method.  Yes.

14       Q      Okay.  And do you have an opinion as to

15    whether that's an appropriate method to determine

16    reasonableness of medical bills?

17       A      It could be.  I mean, it is used

18    frequently.  It's not the method that I typically

19    use, though.

20       Q      Who else uses that method?

21       A      I've seen other expert reports I believe

22    that have used that methodology, but I don't recall

23    their names right now.

24       Q      And why would that methodology be used to

25    look at the Medicare rate and multiply it by 2.5

1    percent?  Or, excuse me, not 2.5 percent, but 2 and a

2    half times the Medicare rate.

3         A    Because a lot of physicians use that

4    formula to establish their fee schedule.

5         Q    To establish their fee schedule?

6         A    Yes.

7         Q    Okay.  And so we can agree, Mr. Blount,

8    that there are other ways of determining the

9    reasonableness of future medical bills other than the

10   way you did in this particular case; is that correct?

11        A    Yes.

12        Q    And so I guess another way to say it is:

13   Your way of determining the reasonableness of medical

14   bills in this case is not the only way?

15        A    Well, if you'll look at our report, I

16   didn't use one way.  I cited multiple sources and

17   methodologies to evaluate the reasonableness.

18        Q    I understand.  But can we agree on that

19   statement that the way that you did it is not the

20   only way to determine reasonableness of medical

21   bills?

22        A    Well, you should say way with a plural; the

23   ways that I did it.

24        Q    Mm-hmm.  Okay.

25        A    I did it multiple ways.

Page 20

1      Q    So can we agree that there are different

2   ways to determine the reasonableness of medical bills

3   other than the ways that you did?

4      A    Yes.

5      Q    All right.  Let me have you take a look at

6   Exhibit 69, please.

7           MS. RICHARDSON:  It's going to be in this

8       stack.

9           THE WITNESS:  Oh, okay.  It's at the top.

10      I'm sorry.  I was flipping.  Yes.

11      Q    (By Mr. Kraeuter) Okay.  This is an excerpt

12   from the book that you wrote; is that correct?

13      A    From one of the two books.

14      Q    Okay.  This is the third edition.  That's

15   the last book that you're credited on; is that

16   correct?

17      A    Correct.

18      Q    Okay.  There's been a fourth edition, but

19   you didn't receive credit for that publication; is

20   that fair?

21      A    That's correct.

22      Q    Okay.  And in your book you talk about the

23   usual, customary, and reasonable method of coming up

24   with medical fees?

25      A    Yes.

1      Q     Okay.  And you say in there, "Historically,
2    commercial and Blue Shield plans have based provider
3    payments on the lowest of the following."  And then
4    you kind of go through the category.  "The provider's
5    most frequent charge"; that's usual.  "The average
6    charge by providers in the area"; that's customary.
7    And "the actual charge appearing on the claim for the
8    services"; that's the reasonable part.  Do you see
9    that, sir?
10     A     Yes.
11     Q     So when you talk about usual, customary,
12   reasonable, that's the methodology you're talking
13   about; is that fair?
14     A     At that time, yes.
15     Q     Has that changed since your third edition
16   was published?
17     A     Well, the UCR that's referred to in my
18   report in this case refers to the UCR data contained
19   in the published sources that we cite in the report.
20     Q     Okay.  The customary portion of that UCR
21   data, is that still the average charge by providers
22   in the area?
23     A     Some payors do use that definition.
24     Q     Okay.  So under that definition, half of
25   the charges in an area are higher than the UCR

1    charge, if you look at averages?

2         A    Yes.

3         Q    Okay.

4         A    That's not the, that's not the -- that's

5    not how the data sources that we used in this report

6    are derived.

7         Q    All right.  How do the data sources you

8    used in this case define what's customary?

9         A    I'm not sure if they have a specific

10   definition for "customary."  They have tables of data

11   that contain the charges at the 50th percentile, the

12   75th percentile, and the 90th percentile.  So

13   there --

14        Q    And you're referring to -- go ahead.

15        A    So there -- in those publications, there

16   are no averages that are reported.

17        Q    Okay.  When we talk about those

18   percentiles, those come out of PMIC book?

19        A    And PFR.

20        Q    Okay.  Do you know how the data that you

21   used defined "usual"?

22        A    Not off the top of my head.  I don't know

23   if they did define "usual."

24        Q    All right.  Do you know how the data that

25   you used in this case defined "reasonable"?

Page 23

1       A    Not off the top of my head.  I don't know
2    if they defined it.

3       Q    Okay.

4       A    I could look it up.

5       Q    All right.  So you don't know the
6    methodology behind these data -- this data that you
7    used, the methodology that the providers in the data
8    used to come up with usual, customary, reasonable
9    charges?

10      A    I know how they came up with the 50th,
11   75th, and 90th percentiles.

12      Q    I understand.

13           My question was how they came up with the
14   usual, customary, and reasonable charges.  You don't
15   know the methodology that was used in the underlying
16   data?

17      A    I think I do.  Yes.

18      Q    Please tell me it.

19      A    They obtain charges for -- by CPT code from
20   all the sources that they use.  And they array those
21   charges by CPT code from low to high, or high to low.
22   And then they count down to the 75th -- the 90th, the
23   75th, and 50th percentile points in that array, and
24   those are the numbers that are published in their
25   data.

```
 1        Q     And where did you get that information that
 2   that is the methodology that was used?
 3        A     From their publications.
 4        Q     Now, you referred to CPT codes.  And CPT
 5   stands for Current Procedure Terminology; is that
 6   correct?
 7        A     That's correct.
 8        Q     And the purpose of a CPT code is to
 9   identify and differentiate the various medical
10   procedures?
11        A     Yes.
12        Q     And in and of itself has nothing to do with
13   the charges for a particular medical procedure?
14        A     Well, it -- it's the, it's the numerical
15   equivalent of the definition -- or description of the
16   service that's being billed.
17        Q     Right.
18              But the AMA book on CPT does not reference
19   a charge or a fee next to it, does it?
20        A     No.  It has no charge values in there.
21        Q     Okay.  Now, tell me all the cases you've
22   been an expert in where the court has either limited
23   or prohibited your testimony.
24        A     In -- there was a case here in Atlanta, a
25   malpractice case, where my testimony was excluded
```

1   because it -- I think the judge basically determined

2   that it was irrelevant to the malpractice issue

3   because my deposition testimony dealt with how the

4   physician had collected an amount in excess of what

5   Medicare would allow.  That was -- let me look back

6   at my list here, my testimony.  It's on the list

7   there.  It's on Appendix B.  And that would be

8   Santrell Bell versus Burroughs and the Georgia Center

9   for Bariatric Surgery.

10       Q    It's on the bottom of the first page, sir?

11       A    Yes.

12       Q    Okay.  Any other cases your testimony has

13   either been excluded or limited?

14       A    It was limited in another case where I

15   test -- yeah.  Same thing -- where I testified.  It's

16   on the list here.  Just a minute and I'll find it.

