```
 1        A    Okay.

 2        Q    Do you see the CPT codes --

 3        A    Yes.

 4        Q    -- in the left-hand column?

 5        A    Yes.

 6        Q    Okay.  And we have a CPT code of 63650 at

 7   the top.  Do you see that, sir?

 8        A    Correct.

 9        Q    Okay.  That's one of the CPT codes used in

10   this case; is that right?

11        A    Yes.  That's for the trial implant.

12        Q    And what does the VA database say that the

13   charge is under their methodology and their database?

14        A    $21,925.21.

15        Q    And is that the 80 percent usual,

16   customary, and reasonable charge?

17        A    Yes.

18        Q    Okay.  And what was the amount listed in

19   your report, sir?

20        A    $17,979, which reflects the geographic

21   adjustment factor for Savannah which is .82.  So you

22   take the national number, the $21,925.21, multiply

23   that by the geographic adjustment factor for Savannah

24   for outpatient facilities of .82, and that equals

25   $17,979.
```

Page 76

1     Q    Okay.  Now, is there anything in this VA

2  database that says that the spinal cord stimulator

3  trial and the spinal cord stimulator permanent

4  implantation are added together in one charge?

5     A    No.

6     Q    Okay.

7     A    But it would be, it would be in the DRG --

8  in an inpatient hospital environment, that would

9  be -- the trial and the permanent would be billed

10  together.

11     Q    And where do you get that information from,

12  sir?

13     A    Just knowing how Medicare works.

14     Q    Can you point to anything that Medicare has

15  published that says that?

16     A    Yeah; with some research I think I probably

17  could.

18     Q    Where would it be found?

19     A    In CMS policies and procedures.

20     Q    All right.  Let's look at number six on

21  your findings.

22     A    Okay.

23     Q    You talk about an 80 percent usual,

24  customary, and reasonable reimbursement rate?

25     A    Yes.

1     Q     Is that the VA again?

2     A     Yes.  The VA uses the 80th percentile.

3     Q     Okay.  So anywhere we look at 80th

4  percentile on your report, you're referring to the

5  VA?

6     A     Correct.

7     Q     Okay.  Going on to number seven -- and I

8  think we discussed this earlier, but I want to make

9  sure -- you looked at ambulatory surgery center

10  charges for spinal cord stimulator and you found one

11  entry for DRG 029 at the Medical University of South

12  Carolina?

13     A     Well, it was 14 cases.

14     Q     Okay.  And we've already discussed that's

15  the closest hospital you found to Savannah, Georgia?

16     A     Yes; for that DRG.

17     Q     Okay.  At number eight you reference the

18  Georgia statewide average for 87 cases.  That came

19  from where, sir?

20     A     The CMS database that is --

21     Q     And that is -- I'm sorry.  Go ahead.

22     A     I think I listed the specific web source.

23  Let's see.  It's footnoted number 13 on page 7.

24  That's the website.

25     Q     What page, sir?

1       A    In my report, page 7, footnote 13 is the

2    link to that database.  When you get into that

3    database, you have to select Georgia, and then

4    specifically DRG 029.  And that will show you there's

5    87 discharges.  The average charges for those were

6    $82,593.78.  It's a little tedious, but it's in

7    there.

8       Q    Okay.  Let's take a look at Exhibit 74,

9    please.

10      A    Okay.

11      Q    Was 74 part of the database where you got

12   this information for on finding number eight on the

13   87 cases from Georgia?

14      A    Well, this describes the database.  It's

15   not --

16      Q    Okay.

17      A    This isn't the database itself, but it

18   tells you what's in the database.

19      Q    All right.  Let's turn to page 5 of Exhibit

20   74, please.

21      A    Okay.

22      Q    Down at the bottom at paragraph 6 it

23   discusses "data limitations"; is that correct?

24      A    Yes.

25      Q    Okay.  And it says that, "The data in the

Page 79

1    inpatient PUF may not be representative of a

·2    hospital's entire population served"; is that

3    correct?

4        A    That's correct.

5        Q    "The data in the file" has only -- "only

6    has information for Medicare beneficiaries with Part

7    A fee-for-service coverage, but hospitals typically

8    treat many other patients who do not have that form

9    of coverage," correct?

10        A    That's what it says.

11        Q    And this is the database you used from

12    Medicare; is that right?

13        A    Correct.

14        Q    Okay.  And it says, the inpatient PUF does

15    not have any information on patients who are not

16    covered by Medicare, such as those with coverage from

17    other federal programs, like the Federal Employees

18    Health Benefit Program or Tricare, or those with

19    private health insurance, or even those who are

20    uninsured.

21        A    That's --

22        Q    Correct?

23        A    -- correct.

24        Q    And it goes on to say, "Even within

25    Medicare, the inpatient PUF does not include

1    information for patients who are enrolled in any form

2    of Medicare Advantage plan," correct?

3         A    Correct.

4         Q    And then it says, "The file only contains

5    cost and utilization information, and for the reasons

6    described in the preceding paragraph, the volume of

7    procedures represented may not" fully -- "may not be

8    fully inclusive of all procedures performed by the

9    hospital."  Do you see that?

10        A    Yes.  I do.

11        Q    And you agree with that statement?

12        A    Yes.  And what that means is that, for

13   instance, a procedure that would be performed

14   possibly only on children is not going to be in this

15   database because, you know, basically children aren't

16   covered by Medicare Part A.

17        Q    The fact of the matter is a lot of people

18   in the United States are not covered by Medicare Part

19   A?

20        A    That's true.  But it is the largest

21   segment, I think, in the United States.  And, you

22   know, the fact remains that hospitals charge Medicare

23   the same way they charge other patients.  They don't

24   have different charge masters for different types of

25   payors.  They have one charge master.  And those

1    charges are uniformly applied regardless of the

2    financial classification of the patient, so what's

3    billed to a Medicare patient for one service would be

4    billed to any other patient for that same service.

5    What they collect is different depending upon the

6    contractual relationships, but here we're talking

7    about charges.  And so the sticker price is the same

8    regardless of the payor.

9         Q    Now, Mr. Blount, you're not a medical

10   doctor?

11        A    You called me doctor when we started back

12   again, but I'm not a doctor.

13        Q    You're not a medical doctor?

14        A    I said I'm not a doctor.

15        Q    Okay.  You've never been to medical school?

16        A    I have been in a medical school, but never

17   to attend a class or earn a degree.

18        Q    You haven't taken any medical classes

19   anywhere?

20        A    I've taken CPR.

21        Q    Okay.  That's the extent of your medical

22   training?

23        A    That's the only formal class I can think of

24   right now.

25        Q    You don't treat patients for medical

1    conditions?

2        A    Only close relatives.

3        Q    Now, your opinion in this case, sir, is not

4    that Jackie Orr's future medical care will be free;

5    that you just feel it should be less than what is

6    listed in the reports you reviewed; is that correct?

7        A    I'm saying the charges --

8             MS. RICHARDSON:  Object to the form.

9             THE WITNESS:  -- claimed in the projection

10            are substantially higher than published charge

11            data that I see.

12       Q    (By Mr. Kraeuter) So we can agree that you're

13   not saying Ms. Orr's future medical care should be

14   free.  Do we agree on that?

15       A    I guess so.

16       Q    Okay.  And your opinion is those charges

17   should be less than what the doctors have listed in

18   their reports?

19            MS. RICHARDSON:  Object to the form.

20            THE WITNESS:  The charges that have been

21            listed in their reports are substantially in

22            excess of published charges.

23       Q    (By Mr. Kraeuter) You don't have any opinions

24   regarding Jack -- the cause of Jackie Orr's injury, do

25   you?

Page 83

1      A    No.

2      Q    You don't have any opinions on her medical

3  diagnosis?

4      A    No.

5      Q    You don't have any opinions as to whether

6  her condition is permanent or not?

7      A    No.

8      Q    You don't have any opinions as to the

9  appropriateness of the future medical care?

10      A    No.

11      Q    And you're not going to offer any testimony

12  in this case about whether a procedure was necessary

13  or not, or reasonable to perform or not?

14      A    No.

15      Q    And in looking at your report it did not

16  appear that you had any opinion as to the

17  reasonableness of any of the doctors' fees

18  themselves.  I'm not talking about medications or

19  ambulatory surgery center fees, but just for payment

20  for the doctor.

21      A    Well, my finding number one deals with the

22  stellate ganglion block procedure professional fee.

23      Q    That's a fair, that's a fair comment.

24           Other than that, do you have any opinion as

25  to the reasonableness or unreasonableness of any of

Page 84

1    the doctor's fees?

2         A    I don't think so.

3         Q    Okay.  That would include the fee for

4    implanting the spinal cord stimulator for the doctors

5    fee portion, correct?