17   Glenwood Systems versus Augment Technology Solutions

18   in two thousand --

19       Q    Okay.  That was the one out in California?

20       A    Yes.

21       Q    Okay.  And was your testimony excluded, or

22   limited in that case?

23       A    Limited.

24       Q    Okay.  And how was it limited?

25       A    I think the judge ruled in response to a

1    motion in limine to -- that he was not going to allow

2    me to state a legal conclusion that was contained in

3    my expert written report.

4         Q    And what conclusion was that, sir?

5         A    That I had not seen any evidence that the

6    defendants had used any proprietary information in

7    their activity.

8         Q    Okay.  Any other cases where your

9    testimony's been limited or excluded?

10        A    Hang on here.  Let me look for another

11   couple here.  Just a minute and I'll tell you.

12             There was a case in Texas before the Texas

13   Medical Board administrative law judges, I think,

14   several years ago.  Let me see if it's here in my

15   list.  Yes; in -- on the second page of Appendix B.

16   In the matter against --

17        Q    In the matter of --

18        A    -- Reginald --

19        Q    -- Reginald Buford?

20        A    Correct.

21        Q    Okay.

22        A    I was not allowed to testify about some CPT

23   coding rules and was limited to testifying about the

24   reasonableness of the charges.

25        Q    What specifically were you not allowed to

1    testify about regarding CPT codes?

2         A    I think it was the, the parts of the

3    report -- we had issued a joint report in that case.

4    I had signed it as well as Dorothy Steed, one of my

5    senior CPT consultants.  And she was not present at

6    the hearing and the defense counsel objected to me

7    citing any of the parts of the report that she had

8    been responsible for.

9         Q    Okay.  Any other case your testimony has

10   been limited or excluded in?

11        A    Not that I can recall right now.

12        Q    All right.  Well, let's talk about the

13   Goldman case.  Do you remember that case?

14        A    No.  Tell me about it.

15        Q    That was, that was the one up in

16   Philadelphia.

17        A    Goldman.  Oh, was that -- Philadelphia.

18        Q    Eugene Goldman, M.D.

19        A    Oh.  Was that the hospice director?

20        Q    That's right.

21        A    Okay.  Yes.  I remember that.

22        Q    That was --

23        A    Yes.

24        Q    That was the case where the federal

25   government indicted Dr. Goldman for illegally

Page 28

1    receiving kickbacks?

·2         A    Yes.

3         Q    And you were scheduled to testify in that

4    case?

5         A    Correct.

6         Q    And your testimony was excluded in that

7    case; is that correct?

8         A    Well, basically I, I was asked on, like, a

9    Thursday before the Monday hearing if I could help

10   the defense counsel in establishing what the typical

11   salary was for a hospice medical director.  And I

12   explained to him that that's not my area of

13   expertise, but he asked if I could still do the

14   research and come to Philadelphia to attempt to get

15   that into the record.

16        Q    Okay.

17        A    So --

18        Q    So you agreed to, you agreed to serve as an

19   expert for Dr. Goldman; is that correct?

20        A    Yes.  I --

21        Q    Okay.

22        A    Well, I agreed to do the research on what

23   the typical medical director compensation was for a

24   hospice of that size, and to be in Philadelphia at

25   the courthouse available to testify.  I don't know

Page 29

1    whether the intent was to present me as a fact

2    witness or as an expert.  But I went to the hearing,

3    went to the trial, and before the jury was called in

4    the assistant U.S. attorney in the voir dire process

5    asked me if I was an expert in physician compensation

6    or medical director compensation.

7         And I answered, no, I was not, but that I

8    had reviewed the reasonableness of compensation

9    amounts for multiple physicians and executive

10   positions within Medicare-certified facilities as

11   part of the work that I had done over the past

12   30-plus years with Medicare cost reports and related

13   appeals.  And the judge basically said that he did

14   not see that I would need to testify, and he excused

15   me.

16        Q    All right.  So let's be clear whether you

17   were going to be testifying as an expert witness in

18   the criminal case of Dr. Goldman or as a fact witness

19   in the criminal case of Dr. Goldman.  You agreed to

20   testify on his behalf.  Is that true?

21        A    Yes, I did.

22        Q    Okay.  But you did not actually testify

23   because the court did not allow your testimony; is

24   that correct?

25        A    Yes.

1      Q    Okay.  And were you aware that Dr. Goldman

2  was found guilty in that case?

3      A    Yes.

4      Q    And that he received 51 months in federal

5  penitentiary for cheating the taxpayers?

6      A    No.  I did not know the sentence.

7      Q    Not aware of that?  Okay.

8      A    No.

9      Q    Now, I understand that you advertise in --

10  on a website called ExpertPages?

11     A    Yes.  I think that's one of the listings

12  that we have.

13     Q    As well as Martindale-Hubbell, which is

14  also an internet listing; is that correct?

15     A    I don't know if I pay anything to

16  Martindale-Hubbell.  I'd have to look and see.  There

17  is about five or six listings that we pay a couple of

18  hundred dollars to a year for listings.

19     Q    You are listed on a, on a site called ALS;

20  is that correct?

21     A    I think so.

22     Q    What's, what's ALS stand for?

23     A    I don't know.

24     Q    You're also listed on a website called

25  Insurance Pro, correct?

Page 31

1        A     I don't know.  I don't recall that one.

2        Q     Okay.  What others do you recall?  You said

3    there is five or six different expert listing sites

4    that you advertise on so that you can get business.

5        A     Well, most of our business comes through

6    Google searches from what I can tell, but the

7    listings that I can recall right now would be

8    Experts.com, ExpertPages.  Those are the only other

9    two I can think of off the top of my head.

10       Q     Okay.  Let's take a look at Exhibit 70,

11   please, sir.

12       A     Okay.

13       Q     Is this your listing that you have in

14   ExpertPages.com?

15       A     It looks like it.

16       Q     Why don't you take a look at it and let me

17   know if that's the case.

18       A     I know there's quite a few pages here.  I'd

19   have to go to the website and compare it, but I trust

20   that you extracted it properly.

21       Q     Well, take your time and look at it, sir.

22       A     I've looked at it.

23       Q     Tell me if this looks like your web page.

24       A     It does not look like my web page.

25       Q     Doesn't look like your listing on

1    ExpertPages.com?

2         A    That's a different question.

3         Q    That's the question I'm asking right now,

4    sir.

5         A    Well, previously you asked me does this

6    look like my web page.  My answer to that was "no."

7         Q    And, sir, I asked --

8         A    If the question is --

9         Q    Sir, and I asked a follow-up question.  And

10   I would like you to answer the follow-up question,

11   please.

12        A    Which is?

13        Q    Is this your listing on ExpertPages.com?

14        A    It looks like it.

15        Q    Okay.  Let's go to the second page, please,

16   sir.  About the middle of the page there is an entry

17   that says, "representative engagements."  Do you see

18   that, sir?

19        A    Yes.

20        Q    Okay.  And below it there appear to be a

21   number of sentences that appear to be your

22   representative engagements; is that correct?

23        A    Correct.

24        Q    And are these representative engagements

25   accurate?