6         A    I don't know.  I mean, I've not been asked

7    to review those.

8         Q    Okay.  And you don't have any opinion as to

9    the reasonableness of the drug testing charges or

10   office visit charges?

11        A    Excuse me just one minute.  Let me look

12   back here at one of my documents in the file.

13             I did look at the charges for the trial

14   implant and the permanent implant.

15        Q    Are you talking about the cost for the

16   ambulatory surgical center, or are you talking about

17   the cost for the doctor to do it?

18        A    The professional fee.

19        Q    Okay.  And where does that appear in your

20   report?

21        A    I don't think it's -- I don't think we put

22   that in the report because it really was not

23   remarkable.

24        Q    Excuse me, sir?

25        A    There was -- the charge amount, I believe,

Page 85

1    that's projected for the professional fee for 63650

2    is $2,055, and that's roughly equal to the 50th

3    percentile.  And the charge for 63685 to the

4    permanent insertion of the generator was $2,000, and

5    that's a little bit below the 75th percentile.  So we

6    really didn't have anything to comment on about those

7    two findings, but I did check them.

8         Q    So, in other words, in other words, you

9    don't have an opinion as to the unreasonableness of

10   those doctors' fees?

11        A    I would say those doctor fees are

12   reasonable.

13        Q    Okay.  Now, how much do you earn as an

14   expert witness in terms of consulting, trial

15   testimony, deposition testimony, report preparation

16   for legal cases?

17        A    I'm not compensated separately by that.  I

18   have a salary.  That includes -- my salary includes

19   my work for Health Law Network as well as for my

20   insurance agency, which is American Benefit Advisors.

21        Q    Do you, do you think that you make as much

22   as $150,000 a year serving as an expert witness in

23   various cases?

24        A    Maybe.

25        Q    Have you made that much in past years

1    serving as an expert witness?

2        A    Well, as I said, I -- I'm not compensated

3    separately by type of service.  I have a single

4    salary that, that is for my work for both Health Law

5    Network as well as American Benefit Advisors.  It's

6    not two separate --

7        Q    You own and run --

8        A    -- checks.

9        Q    All right.  You own the company, correct?

10        A    I own part of the company.

11        Q    Okay.  So you would have access to the data

12    of how much of your business, how much of your fees,

13    how much the company makes comes from you serving as

14    an expert witness, would you not?

15        A    We don't calculate.  That's not a

16    calculation that we make.

17        Q    Okay.  And your testimony, as you sit here

18    today, is that you are not aware whether you've made

19    as much as $150,000 in past years through your expert

20    witness services?

21        A    Correct.  I don't know the number because

22    it's not --

23        Q    Okay.

24        A    I've never calculated it.

25        Q    Does that amount surprise you or shock you

```
1    where you say, oh, absolutely I've never made that
2    much in the past as an expert witness in a year?
3         A    I don't feel shocked.
4         Q    Okay.
5         A    So...
6         Q    And how many cases are you serving as an
7    expert witness on at this time where you're preparing
8    reports, preparing for depositions or trials?
9         A    Over 40.
10        Q    Okay.  How much time do you spend as an
11   expert witness or serving in your expert capacity as
12   opposed to non-expert in your business?
13        A    I would say expert witness work might be
14   25 percent of my total professional time.
15        Q    Okay.  And have you ever broken down what
16   percentage of your cases you are testifying for the
17   defense versus the plaintiff?
18        A    Yes.
19        Q    And what's that percentage?
20        A    Overall it's been 45 percent for plaintiffs
21   and 55 percent for defendants.
22        Q    Okay.  Now, before today, how many times
23   have you met with either Ms. Richardson or anybody
24   from Drew Eckl & Farnham or anybody representing
25   defendant in this case?
```

1       A     I don't think we've ever met in person.

2       Q     Okay.  When were you first contacted in

3   this case?

4       A     Let me see.  I believe it was July 26th,

5   2016.

6       Q     Okay.  Do you know what you've charged so

7   far for fees in this case?

8       A     Yes.  $7,180.50.

9       Q     Okay.  My understanding, sir, is in terms

10  of the materials you were provided by counsel for

11  Macy's that would include the expert report of

12  Dr. Harben, Dr. Niederwanger and Dr. Plumly; is that

13  correct?

14      A     Yes.

15      Q     Okay.  Anything else you've been presented

16  or provided by counsel for Macy's?

17      A     The complaint, the answer, the amended

18  complaint, the answer of Macy's to the -- to

19  plaintiffs' amended complaint, the second amended

20  complaint, and defenses and answer of the defendants.

21      Q     Anything else, sir?

22      A     That's, I believe, all that we've been

23  provided by the attorneys.

24      Q     Have you spoken with any of Jackie Orr's

25  doctors in this case?

```
 1        A    Not that I know of.

 2        Q    Or corresponded with them in any way?

 3        A    No.

 4        Q    E-mail?  Letter?

 5        A    No.

 6        Q    Okay.  Have you spoken with any other

 7   witnesses involved in this case?

 8        A    Not that I know of.

 9        Q    Now, let's take a look at Exhibit 72 again,

10   sir.  That's the Medtronic document.

11        A    Okay.

12        Q    Would you agree with me that this Medtronic

13   document uses a national average to come up with its

14   numbers?

15        A    Well, there's some numbers -- there's CPT

16   numbers.  There's, there's all kinds of numbers in

17   here.  But for the Medicare national average numbers,

18   those are, as described, Medicare national averages.

19        Q    Did you use this document to come up with

20   any appropriate charges for Ms. Orr?

21        A    No.

22        Q    What did you use this document for?

23        A    To identify how the manufacturer expected

24   the device to be used; you know, what types of

25   patients, what -- and specifically what DRGs they see
```

1    this device being used in.

2        Q    And we've discussed those DRGs thoroughly,

3    have we not?

4        A    I'm not sure what you mean by "thoroughly."

5    We probably could discuss it some more if you want

6    to.  For instance, I guess a further explanation of

7    the DRGs, 520, even though the reason for the

8    neurostimulator implant is different than RSD, it

9    still does include a neurostimulator implant.

10       Q    And the prices are significantly different,

11   are they not?

12       A    Well, these rates that you're -- if you're

13   looking on page 13 of that exhibit, those are

14   national average payment rates that Medicare has.

15   That's not the charge amounts.

16       Q    Okay.

17       A    But we did identify DRG 520 charges for two

18   Savannah hospitals.

19       Q    Let's take a look at Exhibit 76, please.

20       A    Okay.

21       Q    Now, are these the DRG 029 procedures for

22   the CMS database?

23       A    Yes.  So you --

24       Q    Okay.

25       A    I can see from this that you did --

Page 91

1    somebody in your office has been to that website that

2    I identified earlier in footnote 13.

3        Q    Okay.  So if I look at footnote 13 and I

4    pull up the database I'm getting a whole lot of DRG

5    charges, but the ones that you're looking at under

6    DRG 029 appear on Number Exhibit 76; is that right?

7        A    No.  There's also another table at that

8    website that has the statewide averages.  You're

9    look -- this is a printout from the national part of

10   the database which would list the individual

11   hospitals; and, again, only disclosing those

12   hospitals who report 11 or more instances.  And that

13   number you'll notice in the fourth from the right

14   column, that's the number of cases.

15           So for the first line item on Exhibit 76

16   you'll see that for that hospital, NUSC in

17   Charleston, South Carolina, they show 11 instances of

18   that DRG.  And that line is actually DRG 28.  But

19   that's -- if you want to know the frequency of the

20   cases, that's in that fourth from the right-hand

21   column.  So hospitals that have less than 11

22   instances would not be in this part of the database,

23   but would be included in the statewide average part

24   of the database.

25       Q    And the statewide average part of the

Page 92

1    database would list the individual hospitals that

2    reported?

3         A    No.  It does not.

4         Q    Okay.

5         A    There's one single line for DRG 29 for

6    Georgia.

7         Q    Okay.

8         A    And that's the one that shows $82,594

9    rounded.

10        Q    Now, this CMS database does not talk about

11   whether the spinal cord stimulator trial and spinal

12   cord stimulator permanent implant are bundled

13   together or not?

14        A    The database doesn't say that, but that's

15   how Medicare claims are submitted.  If you have a

16   planned procedure, a two-step-type procedure such as

17   this where you do the trial and then the permanent if

18   the trial is successful, then the, the hospital

19   submits only one claim.  They would hold that claim

20   after the first -- or the trial implant was

21   completed.  And then after whatever determination

22   time they choose to make, they decide whether or not

23   a permanent is going to be done or not.  If the

24   permanent is done they include the charges for that,

25   and it goes all in on one bill for that DRG 29.