Page 33

1        A     As far as I know.

2        Q     Did you have to fill out some documents or

3    some information for ExpertPages.com to list your

4    representative engagements?

5        A     I believe so.

6        Q     Okay.  And you checked over what was sent

7    to ExpertPages.com to make sure it was accurate

8    before it went out?

9        A     Yes.

10       Q     Now, let's go to the representative

11   engagement that's second from the bottom.  Do you see

12   that?

13       A     Yes.

14       Q     All right.  And tell me what that

15   representative engagement is, sir.

16       A     You mean read you the description?

17       Q     Sure.

18       A     "Developed proforma detailed hospital and

19   physician bill totaling over a million dollars for an

20   attorney representing a burn victim treated by a

21   hospital that does not charge for its services."

22       Q     Okay.  Tell me what that case was about,

23   sir.

24       A     Okay.  Just one second.

25             Name of the case is Sanders versus South

Page 34

1    Louisiana Electric Cooperative Association.   It's a

2    medical damages case in Houma, Louisiana.   I was

3    engaged in 2006 by William S. Bordelon with Bordelon

4    & Shea in Houma, Louisiana on behalf of the

5    plaintiff.   The case settled after my expert report

6    on the proforma amount of expected medical charges

7    was produced.

8             This case involved a -- I believe a

9    teenager, maybe 17 or 18 years old, male who was

10   hunting I believe the day after Thanksgiving.   And

11   while in a wooded area saw a line across the ground

12   and touched it with the barrel of his shotgun or

13   rifle and was electrocuted.   He was airlifted to, I

14   believe, the Shriners burn hospital in Houston and

15   was treated for burns over 70 percent of his body and

16   in the hospital for about 30-something days and then

17   rehabilitation, I believe, for another 30 to 60 days.

18   And we were -- Health Law Network was engaged to take

19   the medical records in that case and develop a

20   proforma hospital and rehab services bill, which we

21   did.

22        Q    Now, you understand that Shriners Hospital

23   does not charge its patients a penny, correct?

24        A    Thus, the engagement.

25        Q    And that Shriners Hospital keeps its doors

Page 35

1    open from donations from the public to help people,

2    children, that have been burned or electrocuted; is

3    that correct?

4          A     That's what I understand.

5          Q     Okay.  And so, according to Shriners

6    Hospital, the reasonableness of their medical bills

7    was zero, correct?

8          A     I wouldn't say that.  No, I wouldn't.

9          Q     You would not?

10         A     I don't think Shriners has an opinion on --

11   they don't have any bills.  All they have are medical

12   records.

13         Q     And so what you did in this case in

14   Louisiana is looked at the medical records, conjured

15   up what the bills would be if Shriners actually

16   charged a fee so that plaintiff could recover those

17   bills as damages in the lawsuit, correct?

18         A     No conjuring was involved.

19         Q     I see.

20               Everything else is true in that statement,

21   correct?

22         A     What we did was to show what charges would

23   have been for these services in the normal

24   environment for a hospital and rehab provider.

25         Q     Right.

Page 36

```
 1              But for the goodness and grace of Shriners
 2   what this kid's medical bills would have been.   Fair?
 3       A    I guess you can say it that way.
 4       Q    Tell me, sir, how you set your rates.
 5       A    About every couple of years I get a survey
 6   from -- I think it's ExpertPages on expert fees.  And
 7   I basically use that to establish my rates.
 8       Q    Okay.  And you charge $395 for research,
 9   evaluation, and preparation of reports; is that
10   correct?
11       A    Yes.
12       Q    And you charge $525 for deposition
13   testimony, trial testimony, plus out-of-pocket travel
14   costs; is that correct?
15       A    Yes.
16       Q    Okay.  And essentially in looking at
17   ExpertPages to come up with your rate you're charging
18   what the market will bear; is that fair?
19       A    I don't know.  I'm charging a rate that's,
20   I believe, consistent with the survey results.
21       Q    Okay.  Do you have a problem with
22   physicians, hospitals, and ambulatory surgery centers
23   charging what the market will bear?
24       A    I'm not sure what you mean by "a problem."
25       Q    Well, do you have an issue or a criticism
```

Page 37

1    with that type of fee arrangement?

2        A    Not, not in general.

3        Q    Okay.  Now, did you do all your work on

4    this case by yourself, or did you have other people

5    help you?

6        A    There were other people involved.

7        Q    Who else helped you?

8        A    Let's see.  It's mentioned in -- it's

9    described in the report, I believe.

10       Q    That would be Dorothy Steed and Jessica

11   Schmor?

12       A    Yes.  I believe so.

13       Q    And who are they, sir?

14       A    Two of the senior consultants that work

15   with Health Law Network.

16       Q    And how much do you pay those folks, sir?

17       A    I don't know off the top of my head.

18       Q    You don't know what you pay them per hour?

19       A    No.  I don't recall --

20       Q    Do you know --

21       A    -- right now.

22       Q    Do you know what their salary is?

23       A    They don't have a salary.  They're paid by

24   the hour.  They're independent contractors.

25       Q    Okay.  But you have no idea what the hourly

1    rate is?

2         A    Well, it's certainly -- it's something less

3    than what we bill.

4         Q    So it wouldn't be 395 for research,

5    evaluation, and report prep?

6         A    No.

7         Q    Okay.

8         A    That's, that's my personal --

9         Q    And --

10        A    -- rate.

11        Q    Okay.  And you said that you would, you

12   would pay these people less than you charge in this

13   case.  Is that because your company has to make a

14   profit?

15        A    Well, we don't have to, but it is

16   desirable.

17        Q    Okay.  I mean, that's, that's why you're in

18   business.  You're working to make a profit, are you

19   not?

20        A    Well, I also enjoy the work.

21        Q    I understand.

22             But would you work for free?

23        A    I have from time to time.

24        Q    Would you work for free on this case?

25        A    No.

Page 39

1       Q     So how much of the work in this particular

2    case with Jackie Orr was done by these other ladies?

3       A     I would have to go back to the invoices and

4    see.  Just one moment and I'll tell you.

5             MS. RICHARDSON:  They're printed out too.

6             THE WITNESS:  Okay.

7             MS. RICHARDSON:  Some of them.

8             THE WITNESS:  I think there's two invoices.

9             MS. RICHARDSON:  Is there more?  Okay.

10            MR. KRAEUTER:  Yeah.  Let's see.

11            THE WITNESS:  23.  Maybe there wasn't.

12       Maybe there was just that one invoice.

13            Okay.  They spent two hours.

14       Q     (By Mr. Kraeuter) And you spent how many

15    hours, sir?

16       A     13.4.

17       Q     Okay.  Now, have you ever submitted the

18    methodology that you used in this particular case to

19    come up with the reasonableness of medical bills for

20    a peer-review study?

21       A     No.

22       Q     Do you know what the rate of error is for

23    your opinions?

24       A     No.  I don't know of any errors.

25       Q     Now, in coming up with your opinion you

1    relied exclusively on data, as you've said; is that

2    correct?