Page 93

1        Q     Okay.  Well, let's look at Exhibit 76.

2        A     Okay.

3        Q     Right at the top, the first entry is

4    University of Alabama Hospital.  Do you see that?

5        A     For DRG 29.  Yes.

6        Q     In Birmingham?

7        A     Yes.

8        Q     And they charged just over $89,000 to

9    implant a spinal cord stimulator?

10        A     Let's see.  Okay.

11        Q     Isn't that correct?

12        A     I don't know.  It's kind of hard to read on

13    my copy.  It looks like 98,000.

14        Q     98,000?

15        A     Yes.

16        Q     I'll take it.

17              Do you know whether the particular

18    procedure and usage of the spinal cord stimulator for

19    Jackie Orr is the same as what's listed in this

20    database?  And maybe that's a badly worded question.

21              In other words, this DRG 029 says it's for

22    spinal procedures W CC, or spinal neurostimulators.

23    Do you see that, sir?

24        A     Yes.

25        Q     So this database and the statewide database

Page 94

1    you talked about with 87 other entries could be for

2    procedures that don't include a spinal cord

3    stimulator?

4         A    Possibly.

5         Q    Okay.  You can't rule that out?

6         A    I believe that's correct.

7         Q    Okay.  And these other possible procedures

8    may have a charge or a cost that's higher or lower

9    than the cost to implant a spinal cord stimulator,

10   correct?

11        A    Yes.

12        Q    But you don't know if they're higher or

13   lower or not, correct?

14        A    Correct.  This is not -- they don't

15   disclose individual cases.  These are all DRG 29

16   cases for that --

17        Q    All right.

18        A    -- particular hospital.

19        Q    So if we look at the University of Alabama

20   Hospital entry -- that's the first DRG 029 entry --

21   it looks like they had 13 of the DRG 029 type

22   procedures in 2014; is that correct?

23        A    Yes.

24        Q    All right.  Tell me how many of those 13

25   procedures were for the implantation of a spinal cord

Page 95

1    stimulator.

2        A    You can't tell from this.

3        Q    You don't know?

4        A    Well, yes.  I don't know.  You can't tell

5    from this.

6        Q    All right.  It could be 13, correct?

7        A    Could be as many as 13.  Yes.

8        Q    Could be zero?

9        A    It's possible.

10       Q    Okay.  Could be 4?

11       A    It could be any number between zero and 13.

12       Q    Okay.  And that would be true about the

13   Georgia statewide database you referenced that has

14   the 87 other cases reported; is that correct?

15       A    That's correct.

16       Q    Okay.  And looking again at Exhibit 76 at

17   the University of Alabama Hospital entry for the

18   approximately $89,000 -- excuse me, $98,000 charge,

19   that's an average of all 13 of those procedures,

20   correct?

21       A    That's correct.

22       Q    Okay.  And so if we have other spinal

23   procedures coded under DRG 029 that are not the

24   implantation of a spinal cord stimulator and those

25   procedures happen to be less than the cost of putting

1    in a spinal cord stimulator, that's going to skew the

2    $98,000 average number low, wouldn't it?

3         A    Well, it would change the average.

4         Q    It would bring it down?

5         A    Yes.

6         Q    And you don't know how far down under that

7    scenario because you don't have any underlying data?

8         A    That's correct.

9         Q    Okay.  Now, let's look at a few of these

10   other charges or entries on Exhibit 76.  It looks

11   like the third entry down, St. Joseph's Hospital and

12   Medical Center in Phoenix, Arizona, their average

13   charge is over $148,000, correct?

14        A    Yes.

15        Q    University of California San Francisco

16   Medical Center in San Francisco is over $191,000 for

17   this particular DRG code number, correct?

18        A    Yes.  And more than two and a half hours

19   away.

20        Q    University of California Davis Medical

21   Center for the same coded procedure is over $227,000.

22        A    Yes.

23        Q    Correct?

24             Okay.  Now, if we go down to further on

25   down the list to Massachusetts General Hospital,

1    their average charge is $137,000?

2         A    No.

3         Q    Or over, over $137,000.   134.   Over

4    $134,000; is that right?

5         A    Correct.   Yes.

6         Q    If we go to San Antonio, Texas down at the

7    bottom, Methodist Stone Oak Hospital, over $132,000,

8    correct?

9         A    Yes.

10        Q    Okay.

11        A    All more than two and a half hours away by

12   drying; some by flying.

13        Q    We can, we can agree, doctor, that these

14   procedures for the, for the implantation of the

15   spinal cord stimulator, it's expensive no matter how

16   you slice it.

17        A    "Expensive" is a relative term.   I'm not

18   sure what you want to compare it to.

19        Q    Okay.

20        A    It's not expensive to -- in comparison to,

21   you know, many other procedures.   It's more expensive

22   than many procedures too.   Generally speaking,

23   though --

24        Q    Now --

25             MS. RICHARDSON:   Hang on.   He's answering.

1       Q      (By Mr. Kraeuter) Go ahead.

2       A      Generally speaking, though, the -- it's

3    true that some hospitals are going to have higher

4    charges than average, and others are going to have

5    lower charges than average.  That's just how math

6    works.  Unless everybody charges identically the same

7    thing, then everybody is average.

8             So the other important point I would make

9    here is that all of these are inpatient cases.  These

10   are patients that stay overnight.  Many of these are

11   three or more days of inpatient care even if they

12   don't have a neurostimulator implant.  So, you know,

13   the tendency would be any time that you are --

14   generally when you are comparing inpatient hospital

15   charges to ambulatory surgery center charges, the

16   hospital charges generally are going to be

17   significantly higher because it includes overnight

18   stays and additional services, the cost of standby

19   services, 24-hour departments that run that you just

20   don't have that kind of overhead in an ambulatory

21   surgery center, so...

22      Q      Well, let me ask you this, Mr. Blount, and

23   let's be clear:  You're the one that chose what

24   databases to use in this case for your opinions,

25   correct?

Page 99

1      A    Right.  And basically what I'm saying is

·2    that the charges for this procedure to be done on an

3    outpatient ambulatory surgery center basis should not

4    exceed what would be charged if it were done on an

5    inpatient hospitalization.

6      Q    Do you have any data on the charges that

7    are charged for the insertion -- or implantation of

8    a spinal cord stimulator by an ambulatory surgical

9    center?

10      A    Yes.  That would be included in the VA

11    database because that includes all outpatient

12    facility services, which would be both ambulatory

13    surgery centers and outpatient hospital surgeries.

14      Q    Let's turn back to Exhibit 76, please.

15      A    Okay.

16      Q    Do you know how many days of inpatient care

17    the particular patients received in any of these DRG

18    029 entries?

19      A    Yes.

20      Q    And where is it listed on Exhibit 79?

21      A    It's not on Exhibit 79.

22      Q    Where would it be listed?

23      A    Well, I pulled -- the AHD database shows

24    for this same line that's in this particular

25    printout -- I think this -- I'm not sure the year is

1    the same.  This is 2015 for University -- South

2    Carolina University Hospital.  Their average length

3    of stay for their DRG 29 was 7.4 days, so --

4        Q    I'm sorry.  I was not asking -- I wasn't

5    asking the average length of stay.  I was asking if

6    you knew the actual days a particular patient for a

7    particular entry of DRG 029 stayed in the hospital.

8        A    Well, I don't know them individually, but

9    the average of all of those at MUSC was 7.4 days.  So

10   there would be some more and some less.

11       Q    And some for procedures that may not even

12   include the implantation of a spinal cord stimulator?

13       A    That's possible.

14       Q    It's possible because you just don't know

15   the answer to that?

16       A    No.   That DRG includes neurostimulator

17   implants as well as certain other back procedures.

18   But the way that the DRG system works, as I explained

19   in our report, is that it is designed to represent

20   relatively homogeneous utilization of resources

21   within that DRG.  So even though it may not include a

22   specific neurostimulator device, all the patients in

23   that DRG should be using roughly the same or similar

24   amount of resources.  And so you would expect the

25   charges to be similar.

1     Q     Now, let's go to page 5 of your report,
2  please.
3     A     Okay.
4     Q     Let's look at bullet point number nine.
5  When you search the American Hospital Directory
6  database for the DRG 029 entries, you searched
7  Georgia, South Carolina, and north Florida, correct?
8     A     Correct.
9     Q     And the only entry you found was the one
10  for the hospital in Charleston, South Carolina?
11     A     Correct.
12     Q     And the American Hospital Directory
13  database comes from information from the Centers for
14  Medicare and Medicaid Services; is that right?
15     A     That's correct.
16     Q     Now, going back to Exhibit 76, the
17  second -- the third column from the right which has
18  the dollar amounts -- we'll look at University of
19  Alabama Hospital again at the top.  The 89 -- excuse
20  me, the $98,000 charge, is that the total payment
21  amount --
22     A     The 98,000 --
23     Q     -- paid by --
24     A     In the third from right column?
25     Q     Yes, sir.