3          A     Published data.

4          Q     Published data.

5                And that published data came from the

6    American Hospital Directory; is that correct?

7          A     That's one source.

8          Q     Okay.  U.S. Department of Veterans Affairs;

9    is that correct?

10         A     Yes.

11         Q     The Physicians' Fee Reference book,

12    correct?

13         A     Yes.

14         Q     And the Practice Management Information

15    Corporation medical fees book; is that correct?

16         A     Yes.

17         Q     It's also called the PMIC; is that right?

18         A     Yes.

19         Q     Okay.  And what other data did you rely on?

20         A     I believe we also looked at billed charges

21    to Medicare patients.

22         Q     Medicare.  Okay.

23                Now, if I understand your methodology in

24    this case correctly, without the data from those

25    entities we just discussed you would not be able to

1    come up with an opinion on the reasonableness of

2    medical charges for the different procedures that

3    Ms. Orr had or will have; is that correct?

4         A    Well, if I didn't have those data points, I

5    would look for other data points.

6         Q    I understand.

7         A    I would not say that these are the only

8    possible data points out there, but they're the ones

9    that I used.

10         Q    Okay.  And if we take those away in this

11    case -- because these are the ones you chose to use,

12    if we take those away, you don't have a basis for

13    your opinion; is that fair?

14         A    Well, there was other peer-review research

15    showing typical charges and costs for this type of

16    case that you didn't mention earlier.

17         Q    Okay.  And that's the --

18         A    So I'd still have that.

19         Q    Okay.  And that's the spinal cord

20    stimulator?

21         A    Spinal cord stimulator research.

22         Q    Okay.  Do you have any personal knowledge

23    of what data Medicare, VA, the American Hospital

24    Directory, PMIC, and Physicians' Fee Reference

25    collates?

Page 42

1      A    Yes.

2      Q    Okay.

3      A    Well, I'm not sure what you mean by

4    "collate," but I do have a general understanding of

5    their sources of data.

6      Q    Okay.  You have personal knowledge of that,

7    or has someone told you that?

8      A    Well, I've read that -- read their sources

9    in their publications.  And I've also talked to Russ

10   Wasserman, I think; one of the publishers at PFR.

11     Q    Have you talked with anyone else at the

12   other entities that we've discussed?

13     A    I have had discussions with some

14   representatives from the VA.  And I have discussed

15   sources -- or I've had discussions with American

16   Hospital Directory staff also.

17     Q    And these discussions with Mr. Wasserman,

18   the VA representatives, and the American Hospital

19   Directory representatives, did they regard the CPT

20   codes for this particular case?

21     A    No.

22     Q    Okay.  Do you have any personal knowledge

23   as to whether these entities keep accurate records?

24     A    Well, the American Hospital Directory

25   derives their data for the parts that I use from

1    certified Medicare cost reports that require a

2    certification by an officer of the hospital, so they

3    are swearing under oath that those are accurate

4    numbers.

5         Q    Is it Medicare that's swearing those

6    numbers are accurate, or the hospital representative?

7         A    The hospital representative.

8         Q    Okay.  Do you have personal knowledge of

9    how these entities enter their data?

10        A    I'm not sure what you mean by "enter their

11   data."

12        Q    Well, what I understand what you used in

13   this case was a compilation of data to come up with

14   your opinion as to the reasonableness of medical

15   bills in this case.  So my question is:  Do you have

16   personal knowledge of how these particular entities

17   that you relied on enter their data into their

18   database?

19        A    Well, it's not like they're keying in data,

20   if that's what you mean by "enter their data."  They

21   are acquiring data files from different sources,

22   including managed care organizations, billing

23   services, insurance carriers, Medicare, FAIR Health,

24   Millimn & Associates; you know, multiple data

25   sources.  And I believe that most all of those -- all

Page 44

1    of that data comes electronically.  So if you're

2    concerned about --

3         Q    And somehow -- go ahead.

4         A    If you're concerned about a key punch

5    error, I think that's not likely to occur because

6    they're not keying in data.

7         Q    Well, somehow all of the raw data that

8    comes in to these various databases has to be put

9    into the database.

10        A    Yes.

11        Q    Correct?

12        A    That's correct.

13        Q    Do you have personal knowledge as to how

14   that is done?

15        A    Not personally.  No, I don't.

16        Q    Do you have personal knowledge of the rate

17   of error contained in these databases for these

18   entities we've talked about:  Medicare, the VA,

19   American Hospital Directory, PMIC, Physicians' Fee

20   Reference?

21        A    No.  And I don't know that there are any

22   errors.  I've not seen any evidence of that.

23        Q    Have you ever seen the raw data that's used

24   by these entities to come up with its fee database?

25        A    In the past years I have.

Page 45

1       Q       And how have you seen that and when have

2   you seen that?

3       A       In, in several past years we actually

4   purchased the data from CMS.

5       Q       Okay.  Is it your testimony that the data

6   from CMS, the Centers for Medicaid Services, is the

7   basis for all of these other databases?

8       A       No.

9       Q       Okay.  What other raw data is used in these

10   particular databases of these entities we've been

11   discussing:  Medicare, the VA, American Hospital

12   Directory, PMIC, Physicians' Fee Reference?

13       A       Well, we mention on page 6 of 10 of my

14   report, number two, the PMIC database was derived

15   from over 400 million actual submitted charges

16   obtained from a variety of sources, including

17   third-party payors, group practices, clinics,

18   universities, and practice management system vendors.

19       Q       And you've seen never seen that raw data?

20       A       Not the current data that they have.  No.

21       Q       Have you ever seen the raw data --

22       A       Like I --

23       Q       -- that PMIC has used?

24       A       PMIC also uses Medicare-charged data, and I

25   have seen that raw data; not --

Page 46

1      Q      I'm talking, I'm talking about from

2   physicians, hospitals, insurance carriers, and other

3   health care professionals.  Have you ever seen that

4   data?

5      A      I have seen third-party payor data.  I've

6   seen group practice data.  I've seen clinics charge

7   data.  I've seen universities medical centers charge

8   data.  And I've seen practice management system

9   charge data.

10     Q      And are you --

11     A      So I've seen --

12     Q      -- are you saying --

13     A      -- I've seen examples, I believe, of all of

14  these.

15     Q      All right.  Are you saying you've actually

16  seen the raw data that PMIC uses from those entities?

17     A      No.  I've seen data that they describe,

18  though.

19     Q      All right.  Have you seen data that PMIC

20  uses that you used in this case; the raw data that

21  PMIC used that you then derived your opinion from?

22     A      No.

23     Q      Do you know the sample size for the

24  Medicare, VA, American Hospital Directory, PMIC, and

25  Physicians' Fee Reference data?

Page 47

```
 1        A    Well, some of those may be based upon
 2   samples, but not all.
 3        Q    So --
 4        A    Many --
 5        Q    -- do you know the sample size?
 6        A    Many of those are 100 percent sample sizes.
 7        Q    I'm sorry, sir?
 8        A    Many of those, I believe, are 100 percent
 9   samples.
10        Q    What does that mean, "100 percent samples"?
11        A    That means all of the data.
12        Q    I'm not following what you mean by that,
13   sir.
14        A    A sample is a subset of the universe.
15   Universe would be a hundred percent of the data
16   that's available.
17        Q    So it's your testimony that American
18   Hospital Directory uses 100 percent of all the
19   medical billing data available in the United States?
20        A    They use a hundred percent of the data file
21   that they purchase from CMS which contain --
22        Q    Okay.
23        A    -- which contains all charges for all
24   hospitals by DRG in instances where 11 or more
25   patients for that DRG are reported.  So it would
```

Page 48

1    exclude those DRGs where there are ten or fewer

2    instances.