1       A      That's the charge amount.

2       Q      Okay.  Where is the payment amount?

3       A      The payment amount that Medicare makes is

4    in the last column.  They paid $17,891 for those

5    patient -- each of those patients.  That includes the

6    hospitalization, room and board, lab, drugs,

7    anesthesia, x-rays, the device.  All those things are

8    included in the $17,891 payment.

9       Q      Now, all of these directories deal with

10   average prices, correct?

11      A      The AHD directory reports only average

12   prices.

13      Q      And that's -- and that includes VA,

14   Medicaid, Medicare, CMS, American Hospital Directory,

15   PMIC --

16      A      No.

17      Q      -- Physicians' Fee Reference?

18             "No"?

19      A      No.

20      Q      Which one does not deal with average?

21      A      PMIC, VA, PFR, those do not report

22   averages.

23      Q      Okay.  Let's talk about the PMIC.  The PMIC

24   book has a discussion in it about super specialist.

25   Are you familiar with that?

Page 103

1     A    No.

2     Q    You're not familiar with super specialist

3  rates in the PMIC book?

4     A    No.

5     Q    And that if a doctor is part of the select

6  group of super specialists they traditionally charge

7  higher fees for certain procedures?

8     A    I said I'm not familiar with it.

9     Q    Okay.

10    A    Is that like a super --

11    Q    The PMIC -- sir?

12    A    Never mind.  Just a joke.

13    Q    The PMIC book has a 75 percent usual,

14  reasonable, customary rate; is that correct?

15    A    Correct.

16    Q    And it's based on 400 million claims that

17  have been built into the database?

18    A    Yes.

19    Q    And that would suggest that at least a

20  hundred million claims are higher than the 75 percent

21  rate?

22    A    No.

23    Q    "No"?

24         Tell me where my logic is breaking down.

25    A    It's possible that 25 percent of the claims

1    would be higher, but the 75th percent -- charge point

2    at the 75th percentile could be the same number as

3    the 80th percentile or the 90th or the 100th.

4         Q    You just don't know?

5         A    I don't have the raw data.  But the way

6    percentiles work, it's not, it's not a linear

7    relationship between the 75th and 90th or even the

8    100th percentile.  It could be incrementally going up

9    a dollar per percentile or less.  It doesn't have to

10   go up at all.  It has to at least be the same or

11   greater than the percentile below it.

12        Q    Did you use --

13        A    Mathematically, that's the way it works.

14        Q    Okay.  Did you use the PMIC book to deal

15   with spinal cord stimulators in this case?

16        A    No.  Only for the professional fee.

17        Q    The ganglion block?

18        A    Well, the professional fee for the

19   insertion of the spinal cord stimulator and the

20   ganglion block.

21        Q    Okay.  And do you know how many of the

22   claims listed in the PMIC book for those services

23   actually came from the Savannah, Georgia area?

24        A    No.  And I think you've asked that before

25   at least once.

1        Q     Okay.  Does this PMIC book instruct

2   providers to never receive 75 -- the 75 percent rate?

3        A     No.

4        Q     Okay.  Does the PMIC book take the position

5   that anything over the 75 percent rate is

6   unreasonable?

7        A     No.

8        Q     It's your interpretation that anything over

9   the 75 percent rate is unreasonable; is that correct?

10       A     I didn't say that.

11       Q     Well, is that your position in this case?

12       A     I don't think so.  I'm saying -- I'm

13  quantifying how much in excess the projected charges

14  are above the 75th percentile.

15       Q     Okay.

16       A     The judge or the jury may want to make

17  their own reasonableness determinations.

18       Q     Well, aren't you going to testify as to

19  what's reasonable and what's not reasonable in this

20  case?  Aren't you going to use those words in trial?

21            MS. RICHARDSON:  Object to the form.

22            THE WITNESS:  Possibly.

23       Q     (By Mr. Kraeuter) Okay.  So if you, if you

24  use the words that, that the ganglion block

25  professional charges are more than the 75 percent rate

Page 106

1    of the PMIC book and they are reasonable, aren't you

2    making that opinion?  Aren't you stating that opinion?

3    Sir?

4        A    Well, I have stated my opinion in the

5    report about the ganglion block.  And I said that

6    the, the 75th percentile in the Savannah area is

7    $766, which is 38 percent of what the plaintiffs'

8    projected charge is.

9        Q    How come you didn't you use the 90

10   percentile rate for the PMIC book?

11       A    Again, I think that's been asked and

12   answered.  But, again, the 75th percentile is the

13   more frequently used threshold in the industry.

14       Q    Now, are Medicare rates typically lower

15   than prime insurance rates for medical fees?

16            MS. RICHARDSON:  Object to the form.

17            THE WITNESS:  Well, the charges are

18            generally the same.  The payment amount to the

19            provider does vary based upon the contractual

20            relationship.

21       Q    (By Mr. Kraeuter) Now, you mentioned on page

22   5 of your report that you did online research of

23   peer-reviewed journals?

24       A    Correct.

25       Q    Okay.  And did you rely on these

Page 107

1   peer-reviewed articles as part of your methodology in

2   this case?

3        A    It's one of the bases of comparison that we

4   made.

5        Q    Okay.  Let's take a look at Exhibit 81,

6   please.

7        A    Before we go to that, can we go back to the

8   question you had about the 90th percentile?  As you

9   will see when you get the printouts of my files, I

10  did compare the ganglion block $2,000 charge to the

11  90th percentile.  And for the Savannah area the 90th

12  percentile would be $1,023, so the $2,000 projected

13  charge is almost twice what the 90th percentile would

14  be.  Even though we didn't say that in the report, I

15  did do the work.  It is in the work papers.

16       Q    Okay.

17       A    Okay?

18            And what exhibit number?

19       Q    81, please.

20       A    Okay.

21       Q    All right.  Was this one of the

22  peer-reviewed articles that you relied on in this

23  case?

24       A    Let me look back at -- I'm sorry.

25            MS. RICHARDSON:  No, no, no.  You're fine.

Page 108

1          THE WITNESS:  We got a very small table

2     here.

3          Yes.  I think it's the one I referred to at

4     the bottom of page 9; number 14, letter B, in my

5     report.

6     Q    (By Mr. Kraeuter) Okay.  Is this

7     peer-reviewed article stating an opinion on the

8     reasonableness of the cost of spinal cord stimulation

9     implantations?

10    A    I don't think they -- it's not a study of

11    reasonableness.  It's a study that quantified charges

12    and costs.

13    Q    Okay.  And this document was written in

14    November of 2006, was it not?

15    A    Yes.  I believe so.

16    Q    Okay.  And in the first page, that second

17    column down at the bottom it says, "implanted

18    stimulation devices are relatively expensive."  Do

19    you see that?

20    A    Yes.

21    Q    Do you agree with that statement?

22    A    Again, I've already answered that.  It's

23    relative in comparison to what?  It's not --

24    Q    Okay.  Well, this is your article.

25    A    It's not expensive relative to, you know,

1    open-heart surgery, but it is more expensive than a

2    Coca-Cola, you know.  It depends on what you want to

3    compare it to.

4        Q    Well, this is an article that you reviewed.

5    You liked what it said and you relied on it in your

6    opinion; is that true?

7            MS. RICHARDSON:  Object to the form.

8            THE WITNESS:  I don't have any like or

9            dislike about the article.  I cited the article

10           because it contains an independent determination

11           of what charges and costs are for this type of

12           device over an extended number of patients and

13           over an extended period of time, I believe.

14       Q    (By Mr. Kraeuter) All right.  Well, let's go

15   to the next page, the second page of this document.

16       A    Okay.

17       Q    You say that it was an analysis of the cost

18   over a number of patients.  If you look at the top,

19   there were only 42 participants in this study, were

20   there not?

21       A    That's correct.

22       Q    Okay.  And if you look on the column on the

23   left of that page under where it says "economic

24   analysis," it says the costs were incurred and are

25   reported in 1991 and 1995, United States dollars.  Do

1    you see that?

·2         A    Yes, I do.

3         Q    So the costs that were reported are from 21

4    to 25 years ago, correct?

5         A    Well, it says, "We gathered professional

6    charge data" in the sentence before that, so I would

7    agree to that as far as it relates to professional

8    charge data from John Hopkins.

9         Q    It says, the John Hopkins Hospital billing

10   department provided data on hospitalization-related

11   costs, including admission, room, board, operating

12   room, pharmacy, radiology, laboratory, medical,

·13  surgical supplies, physical, occupational,

14   respiratory therapy, and other charges.  And then it

15   talks about professional charges.

16             Do you have any evidence that the numbers

17   used in this particular article are from any other

18   time period other than 1991 to 1995?

19        A    I would have to read back through it again

20   to see.