3           Q    And a DRG is what, sir?

4           A    Diagnosis-related group.

5           Q    Okay.  And the CMS data is what, sir?

6           A    The Medicare paid claims file.

7           Q    So American Hospital Directory, if I hear

8    you correctly, is based a hundred percent on the

9    Medicare information; is that correct?

10          A    It's based upon the charges on the Medicare

11   claims that have been paid.

12          Q    Okay.  Which is the same as the Medicare

13   database that you used in this case; is that correct?

14          A    It's one of them.

15          Q    Okay.  So essentially it's one in the same.

16   When you look at American Hospital Directory, you're

17   looking at the same data you've already looked at

18   under Medicare?

19          A    Not necessarily.  There's also another

20   database for Medicare that includes all D -- all

21   charges by DRG for all hospitals, even those that

22   report less than 11 per DRG.  That's available on a

23   state-by-state basis and nationally.

24          Q    Well, let me ask it this way:  Is there

25   anything in the American Hospital Directory data that

Page 49

1    you couldn't get from Medicare directly?

2         A    Yes.

3         Q    What?

4         A    The identification of the hospitals within

5    a certain radius of a zip code or a specific

6    provider.  And then there's other non-Medicare data

7    that's in the AHD database too, like their financial

8    statements.

9         Q    Do you know if any of the data used in this

10   case from the Medicare, VA, American Hospital

11   Directory, PMIC, or Physicians' Fee Reference

12   databases came from the Savannah, Georgia area?

13        A    Yes.

14        Q    What data?

15        A    Hospital charges.

16        Q    What database?

17        A    The medicare database.

18        Q    And what hospital charges came from the

19   Medicare database?

20        A    Just a minute.

21             All hospitals that reported DRG 29 in 2014.

22        Q    Can you name those hospitals, please, sir,

23   that are in the Savannah, Georgia area?

24        A    Hang on just a minute.  Let me see if

25   that's in here.

1              I believe that's Memorial University

2    Medical Center and St. Joseph's Hospital.

3         Q    And how many entries did they have,

4    respectively, under DRG 029?

5         A    Just a minute.  We actually use two

6    different DRGs:  029 and 520.  For 520 -- just a

7    minute.  Let's see -- Memorial University Medical

8    Center had 20 cases.  Their average charge was

9    $25,764.  St. Joseph's had 24 cases.  Their average

10   charge was $26,940.  And let's see if I've got any

11   others.  Just a minute.  That's all 520.

12             So I did not find any in Savannah -- any

13   hospitals that reported 11 or more cases.  The

14   closest hospital we could find that reported at least

15   11 cases was Medical University of South Carolina and

16   Charleston.  And for DRG 29 they had 14 cases and

17   their average charge was $79,307.

18        Q    Okay.  And where is the University of South

19   Carolina hospital located, sir?

20        A    I said Charleston, South Carolina.

21        Q    Charleston.

22             All right.  And do you consider that to be

23   in the Savannah, Georgia area?

24        A    Not necessarily, but it was the closest

25   hospital that had at least 11 instances reporting.

1       Q       Okay.

2       A       We looked at --

3       Q       You would agree that, you would agree that

4   Charleston, South Carolina is two, two and a half

5   hours away from Savannah?

6       A       Depends on how you go.  If you fly, it's

7   not that far, not that much time.  If you walk, it

8   could be much longer.

9       Q       How about if you drive it, sir?

10      A       About two and a half hours, I guess.

11      Q       Yeah.

12              So let's talk about DRG 250.  Excuse me,

13  DRG 520.

14      A       Okay.

15      Q       Show me where that appears in your report.

16      A       I don't think we put that in the report.

17      Q       I see.

18      A       I don't see that.

19      Q       Now, DRG 520 is a reference to back and

20  neck procedures except spinal fusion, correct?

21      A       That's correct.

22      Q       Okay.  It is not a reference to a spinal

23  cord stimulator, is it?

24      A       No.

25      Q       Okay.  And you can agree that different

Page 52

1    procedures with different CPT codes or different DRG

2    codes have different costs, correct?

3         A    Yes.

4         Q    Okay.  Do you have any evidence that DRG

5    520 -- that that code applies in any way to spinal

6    cord stimulators?

7         A    If I'm recalling correctly, I think that

8    DRG 520 was identified in the Medtronic's

9    publications as a DRG that is sometimes used for that

10   device.

11        Q    Well, let's go to Exhibit 72, please.

12             Can you show me where that DRG code comes

13   up in that document; in the Medtronic document 72?

14        A    Let's see.  Yes.

15        Q    Where is that, sir?

16        A    Well, you don't have your pages

17   sequentially numbered maybe.  Or you do too.  Okay.

18   So look on page 12 -- I'm sorry, 13.  In the bottom

19   right-hand corner is the number of the page.  About

20   almost halfway down the page DRG 520 is identified.

21        Q    It's right below DRG 519; is that correct?

22        A    Correct.

23        Q    And that is a subsection of medical

24   procedures that are, quote, due to musculoskeletal

25   disorders, correct?

1      A    Yes.

2      Q    Okay.  Are you aware of whether Ms. Orr,

3    Jackie Orr, has a musculoskeletal disorder?

4      A    I don't know.

5      Q    You don't know?

6      A    No.

7      Q    So you don't know --

8      A    We --

9      Q    Sir?

10     A    We were looking for any instances in the

11   database that would contain, that would contain the

12   charges for a neurostimulator.  And based upon this

13   material from Medtronics, they identified six

14   possible DRGs that could contain neurostimulators.

15   And the -- there were no -- the ones that would be --

16   that had any frequency were DRG 29 and DRG 520 in the

17   AHD data --

18     Q    Okay.

19     A    -- in the AHD database.

20     Q    Do you have any evidence that DRG 520

21   applies to Jackie Orr in any way, shape or form?