21        Q    So the short answer, as you sit here today,

22   you do not have any such evidence, correct?

23        A    As I said, I would have to read through the

24   article again to see.

25        Q    Okay.  Now --

Page 111

1      A      But we also point out in my report in

2    number ten on page 9 that the prices for implantable

3    medical devices have a history of declining over

4    time.

5      Q      Now, let's go to the third page of this

6    document, sir.

7      A      Okay.

8      Q      Under "cost effectiveness" it says, the

9    mean cost of randomization to spinal cord stimulators

10   was $31,000 and change.  Do you see that, sir?

11     A      Yes.

12     Q      All right.  The word "mean" is just another

13   word for "average," is it not?

14     A      It's not the same.

15     Q      It's not the same?

16            How is it different, sir?

17     A      I'm sorry.  Mean is basically the same as

18   the average.  Yeah.  You're correct.

19     Q      Okay.  And so when they talk about the

20   average charge of spinal cord stimulators some 21, 26

21   years ago, that means that half of the cost to

22   implant these devices was more than what's recorded

23   in this peer-reviewed article, correct?

24     A      Yes.  And, conversely, half was less.

25     Q      Okay.  And if we go further on down that

1    column it talks about the cost per patient who

2    achieved long-term success with spinal cord

3    stimulators after crossing from reoperation was over

4    $117,000.  Do you see that?

5         A    The cost per patient who achieved -- with

6    reoperation.

7         Q    It says, "after crossing from reoperation."

8         A    That's what it says.  I'm not sure what

9    that means --

10        Q    Okay.

11        A    --- "crossing from reoperation."

12        Q    Okay.  So you don't know if that means that

13   some people have these spinal cord stimulators need

14   further operations after they get them?

15        A    Well, I do know that some patients do

16   require revision.

17        Q    Okay.  Which would be an added cost?

18        A    Yes.

19        Q    Okay.  Let's look at Exhibit 82, please.

20        A    Okay.

21        Q    Was this one of the peer-reviewed articles

22   that you relied on in forming your opinions in this

23   case?

24        A    I believe so.

25        Q    Okay.  And this was an article that

Page 113

1    examined twenty -- let's see, 222 case records at the
2    Cleveland Clinic Foundation between 1990 and 1998?
3         A    Yes.
4         Q    So that's 18 to 26 years ago, correct?
5         A    Yes.
6         Q    And it also talks about the mean patient
7    total reimbursement.  Do you see that, sir?
8         A    Yes.
9         Q    Which, as we've said, is just a fancy word
10   for "average"?
11        A    Correct.
12        Q    Now, on that first page in the left-hand
13   column under "results," do you see the words that
14   say, "Patients treated with spinal cord stimulation,
15   slash, peripheral nerve stimulation for pain
16   management achieved reductions in physician office
17   visits, nerve blocks, radiologic imaging, emergency
18   department visits, hospitalizations"?  Do you see
19   that?
20        A    Yes.
21        Q    Okay.  Do you think that's a good thing?
22             MS. RICHARDSON:  Object to the form.
23             THE WITNESS:  I, I don't have an opinion
24        about good or bad.  I mean, it's --
25        Q    (By Mr. Kraeuter) Okay.

```
 1        A     That's part of the report.

 2        Q     Do you believe that Jackie Orr should have

 3   more physicians' office visits, more nerve blocks,

 4   more visits to the ER?

 5              MS. RICHARDSON:  Object to the form.

 6              THE WITNESS:  I don't have an opinion about

 7        that.

 8        Q     (By Mr. Kraeuter) Okay.  The article goes on

 9   and says that the use of spinal cord stimulators

10   results in a large reduction in health care

11   utilization.  Do you see that?

12        A     Yes.

13        Q     Do you think that's a good thing?

14              MS. RICHARDSON:  Object to the form.

15              THE WITNESS:  Again, I don't have any

16        opinions about good or bad feelings about any

17        part of this report.

18        Q     (By Mr. Kraeuter) Okay.  In the discussion

19   section it says, "The reduced demand for health care

20   resources by patients receiving neurostimulation

21   suggests that peripheral nerve stimulation and spinal

22   cord stimulation treatment, although associated with

23   relatively high initial costs, demonstrates substantial

24   long-term economic benefits."  Do you agree with that

25   statement?
```

1           MS. RICHARDSON:  Object to the form.

2           THE WITNESS:  I agree that the statement is

3      in the report.

4      Q     (By Mr. Kraeuter) You don't, you don't agree

5  whether it's true or not?

6      A     I don't know.  I've not -- I did not use --

7  I did not evaluate the report for determination of

8  truthfulness of any of the statements that are in

9  here.  I only relied --

10     Q     Do you ---

11     A     -- upon it as an additional source for the

12  general range of what these procedures typically

13  cost.

14     Q     Do you think it's a good idea to try to

15  have substantial long-term economic benefits of

16  reduced costs; reduced medical costs?  Do you think

17  that's a good thing?

18          MS. RICHARDSON:  Object to the form.

19          THE WITNESS:  I don't have any objection to

20      that.  I don't -- you know, I've not thought

21      about it in terms of developing any professional

22      opinion about it, though.  It's not my --

23     Q     (By Mr. Kraeuter) Okay.  It goes on and

24  says --

25     A     It's not my area of expertise.

Page 116

1          Q     Okay.  It goes on on the second column of

2     that page to say, "Additionally, these cost data

3     underestimate the true economic impact by failing to

4     account for the effect of chronic pain on disability

5     and other social costs, including effects on

6     morbidity and quality of life, lost earnings, and

7     reductions in productivity."  Do you agree with that

8     statement?

9               MS. RICHARDSON:  Object to the form.

10              THE WITNESS:  I agree that the statement is

11         in the report.

12         Q     (By Mr. Kraeuter) Okay.  Morbidity, the word

13    "morbidity," can we agree that means death?

14              MS. RICHARDSON:  Object to the form.

15              THE WITNESS:  I'm not sure of the exact

16         definition for morbidity.  Mortality would

17         relate to death.  Morbidity is something

18         different, I believe; not quite death.

19         Q     (By Mr. Kraeuter) Okay.  The document goes on

20    and says, "Management of chronic pain often involves

21    frequent physician office visits and analgesic use,

22    emergency department visits and hospitalizations,

23    numerous radiologic imaging studies, multiple

24    corrective surgeries, and interventional pain

25    management procedures."  Were you aware of that?

Page 117

1              MS. RICHARDSON:  Object to the form.

2              THE WITNESS:  I'm aware that it's in the

3         report.

4         Q    (By Mr. Kraeuter) Okay.  It goes on to say,

5    "These treatments are generally administered

6    repetitively and at great expense and fail to provide

7    patients with favorable long-term clinical outcomes."

8    Do you agree with that statement?

9              MS. RICHARDSON:  Object to the form.

10             THE WITNESS:  I'm not a clinician.  I

11        didn't participate in this study.  I've not been

12        asked to critique this study.  And I'm not going

13        to express an opinion about those parts of the

14        study or the report.

15        Q    (By Mr. Kraeuter) Okay.  Goes on to say,

16   "Several studies have reported that greater than

17   50 percent of patients treated with neurostimulation

18   achieve marked improvement in pain relief."  Were you

19   aware of that?

20             MS. RICHARDSON:  Object to the form.

21             THE WITNESS:  I see it in the report.

22        Q    (By Mr. Kraeuter) Okay.  So you don't have an

23   opinion on that, even though you relied on this

24   document to form your opinion?

25             MS. RICHARDSON:  Object to the form.

Page 118

```
1              THE WITNESS:  It's one of the sources of

2        information that's published that deals with

3        the, the cost of this type of service.

4        Q    (By Mr. Kraeuter) Okay.  Further it says,

5   "Additionally, in patients with advanced complex

6   regional pain syndrome, neuroaugmentation led to a

7   50 percent reduction in opioid use and quality of life

8   was reported to improve in the majority of treated

9   patients."  Do you see that?

10       A    Yes.

11       Q    You think it would be a good thing for

12  Jackie Orr to have a 50 percent reduction in opioid

13  use?

14             MS. RICHARDSON:  Object to the form of the

15       question.

16             THE WITNESS:  I've got no opinion on those

17       issues.

18       Q    (By Mr. Kraeuter) No opinion on it?

19       A    Those are clinical issues and lifestyle

20  issues.  I'm not -- I've not been tendered -- or not

21  been reporting on any professional opinions related

22  to those issues.

23       Q    Do you think it would be a good thing for

24  Jackie Orr's quality of life to improve?

25             MS. RICHARDSON:  Object to --
```

1      Q    (By Mr. Kraeuter) Is that a good thing, or a

2   bad thing?

3             MS. RICHARDSON:  Object to the form.

4             THE WITNESS:  I don't have an opinion on

5        that.