22     A    I don't know.

23     Q    Okay.  Now, if you look on page 13 right

24   above this subsection of "due to musculoskeletal

25   disorders" you'll see a subsection that says, "pain

Page 54

1    disorder or due to causalgia or RSD."  Do you see
2    that, sir?
3         A    Yes.
4         Q    Do you know what RSD stands for?
5         A    Not off the top of my head.
6         Q    Stands for reflex sympathetic dystrophy.
7              Would it surprise you that that's what
8    Ms. Orr's been diagnosed with in this case?
9         A    That sounds --
10             MS. RICHARDSON:  Object to form.
11             THE WITNESS:  -- familiar.
12        Q    (By Mr. Kraeuter) Okay.  Can we agree that
13   the DRG 520 does not apply to Ms. Orr in this case?
14             MS. RICHARDSON:  Object to the form.
15             THE WITNESS:  I don't, I don't know.  I
16   would --
17        Q    (By Mr. Kraeuter) Okay.
18        A    I would agree that Medtronics includes it
19   in the possible DRGs where their device would be
20   used.
21        Q    All right.
22        A    I don't, I don't know.
23        Q    Let me ask you this --
24        A    It's a clinical question as far as her
25   diagnosis.  I'm not a clinician.

Page 55

1        Q    Let me ask it -- I'm sorry, sir.

2             Let me ask it this way:  Can we agree, as

3    you sit here today, that you don't know that DRG 520

4    applies to Ms. Orr in this case?

5             MS. RICHARDSON:  Object to the form.

6             THE WITNESS:  I don't know.

7        Q    (By Mr. Kraeuter) Okay.  Have you told us all

8    of the Medicare, VA, American Hospital Directory, PMIC,

9    and Physicians' Fee Reference data that came from the

10   Savannah, Georgia area?

11            MS. RICHARDSON:  Scot, can you hang on one

12            second?  The, the building operator needs

13            something.  She's going to have to interrupt

14            your video feed.

15            (Whereupon, a brief recess was taken.)

16            THE WITNESS:  Have you read the question

17            back, or somebody repeat it.

18            MR. KRAEUTER:  Yeah.  Let's read it back,

19            please.

20            (Whereupon, the court reporter read back

21            the previous question on page 55, line 7.)

22            THE WITNESS:  I think so.

23       Q    (By Mr. Kraeuter) Okay.  Now, did you perform

24   an independent survey of the physicians, hospitals, and

25   ambulatory surgery centers in the Savannah, Georgia

Page 56

1    area to determine the reasonable charges in the

2    Savannah, Georgia area for the types of treatment

3    recommended?

4        A    No.  I did not survey individual

5    facilities.  We used the published sources that are

6    described in the report.

7        Q    Okay.  Now, does Jackie Orr receive VA

8    benefits, medical benefits?

9        A    I don't know.

10        Q    Does she receive Medicare benefits?

11        A    I don't know.

12        Q    Does she receive Medicaid benefits?

13        A    I don't know.

14        Q    Does she have private health insurance?

15        A    I don't know.

16        Q    Okay.

17        A    And all those are irrelevant in terms of

18    what charges are.

19        Q    Well, private health insurance pays a

20    different reimbursement rate than Medicare, correct?

21        A    Payment and charges are two different

22    things.  Our report addresses billed charges.

23        Q    I see.

24             So your testimony is that the data you've

25    relied on is what various hospitals or physicians

Page 57

1    have charged for various procedures as opposed to

2    what they've received as reimbursement; is that

3    correct?

4         A    Yes.  We're reporting primarily on the

5    charges; gross charges.

6         Q    Have you seen any of the patient repayment

7    agreements that Optim Healthcare has in this case?

8         A    I don't think so.

9         Q    Now, let's look at your report, please.

10        A    Okay.

11        Q    At the top of page 2 it talks about your

12   engagement in this case.  And you were engaged to

13   independently review the plaintiffs' projected

14   medical charges?

15        A    Yes.

16        Q    So you were not asked to review her

17   existing or past medical bills; is that correct?

18        A    Correct.

19        Q    Okay.  And you have no opinion on the

20   reasonableness of the past medical bills charged to

21   Ms. Orr?

22        A    I've not reviewed them, so I have no

23   opinion.

24        Q    So you have -- okay.

25             Now, let's talk about your findings in this

Page 58

1    case; page 8 of your report.

2           MS. RICHARDSON:  Scot, is this a good place

3    to take a short break?

4           MR. KRAEUTER:  Yeah, as long as it's short.

5    I lost about a half hour with that document

6    production.

7           MS. RICHARDSON:  Yeah.  Just five minutes

8    is all.  Nothing --

9           MR. KRAEUTER:  Okay.

10          MS. RICHARDSON:  Just restroom break, if

11   that's all right.

12          MR. KRAEUTER:  Sure, sure.

13          (Whereupon, a brief recess was taken.)

14   Q     (By Mr. Kraeuter) Now, doctor, we were

15   looking at page 8 of your report when we took a break.

16   And I want to call your attention to finding number one

17   regarding the ganglion blocks.

18   A     Yes.

19   Q     Okay.  And your opinion is that the 75th

20   percentile UCR -- usual, customary, reasonable --

21   charge in Savannah, Georgia is $766.  Do you see

22   that, sir?

23   A     Yes.

24   Q     Okay.  Now, any particular reason why you

25   didn't use the 80 percent UCR or the 90 percent UCR?

Page 59

1      A      Well, the PFR and PMIC databases that we

2   used did not offer an 80th percentile option.   They

3   have the 50th, 75th, and 90th percentiles reported.

4      Q      Right.

5             But they do offer a 90th percentile,

6   correct?

7      A      Yes, they do.

8      Q      Okay.   Any reason why you didn't use the

9   90th percentile?

10     A      Basically the 75th percentile is the most

11  commonly used threshold in the industry for purposes

12  of establishing limits.   90th percentile is sometimes

13  used -- or more frequently used in dental procedures,

14  but for medical procedures I've seen 75th percentile

15  more frequently used.

16     Q      And that's what the insurance companies

17  will pay, correct?

18     A      Not necessarily.

19     Q      Are you saying that they'll pay more than

20  the 75 percent UCR?

21     A      They could.   It depends upon the agreement

22  with the provider, if there is any.   If there's no

23  agreement with the provider, then it depends upon the

24  insurance carrier's practices as to how they pay for

25  out-of-network services.   And sometimes in other

Page 60

1    states it would depend upon state law.

2         Q    Okay.  So the reality when we talk about

3    these ganglion blocks is you don't know what the

4    doctors are actually getting paid in Savannah,

5    Georgia for these blocks?

6         A    For Medicare I do.  Or I could.

7         Q    Okay.

8         A    I can determine.  That is published.

9         Q    But you didn't do that in this case?

10        A    I didn't report on it in here.  I reported

11   on the charges.

12        Q    Okay.  And as we talked about, all your

13   opinions are contained in your report.

14             Now, do you know if the charge of $2,000

15   per ganglion block is unreasonably high if Jackie Orr

16   has them done in the Atlanta, Georgia area?

17        A    Yeah.  It would be unusually high in

18   Atlanta also because the geographic factors between

19   Savannah and Atlanta are not significantly different.

20        Q    Now, how many hospitals, doctors, and

21   ambulatory surgery centers in the Savannah, Georgia

22   area were provided data to come up with this

23   75 percent usual, reasonable, and customary amount?