6      Q    (By Mr. Kraeuter) Okay.  Now, if it were your

7   wife that's referenced in this report, would you want

8   her to reduce her opioid use by 50 percent?

9             MS. RICHARDSON:  I'm going to object.  This

10        is getting way too argumentative, Scot.

11             You do not have to answer that question if

12        you don't want to.

13             MR. KRAEUTER:  Ms. Richardson, is there a

14        privilege you're asserting?

15             MS. RICHARDSON:  I'm not asserting a

16        privilege, but this is argumentative.  It's

17        outside of his scope of expertise.  It's outside

18        of his report.  And it's improper.  He can do --

19             MR. KRAEUTER:  It's not outside, it's not

20        outs his report.

21             MS. RICHARDSON:  It's far outside of his

22        report, Scot, and you know it.  But if he wants

23        to answer it, he can answer it.

24             MR. KRAEUTER:  All right.  He has

25        testified, for the record, he has testified that

Page 120

```
1        this is a peer-reviewed article that he relied

2        on forming his opinion.  And I am

3        cross-examining him.

4             MS. RICHARDSON:  He relied on a portion of

5        it, Scot.  And you know that you're exceeding

6        it.  He can answer.  I've not instructed him not

7        to answer.

8        Q    (By Mr. Kraeuter) Okay.  Answer the question,

9   please, sir.

10       A    This is not part of the report that I

11  relied upon.  As explained in my report, number 14 on

12  page 9, these -- there were three studies that we

13  found in peer-reviewed professional journals that

14  disclose the cost of neurostimulation or

15  neuromodulation for treatment of back pain.  And

16  those were generally in the 30,000 to $40,000 range,

17  and I included copies of abstracts of those studies

18  and cite them.  We're not relying on any other

19  elements of those reports for my opinions; only the

20  costs.

21       Q    So if I'm summarizing this correctly,

22  Mr. Blount, you want to cherrypick the good parts of

23  these peer-reviewed articles that you believe help

24  your opinion and disregard anything else that may

25  not?
```

Page 121

1              MS. RICHARDSON:  Object to the form.

2         Q    (By Mr. Kraeuter) Is that fair?

3         A    No.  I looked for any studies disclosing

4    costs for these types of devices.  These were the

5    only three that I could find.  I did not cherrypick

6    any to exclude any reports, and I did not search for

7    reports that had low numbers.  I searched for reports

8    that had these devices in studies that included cost

9    or charges.

10        Q    Well, Mr. --

11        A    And I've presented to you all of the

12   information that we did obtain.  Nothing has been

13   cherrypicked.

14        Q    Mr. Blount, maybe my question was not clear

15   enough.  I'm not suggesting you cherrypicked from

16   different peer-reviewed articles and went with the

17   best of the articles out there.  I'm asking whether

18   you cherrypicked the contents within the very

19   peer-reviewed articles you state you rely on for your

20   opinion.  You want to take out the parts of the very

21   peer-reviewed articles that you like, but disregard

22   other parts; isn't that true?

23             MS. RICHARDSON:  Object to the form.

24             THE WITNESS:  No.  That's not true.

25        Q    (By Mr. Kraeuter) Okay.  Let's go to Exhibit

1    83, please.

2        A    Okay.

3        Q    Is this a peer-reviewed article you relied

4    on in formulating your opinion?

5        A    I believe so.

6        Q    Okay.  And this article was written by it

7    looks like three doctors from Canada?

8        A    Yes.

9        Q    Okay.  And --

10       A    Well, I'm not sure where they're from.

11   They have Canadian medical affiliations, though.

12       Q    The hospitals that they have privileges at

13   are in -- I can't even say it.  Sakas --

14       A    Saskatchewan.

15       Q    Saskatchewan, Canada; is that right?

16       A    Yes.  But that doesn't prove where they're

17   from.  I mean --

18       Q    Okay.

19       A    -- they could have been born in

20   Afghanistan, for all I know.

21       Q    Well, let me rephrase it.

22       A    Okay.

23       Q    This article was written by three doctors

24   that practice in Canada, correct?

25       A    That's correct.

1        Q     All right.  Now, looking at page 107 of the

2   article, first column under "patient selection" it

3   says, we have a large database that includes 350

4   patients who have undergone SCS, spinal cord

5   stimulation, in the past 20 years.  Do you see that?

6        A     Yes.

7        Q     And this paper was written back in 2001?

8        A     Yes.

9        Q     So we're looking at data that automatically

10   is 15 years old, correct?

11        A     Correct.  Well, part of it.

12        Q     Okay.  And the data could go as far back as

13   about 1980 since it's 20 years of data, correct?

14        A     Yes.

15        Q     So that makes the data up to 36 years old,

16   correct?

17        A     Yes.

18        Q     Now, looking at the bottom on page 107 it

19   says, "To non-Canadian readers, the" low -- excuse

20   me, "the cost calculations presented in this article

21   may seem low, compared with their experience in the

22   United States."  And it goes on to say, "The lower

23   financial costs are attributable to differences in

24   pricing by the manufacturer of the implantable

25   devices used and" tightening -- "and tight regulation

1    by the provincial or federal government of the fee

2    schedules for various professional organizations."

3    That's talking about Canadian fees, right?

4         A    That's correct.

5         Q    And we can agree that in Canada the cost of

6    medical care is much different than in United States?

7         A    It's different.

8         Q    Correct.

9         A    It's different.  I'm not sure what you mean

10   by "much."

11        Q    I see.

12             Let's go to page 108 where it talks about

13   the "costs of implantable devices."  It says, the

14   costs for implantable devices were calculated from

15   the 2000 price list provided by the manufacturer,

16   Medtronic of Canada, as charged to Canadian

17   hospitals.  Do you see that?

18        A    Yes.

19        Q    Okay.  Anywhere in this article that talks

20   about the charges at American hospitals?

21        A    I'm not sure.  I was looking for a part of

22   the study that may have disclosed a factor that they

23   used to determine the U.S. equivalent, but that could

24   be in one of the other three studies.  I'm sorry, the

25   other two studies.  So this could be Canadian only.

Page 125

1      Q    Okay.

2      A    I don't -- I'd have to go back and review

3   the report in detail.  It's a lot of fine print.

4      Q    Now, further on down that column it says,

5   "The pulse generator needed to be replaced after 3.5

6   to 4.5 years, the average lifespan of its battery."

7   Do you see that?

8      A    Which page again are you on?

9      Q    108.

10      A    Okay.  Just a minute.

11      Q    Just below where it says "costs of

12   implantable devices."

13      A    In that same section of costs?

14      Q    Yeah.  It says, "The pulse generator."

15      A    Okay.  Oh, I see it.  Yes.  I see that now.

16   Yes.

17      Q    Okay.  Now, I think Dr. Niederwanger said

18   it needed to be replaced every 7 to 10 years?

19      A    Yes; the, the battery life over at least

20   recent years.  I don't profess to know about these

21   things going back 20 years ago, but I think there's

22   multiple manufacturers now that say that their

23   battery will need to be replaced every 10 years.

24      Q    Okay.  So you --

25      A    Battery life has extended over time as

1    technology has advanced.

2         Q    Okay.  And at the bottom of that column,

3    the very last sentence it says, "The fees paid to the

4    various physicians and surgeons in the study were

5    derived from the year 2000 payment schedule for the

6    Saskatchewan Medical Association."  Do you see that?

7         A    Yes.

8         Q    Does that have any bearing on rates in the

9    United States?

10        A    I think they're -- they have some

11   similarity.

12        Q    Let's go to page 114 of the article,

13   please, sir.

14        A    Okay.

15        Q    Down at the bottom of the page in the

16   second column, the right-hand column, it says, "The

17   absolute derived costs may not be directly comparable

18   to those encountered and may be lower than those in

19   the United States or Europe.  This difference is a

20   consequence of the nature of the medical delivery

21   system in Canada and differences in pricing by the

22   manufacturer in different countries, which limit

23   absolute costs."  Do you see that?

24        A    Not yet.  Which paragraph are you in?

25        Q    Very, very bottom of page 114.  The last

Page 127

1    sentence on the right column is where it starts, and

2    it goes on to page 115.

3          A    Oh, okay.

4               I think you read that correctly.

5          Q    Okay.  So do you agree with that statement?

6               MS. RICHARDSON:  Object to the form.

7               THE WITNESS:  I agree that it's in the

8          report.

9          Q    (By Mr. Kraeuter) Okay.  You don't agree that

10   pricing in Canada is much different and, in fact, lower

11   than pricing in the United States and costs in the

12   United States?

13         A    Well, it says it "may be lower."  It

14   doesn't say --

15         Q    Mm-hmm.

16         A    The word "much" is not, I don't think, in

17   this paragraph.