24        A    I don't know.  You'd have to ask the

25   publishers.

```
 1        Q    Okay.  Do you know if any of the data in
 2   either the PMIC or the Physicians' Fee Reference
 3   books and database for ganglion blocks came from
 4   Savannah, Georgia area?
 5        A    Yes.
 6        Q    Okay.  But you don't know how much of it
 7   came from the Savannah, Georgia area?
 8        A    Well, because both of those databases
 9   includes Medicare -- charges to Medicare patients are
10   included in both of those databases, it would include
11   all charges to Medicare patients made by providers in
12   the Savannah area.
13        Q    All right.  And do you know how many
14   representative charges were taken from the Savannah,
15   Georgia area by either PMIC or the Physicians' Fee
16   Reference book to come up with this usual, customary,
17   and reasonable number of $766?
18             MS. RICHARDSON:  Object to the form.
19             THE WITNESS:  Well, all of them.  All the
20        Medicare claims are in that database.
21        Q    (By Mr. Kraeuter) Okay.  Well, how many came
22   from the Savannah, Georgia area, sir?
23        A    I don't know the precise number.  It's tens
24   of thousands, you know.
25        Q    Well --
```

Page 62

1      A      It depends -- you know, there is -- it's

2  possible to -- it may be possible to determine the

3  specific number, but I don't know it.  But it would

4  be -- it's essentially all of the charges were

5  Medicare patients reported -- or paid to providers in

6  the Savannah area; not the payment amount, the charge

7  amount.

8      Q      I understand that the PMIC and Physicians'

9  Fee Reference books use data from Medicaid.  I

10  understand that whatever Medicaid data for ganglion

11  blocks existed in Savannah, Georgia area would appear

12  in those databases.  I understand all that.

13         But my question to you is:  How many actual

14  charges or procedures from the Savannah, Georgia area

15  for ganglion block shows up in that data; do you

16  know?

17      A      I've already answered that question.  I

18  said I did not know the number.

19      Q      Okay.

20      A      But it's all of them.

21      Q      Okay.  I just want to make sure we're

22  clear.

23      A      Okay.

24      Q      Now, your next opinion is that Dr. Harben's

25  projected charges for the Nucynta drug,

Page 63

1    N-U-C-Y-N-T-A, are 37 percent higher than the

2    projected charges for the same drug for

3    Dr. Niederwanger.  Do you see that, sir?

4         A    Yes.

5         Q    Okay.  Do you know the milligram dosage

6    that Dr. Harben was recommending?

7         A    Let's see.  Dr. Harben was recommending

8    600 milligrams, and Dr. Niederwanger was recommending

9    800 milligrams.

10        Q    Are you sure you're looking at the Nucynta,

11   sir?

12        A    Oh, I'm sorry.  Yeah.  That was Gabapentin.

13             Nucynta.  Dr. Harben was recommending

14   400 milligrams, and Niederwanger was recommending

15   100 milligrams.

16        Q    So we can agree that the dosage that

17   Dr. Harben was recommending was 75 percent higher

18   than Dr. Niederwanger?

19        A    It's four times higher.

20        Q    In percentage terms, isn't that 75 percent?

21        A    I don't think so.

22        Q    Well, 100 is 25 percent of 400, is it not?

23        A    Let me -- just a minute.

24             You're asking what the ratio of 400 is to

25   100?

Page 64

1        Q     Mm-hmm.   Yes.

2        A     It's four to one.

3        Q     Okay.   If I take a hundred and I divide it

4   by 400, it's .25, is it not?

5        A     Yes.

6        Q     It's 25 percent, right?

7        A     One hundred is 25 percent of 400.   I would

8   agree with that.

9        Q     Okay.   So Harben's dosage is 75 percent

10  higher, is it not?

11       A     No.   That's not how math works.

12       Q     Okay.   Do you think it's unreasonable that

13  Dr. Harben's charge for -- or projected charge for

14  Nucynta at 400 milligrams would be 37 percent more

15  expensive than Dr. Niederwanger's, but it's that much

16  stronger?   Do you think that's unreasonable?

17       A     I'm calculating this on a per milligram

18  basis.   On a per milligram basis, Dr. Harben is at

19  8.167 cents per milligram.   Dr. Niederwanger is at

20  5.967 cents per milligram.   The difference between

21  those two is 37 percent.   Dr. Harben is 37 percent

22  higher per milligram than Dr. Niederwanger.

23       Q     Okay.   Let's talk about your opinion on

24  Gabapentin.

25       A     Okay.

Page 65

1      Q      You're critical of Dr. Harben's projected

2    charge of $55 for a 30-day supply of Gabapentin; is

3    that correct?

4      A      Well, it's not -- it is significantly

5    higher than what I see as prices quoted by

6    GoodRX.com.

7      Q      Okay.

8      A      About twice --

9      Q      And --

10     A      -- too much.

11     Q      So you went onto GoodRX.com website to come

12   up with the cost for Gabapentin; is that correct?

13     A      That's correct.

14     Q      Did you use any other source of information

15   to come up with your opinion on the reasonableness of

16   Gabapentin charges with Dr. Harben?

17     A      I don't think so.

18     Q      Okay.  Let's take a look at Exhibit 71.

19     A      Okay.

20     Q      All right.  Is this the GoodRX website

21   you're talking about?

22     A      That is from the GoodRX website.

23     Q      Okay.  And the dosage that Dr. Harben was

24   recommending was a 600-milligram dosage; is that

25   correct?

Page 66

```
 1       A    Yes.
 2       Q    Okay.  Does the GoodRX website have numbers
 3  for 600 milligrams of Gabapentin?
 4       A    Umm.
 5       Q    For the cost of 600 milligrams?
 6       A    Hang on just a minute.  Let me pull up my
 7  copy cause the copy that I referenced is in the
 8  printouts.
 9            Yes, they do.
10       Q    They do?
11       A    They do.
12       Q    Okay.  I mean, I'll tell you I looked at it
13  and they didn't have an entry for 600 milligrams.
14  They had 100, 300 and 400.
15       A    I've got it at 600 milligrams, 60 tabs per
16  prescription.
17       Q    And you got off that -- that off the GoodRX
18  website?
19       A    Yeah.  I've got a screenshot in the
20  printouts.
21       Q    And that's going to be in the material that
22  you're giving me?
23       A    Yes.
24       Q    Okay.
25       A    As well as 800 milligrams.
```

1      Q      Now, going to finding number five regarding

2    the ambulatory surgery center charges for trial

3    spinal cord stimulators --

4      A      Yes.

5      Q      -- do you see that, sir?

6      A      I do.

7      Q      And you used an 80 percentile usual,

8    customary, reasonable charge; is that correct?

9      A      That's correct.

10     Q      Any reason why you wouldn't use a 75

11   percent usual and reasonable, customary charge?

12     A      The -- yes, there is.

13     Q      And what is the reason for that, sir?

14     A      That data is not provided at any percentile

15   other than the 80th.

16     Q      Other than who, sir?

17     A      Other than the 80th percentile.  That's the

18   only percentile that's published.

19     Q      And where did you get that information

20   from; the 80th percentile UCR?

21     A      The Veterans Administration's reasonable

22   charge database.

23     Q      Okay.  Do you know if any of the data for

24   the VA database came from the Savannah, Georgia area?