18         Q    Okay.

19         A    It says it "may be lower."

20         Q    Have you undertaken in this case to do any

21   study to determine the relative difference in pricing

22   and costs for medical care in Canada and the United

23   States?

24         A    No.

25         Q    Let's take a look at Exhibit 84.

1      A    Okay.

2      Q    Did you rely on this peer-reviewed article?

3      A    No, but it looks somewhat familiar.  I

4  recognize the author's name Kumar, but it's not cited

5  in my report.  But, see, this -- I think I have read

6  this.  And it does contain both U.S. dollar and

7  Canadian dollar amounts.

8      Q    Well, let's take a look at page 8 of your

9  report, please, sir.  Down at the bottom you talk

10 about independent research on spinal cord stimulation

11 costs.  Do you see that, sir?

12     A    Yes.  Oh.  Yes.  This is that article.

13 This is referring to that article.

14     Q    Okay.  So you did rely on this in forming

15 your opinions in this case?

16     A    Yes.

17     Q    Okay.  And this is also, again, written by

18 Dr. Kumar, the Canadian doctor?

19     A    Yes.

20     Q    Okay.

21     A    So I do have this.

22     Q    And this article was written in 2009?

23     A    Correct.

24     Q    And I believe if you look on the method

25 section of the first page it analyzed 197 cases

1    between 1995 and 2006?

·2          A    Yes.

3          Q    Okay.

4          A    I believe this is the most recent study

5    that we could find.

6          Q    Okay.  And in there it has a cost for Blue

7    Cross/Blue Shield, which is private insurance?

8          A    Yes.

9          Q    And the Blue Cross/Blue Shield cost back in

10   2009 was $57,896 to implant a spinal cord stimulator?

11         A    That's what they report.

12         Q    Okay.  And Medicare costs were $32,882; is

13   that right?

14         A    Yes.  That's what it says.

15         Q    So there's a difference between Blue

16   Cross/Blue Shield costs and Medicare costs, correct?

17         A    Yes.  And I believe they're referring to

18   the amount of the reimbursement; the payment.

19         Q    Does -- is there anywhere in this article

20   that talks about what's charged?

21         A    I'm not sure.  I'd, again, have to go back

22   and read all the words.  A lot of times I've seen in

23   studies -- other studies, not necessarily this one --

24   but the researchers sometimes confuse the term

25   "charge" and "cost," as you have in some of your

1    questions.  But --

2         Q    The same question -- I would have the same

3    question for exhibits 81, 82, and 83.  Do any of

4    those reports deal with what's paid versus what's

5    charged for the spinal cord stimulator?

6         A    Yes.  I believe the 2007 study collected

7    charge data for the 42 patients.

8         Q    And it looks like the, the cost for annual

9    maintenance under Blue Cross/Blue Shield is $7,277?

10        A    Yes.

11        Q    Back in 2009?

12        A    I believe so.

13        Q    Or, I guess, somewhere between 1995 and

14   2006, to be accurate?

15        A    Well, the $7,277, the amount that's quoted

16   in the result, is part of the report.

17        Q    Right.

18             And that's for data between 1995 and 2006?

19        A    Yes.

20        Q    Now, it looks like if we go to page 566 of

21   the study --

22        A    Okay.

23        Q    -- in that first column where it says,

24   "Cost comparison with the United States" --

25        A    Yes.

1     Q    Okay.  It says, "We have chosen the payment

2  schedule from the state of Texas."  Do you see that,

3  sir?

4     A    Yes.

5     Q    Is Jackie Orr from Texas?

6     A    I'm not sure where she's from.

7     Q    Okay.  Do you know what it means when they

8  say, "We've chosen the payment schedule from the

9  state of Texas"?

10     A    Not exactly.

11     Q    Do you know if that's a reference to a

12  Workers' Compensation fee schedule for physicians and

13  hospitals?

14     A    It doesn't say that.

15     Q    Okay.  Do you know if it's Medicare charges

16  or payments from the state of Texas?

17     A    Well, it says they're using two major

18  insuring agencies in the United States, Medicare and

19  Blue Cross/Blue Shield.  So if they said that in the

20  proceeding sentence, I would assume that's the, the

21  sources that they're referring to in the next

22  sentence.  Why would I assume --

23     Q    Do you --

24     A    -- that it would be Workers' Comp?

25     Q    Do you know that for a fact?

1       A    Well, it certainly makes more sense than

·2    guessing that it would be Workers' Compensation.

3       Q    Sir, my question was:  Do you know that for

4    a fact?

5       A    The sentence before that says that they,

6    "To provide a clear understanding of the financial

7    impact for implanters in the U.S., we are providing a

8    parallel analysis of our frequency data, using the

9    payment schedule of two major insuring agencies in

10   the United States, comma, namely, Medicare and BCBS,

11   period.  We have chosen the payment schedule from the

12   State of Texas, as it most closely approximates the

13   mean payments for the country."  I think it's a

14   logical inference that the second sentence reference

15   to payment schedule is the same payment schedule

16   referred to in the immediately preceding sentence.

17      Q    All right.  Do you know if this Texas

18   payment schedule that's referred to in the document

19   is the same as Savannah, Georgia medical charges for

20   the same services?

21      A    I do not know.

22      Q    Let's take a look at page 567, please.

23      A    Okay.

24      Q    Okay.  The table -- excuse me.  Let me see

25   here.

Page 133

1              I'm sorry.  Let's go to page 568.

2        A    Okay.

3        Q    Table 4, there's a reference to a

4   rechargeable device.  Do you see that; rechargeable

5   system?

6        A    I don't see it yet.  In the table on

7   page --

8        Q    Table 4.

9        A    Oh.  Table 4.  Okay.

10       Q    Table 4 at the bottom of the page.

11       A    Okay.  Yes.  I see that.

12       Q    Okay.  And it says, "US MC."  Do you know

13  what that stands for?

14       A    No.  I'm not certain.

15       Q    Okay.  It's listing U.S. dollars; USD,

16  correct?

17       A    Yes.

18       Q    And it has a rechargeable system of over

19  $43,000.

20       A    Yes.

21       Q    Okay.  Do you know what that rechargeable

22  system is they're referring to?

23       A    Not without reading the report again.

24       Q    Let's go to Exhibit 85, please.  Do you

25  have that in front of you?

Page 134

```
 1      A    Yes.

 2      Q    Is this a document that you relied on in

 3  formulating your opinion, or opinions in this case?

 4      A    Yes.  We cite that in number ten on page 9

 5  of my report.

 6      Q    Where did this document come from?

 7      A    Page 15.  Well, I have the web link

 8  footnoted number 15 on number -- page number 9.

 9      Q    Okay.

10      A    Apparently somebody in your office found it

11  because they printed it out.

12      Q    And this document examined empirical

13  evidence on reported average price trends for several

14  major categories of implantable medical devices over

15  the period 2007 through 2011; is that correct?

16      A    That's correct.

17      Q    Okay.  And it does not address the price

18  trend after 2011, correct?

19      A    Correct.

20      Q    Do you know what the price trend has been

21  for implantable medical devices since 2011 to today?

22      A    No.  I have searched for --

23      Q    Okay.

24      A    -- studies that would disclose that; have

25  not found one yet.
```

Page 135

1      Q     Now, let's talk about the study, scope, and
2    approach.  Okay?  They looked at the average pricing
3    data for selected device categories.  Do you see
4    that?
5      A     Yes.
6      Q     And they looked in the following seven
7    categories of medical devices:  Cardiac
8    resynchronization therapy defibrillators, implantable
9    cardioverter defibrillators, pacemakers, artificial
10   hips, artificial knees, drug eluting stents, and bare
11   metal stents.  Do you see that, sir?
12     A     Yes.
13     Q     Is a spinal cord stimulator referenced
14   anywhere in the category of devices that were part of
15   this particular study?
16     A     No.
17     Q     Now, Mr. Blount, can we agree that many
18   private insurance carriers say that a doctor or an
19   ambulatory surgical center can bill above the 75
20   percentile usual, reasonable, and customary charge
21   amount and still be reasonable?
22     A     It's possible.
23     Q     In fact, the Veterans Administration say
24   you can go as high as 80 percent, correct?
25     A     That's not what they say.

Page 136

1       Q     I see.

2             Now, if a doctor bills above the 75 percent

3       rate or the 80 percent rate, does that mean the

4       doctor's committing fraud?

5       A     No.

6       Q     Does that mean the doctor's violated some

7       law?

8       A     Not that I know of in Georgia; maybe some

9       other states.

10      Q     Okay.  Are any of the charges in either

11      Dr. Niederwanger or Harben's reports under the

12      uniform customary and reasonable rates -- the usual,

13      customary, and reasonable rates?