25     A      I believe it did, but let me see here.

```
 1              You got in your exhibit stack one of the
 2    listings of sources from the VA database.  Can you
 3    point me to where that is?  I saw it earlier.
 4              Okay.  Let's look at your Exhibit 79.  Just
 5    one second and I'll look it up.
 6         Q    Sure.
 7         A    Yes.  It would include facilities in the
 8    Savannah area.
 9         Q    And what are you looking at, sir?
10         A    What's been labeled Plaintiffs' Exhibit 79.
11         Q    And where do you find that, sir?
12         A    About a third of the page down, "charge
13    type, OPT."  That means outpatient; refers to the
14    outpatient facility database.  And what the VA is
15    reporting here, that their data source is the
16    Medicare APC payment amount, OPPS data file for
17    calendar year 2016.  And that's a hundred percent --
18         Q    Okay.
19         A    -- data file of all charges to Medicare
20    patients by outpatient facilities.  And that would
21    naturally include any Medicare patients in the
22    Savannah area as well as the whole country, but it
23    includes Savannah.
24         Q    How many, how many data entries for the VA
25    database came from the Savannah, Georgia area?
```

1     A     I don't know.

2     Q     Okay.

3     A     But it would be all of them.

4     Q     Which all could be anywhere from zero to

5  infinity, correct?

6     A     Theoretically, yes.

7     Q     I mean, this is kind of like with the DRG

8  029 we talked about earlier.  You couldn't find a DRG

9  029 entry for spinal cord stimulators closer than

10 Charleston, South Carolina, correct?

11    A     No.  That's not true.  There are no

12 hospitals that reported 11 or more of that DRG.

13    Q     Okay.

14    A     There are hospitals that reported less than

15 that all over Georgia.

16    Q     But not in Savannah, Georgia?

17    A     Well, "all over Georgia" includes Savannah,

18 I think.

19    Q     Well, in all your data, sir, show me one

20 hospital in Savannah, Georgia that reported a DRG 029

21 in your research.  Pull your records.  Show me.

22    A     I don't have it in my file.

23    Q     Because it doesn't exist.

24    A     There's no hospital --

25          MS. RICHARDSON:  Object to the form.

Page 70

1          THE WITNESS:  -- that reported more than

2     11.

3          Q    (By Mr. Kraeuter) And you're not aware of --

4          A    If there --

5          Q    -- any hospital -- excuse me.  Let me

6     finish.

7               You're not aware of any hospital in

8     Savannah, Georgia that reported a DRG 029 procedure

9     in your research.  Cause if you had, you'd show it to

10    me.

11         A    That's correct.

12         Q    Okay.

13         A    But I can tell you it did report on the

14    average charge for all hospitals in Georgia of which

15    there's 87 cases.  And I believe that it's highly

16    likely that at least one of those is from Savannah,

17    but I can't prove that.

18         Q    And you're basically guessing when you say

19    that?

20         A    No.  I'm just thinking about --

21              MS. RICHARDSON:  Object to the form.

22              THE WITNESS:  -- distribution of population

23     throughout the state.  I think that --

24         Q    (By Mr. Kraeuter) You --

25         A    -- Savannah represents more than 1/87th of

Page 71

1    the total population of the state when it comes to

2    Medicare beneficiaries.

3              MR. KRAEUTER:  I'm going to move to strike

4         those answers as speculative.

5         Q    (By Mr. Kraeuter) Because, really,

6    Mr. Blount, that's what you're doing right now.  You're

7    speculating.  You don't know for a fact that any of

8    those DRG 029 entries came from one of the three

9    Savannah, Georgia hospitals:  Memorial Medical Center,

10   St. Joseph's, or Candler?

11             MS. RICHARDSON:  Object to the form.

12        Q    (By Mr. Kraeuter) Answer the question, sir.

13        A    What was -- it sounded like you were making

14   a statement.

15        Q    No.  It was a question.

16        A    Okay.

17        Q    Please answer.

18        A    I don't, I don't know of any particular

19   hospital volume in Savannah for this DRG.

20        Q    Okay.

21        A    But I do know --

22        Q    Now, you --

23        A    I do know the statewide average.

24        Q    Okay.  Now, you have stated in your report

25   that Congress has charged the VA to establish charges

Page 72

1    that are 80 percent of the community charges.  Do you

2    recall that part of your report?

3         A    Yes.

4         Q    Okay.  And that means that community

5    charges are actually 20 percent more than the VA

6    charges?

7         A    No.

8         Q    "No"?

9              Okay.  Do you know any hospital in Georgia

10   that uses the VA hospital data to determine usual,

11   customary, and reasonable charges other than VA

12   hospitals?

13        A    Not that I know of.  But I don't know what

14   most hospitals use for their basis for charges.

15        Q    Okay.  Same question for ambulatory

16   surgical centers.

17        A    The same answer.

18        Q    You don't know what ambulatory surgical

19   centers use as the basis of their charges or to form

20   their charges; isn't that correct?

21        A    No.  And their basis for the charges is

22   irrelevant.  What's important is that the VA database

23   includes whatever they are charging regardless of how

24   they calculated it or whether or not they even have a

25   basis for it.  They could be picking random numbers

1    for all I know, but it's still what they charge.

2        Q    Do you know if any of the physicians

3    involved in this case or any of the ambulatory

4    surgical centers involved in this case even accept VA

5    patients?

6        A    No.  And it's not relevant because the VA

7    database is based -- is a determination of rates

8    from -- that other facilities charge.  It's not for

9    VA -- the VA uses it to set their rates, but the

10   basis for their information is -- are all the charges

11   for all other types of providers.

12       Q    Now, we can agree that doctors, hospitals,

13   ambulatory surgery centers are not required by law to

14   accept VA patients, are they?

15       A    I don't know.  I've never researched that.

16       Q    Okay.  You're not here to suggest that any

17   of the physicians or surgery centers involved in this

18   case are required to use the VA database when setting

19   charges and fees?

20       A    VA facilities are.

21       Q    Excuse me?

22       A    VA facilities are required by law to use

23   this database.

24       Q    Are you aware whether Ms. Orr is going to

25   have her procedures done at a VA facility, sir?  Do

Page 74

1    you even know that?

2         A    I don't know.

3         Q    Okay.  Is a private physician at a private

4    surgery center required to use VA database in setting

5    its charges?

6         A    Private facilities are not required to use

7    any database that I know of.

8         Q    And you're not here to say that the VA

9    database is the only way to determine reasonableness

10   of fees and charges for medical services, are you?

11        A    No.

12        Q    Now, let's take a look at Exhibit 73,

13   please.  Can you identify this, sir?

14        A    I haven't found it yet.

15             Okay.  I've got it now.

16        Q    Okay.

17        A    Yes.

18        Q    Please identify it.

19        A    Looks like a screenshot from the VA website

20   where the databases are available in PDF format.

21        Q    And is that where you got your information,

22   sir?

23        A    Yes.

24        Q    Okay.  Why don't we turn to page 4 of that

25   document, please.