14      A     Possibly.

15      Q     Okay.  Did you look at all of the, all of

16      the future medical charges that Dr. Niederwanger and

17      Dr. Harben have recommended in this case?

18      A     I have the list --

19      Q     Okay.  And --

20      A     -- from at least Dr. Plumly.

21      Q     Okay.  And in looking at that list, do any

22      of those charges come underneath or below the usual,

23      customary, reasonable charge rate?

24      A     It's, it's almost impossible to tell

25      because he did not provide the specificity of CPT

1    codes for a lot of these things.  So it's -- you

2    know, I had a limited ability to evaluate some of his

3    data, or charges.  Those that I did evaluate I have

4    provided the information for in the report, or in the

5    material that is included in my other research file

6    that I've provided to you now.

7         Q    Now, is there any law in the State of

8    Georgia that says what is reasonable and not -- what

9    is not reasonable in regard to medical bills?

10        A    I don't know.

11        Q    Okay.

12        A    You'd have to consult --

13        Q    Is there any rule -- go ahead.

14        A    You'd have to consult with an attorney on

15   that, probably.

16        Q    All right.  Is there any rule or law that

17   you know that dictates what a doctor's office or an

18   ambulatory surgical center can charge a patient that

19   doesn't have insurance or Medicaid or Medicare or VA

20   benefits?

21        A    I think there's a law that says you can

22   only charge for what you do.

23        Q    Okay.  But in terms of setting the rate for

24   what you do is there any such law or rule?

25        A    Maybe in the Worker Comp area of the law.

Page 138

1     Q    Okay.  How about for someone that doesn't

2  have Comp, VA benefits, Medicaid benefits or private

3  insurance or Medicare?  Any law or rule that says

4  what a doctor has to charge, or may charge?

5     A    Not that I know of, but I don't profess to

6  have the ability to opine on what the law says.

7     Q    Do you know what the cost of medical care

8  would be if someone walked in off the street to

9  Dr. Harben, Dr. Niederwanger, or the ambulatory

10  surgical center that Optim has for the same type of

11  procedures that we've been talking about in this

12  case?

13     A    No.  I don't have their fee schedule.

14     Q    Do you agree that Jackie Orr is entitled to

15  have a doctor of her choice?

16     A    I guess.

17     Q    Okay.

18     A    I've not been asked to opine on that, but I

19  don't know any reason why she shouldn't.

20     Q    In the Savannah, Georgia area, can we agree

21  that different doctors charge different amounts for

22  their services?

23     A    Some do.  Some charge the same as other

24  doctors.  It does vary.

25     Q    And as a general rule, there's nothing

1    wrong with doctors charging different amounts for the

2    same service?

3                MS. RICHARDSON:  Object to the form.

4                THE WITNESS:  I'm not sure what "wrong"

5           means; if you mean illegal.  I don't, I don't

6           know of a law that would prohibit them from

7           charging a different amount.

8       Q    (By Mr. Kraeuter) Well, do you think it's

9    improper for different doctors to charge different

10   amounts for the same services?

11               MS. RICHARDSON:  Object to the form.

12               THE WITNESS:  Not necessarily.  You know,

13          if one doctor is charging, you know, ten times

14          what the other doctors charge that would seem to

15          be at least questionable and certainly out of

16          the market range.  I mean, if I was spending my

17          money I would not want to spend ten times what

18          everybody else is charging.

19      Q    (By Mr. Kraeuter) Can we agree that sometimes

20   better doctors charge more than other doctors that

21   aren't quite as good?

22               MS. RICHARDSON:  Object to the form.

23               THE WITNESS:  I'm not sure how you would

24          measure good and not quite as good, though.

25      Q    (By Mr. Kraeuter) Well, can we agree that a

Page 140

1   board-certified physician may charge more than one --

2   than a doctor that's not board certified?

3            MS. RICHARDSON:  Object to the form.

4            THE WITNESS:  They could; or they could

5        charge less.

6        Q    (By Mr. Kraeuter) Okay.  Now, you do agree

7   that the doctors should be paid for their medical care

8   and treatment that they're rendering?

9        A    Yes.

10           MS. RICHARDSON:  Did we lose sound?

11       Q    (By Mr. Kraeuter) Now, are you aware of

12  whether somebody like Jackie Orr can go to their

13  physician and tell the physician what she will or will

14  not pay for medical services?

15       A    Yes.  She can do that.

16       Q    Do you know the likelihood of success she

17  would have in doing that?

18           MS. RICHARDSON:  Object to the form.

19           THE WITNESS:  No.

20       Q    (By Mr. Kraeuter) Okay.

21       A    I don't know the chance of success.

22       Q    Have you ever gone to one of your

23  physicians and said, "Look, I'm not going to pay a

24  hundred dollars for this procedure, but I'll pay you

25  75"?

1       A     Not those numbers.  No.

2       Q     Have you ever negotiated with your

3   physician?

4       A     Yes.

5       Q     Or any medical care provider?

6       A     Yes.

7       Q     How many times has that happened?

8       A     I don't recall, but it is becoming much

9   more common now with very high deductibles on

10  insurance plans.  And many people who have health

11  savings accounts will do that, I know from

12  experience.  And there are a number of services that

13  have cropped up on the internet that offer the

14  ability for individuals to outsource that negotiation

15  process.

16          MR. KRAEUTER:  And I'll object to that

17      as -- to that response as speculative.

18          MS. RICHARDSON:  That's not what he wanted

19      to hear.

20      Q     (By Mr. Kraeuter) Would you expect someone

21  like Jackie Orr to know what a CPT code is?

22      A     I don't know.  I don't know her background.

23  She could be a nurse for all I know.

24      Q     Would you expect her --

25      A     She could be --

1      Q     Go ahead.

2      A     She could be a nurse or a coder or maybe

3  has looked at her explanation of benefits if she's

4  had insurance.  A lot of times CPT codes are included

5  on EOBs, and many times they include a brief

6  explanation of what that CPT code definition is.

7      Q     Would you expect Jackie Orr to know what

8  "usual, customary, and reasonable" means regarding

9  medical expenses?

10     A     I have no idea.

11     Q     Okay.  Would you expect her to know what

12 the range of reasonable medical charges are?

13     A     Not necessarily, but, I mean, she could

14 call and ask.

15     Q     Okay.  You're not saying in this case that

16 Jackie Orr had any involvement in setting the amount

17 of the future medical charges in this case, are you?

18     A     That's certainly not in my report.

19     Q     What's that?

20     A     It's certainly not stated in my report.

21     Q     Okay.

22     A     I've not even thought about that until you

23 mentioned it.

24     Q     Now, we talked earlier about someone like

25 Jackie Orr as a patient going to the doctor and

Page 143

1    asking the doctor to reduce their medical bill.  Is

2    the doctor legally required to do that?

3         A    No.

4         Q    Is there anything that would compel the

5    doctor to do that or force the doctor to do that?

6         A    Maybe compassion.

7         Q    Okay.  And if the doctor doesn't reduce

8    their charges and the patient doesn't pay the portion

9    that they're responsible for, they can be sent to

10   collections, can't they?

11              MS. RICHARDSON:  Object to the form.

12              THE WITNESS:  I don't know.  Possibly.

13        Q    (By Mr. Kraeuter) Okay.  Now, in this case if

14   the jury does not award Jackie Orr some of her medical

15   bills as damages in the case and her physicians don't

16   reduce what they've charged her for the medical care,

17   she's the one that's going to have to make up the

18   difference, isn't she?  She's the one that's going to

19   have to pay, is she not?

20              MS. RICHARDSON:  Object to the form.

21              THE WITNESS:  I don't know.  I don't know

22        what her arrangement is with the physician or

23        the ambulatory surgery center.

24        Q    (By Mr. Kraeuter) Now, one of the ways to

25   look at the reasonableness of medical bills is to look

Page 144

1   at the cost for the medical provider to provide the

2   services; is that correct?

3        A     That methodology I think is rarely done.

4        Q     But it's -- it is a methodology?  It is an

5   approach, is it not?

6        A     Yes.

7        Q     And, in fact, it's one that the medical --

8   that the American Medical Association says is an

9   accepted approach to setting rates, fees and charges,

10  correct?

11       A     I have heard other people say that.  I've

12  never seen the actual publication from AMA saying

13  that.

14       Q     Okay.  All right.  So if a physician or

15  ambulatory surgical center has a certain type of

16  specialized equipment that costs more than perhaps

17  another surgery center down the road or a hospital

18  doesn't have such advanced equipment, but that

19  equipment costs more, the specialized equipment costs

20  more, it would be appropriate for the doctor or the

21  surgery center to charge more because their overhead

22  is higher because they have better equipment,

23  correct?

24            MS. RICHARDSON:  Object to the form.

25            THE WITNESS:  Some of your assertion there