# Expert Report of

## L. Lamar Blount, CPA/CFF, FHFMA
## Health Law Network, Inc.

### In the case of

### Jacquelyn Orr

### vs.

### Macy's Retail Holdings, Inc.

### Civil Action No. 416-52

### in US District Court for the
### Southern District of Georgia,
### Savannah Division

### Prepared for
### Drew, Eckl & Farnham

### August 22, 2016



EXHIBIT

4

## I.   BACKGROUND, SUMMARY OF ISSUES AND OPINIONS

This action arises from an accident that the plaintiff, Jacquelyn Orr, had on April 2, 2015.  Health Law Network was engaged by Drew, Eckl & Farnham, on August 8, 2016, to independently review the plaintiff's projected medical charges and to report on our findings as to the reasonable charges for those medical services.

I was provided plaintiff's documents for medical services projected by Alan Harben, MD, PhD, and Markus Niederwanger, MD, and present value calculations by Wayne Plumly, PhD.

### Summary of Opinions

My opinions are based upon my review of the facts presented in this case, published data on usual, customary and reasonable charges for medical services, and my experience as a CPA, auditing and consulting with healthcare providers nationwide for over 30 years.

It is my opinion that the many of the Plaintiff's projections of medical charges exceed the independently sourced usual, customary and reasonable charges for similar services in the Savannah area by more than 50%, and therefore are not credible. Additional errors in the Plaintiff's projections include projections for Oxycodone that contradict the Amended Report of Dr. Niederwanger, and unresolved inconsistencies between projections made by the two MDs.

## II.   PROFESSIONAL QUALIFICATIONS & EXPERIENCE

My current resume and list of publications are attached as Appendix A.  I am a Certified Public Accountant, Certified in Financial Forensics, a Fellow of the Healthcare Financial Management Association, and the founder and president of Health Law Network.

Since 1974, I have provided financial statement audits, financial advisory, reimbursement consulting, and litigation support services for over 500 healthcare clients.  This includes publicly traded national healthcare organizations, integrated healthcare delivery systems, multi-hospital groups, individual hospitals, ambulatory surgery centers and physician groups, as well as health insurance companies, managed care organizations, and government agencies.

In my professional experience, I have directed and managed: charge master and fee schedule rate setting projects, reimbursement consulting and appeal engagements, and resolutions of complex payment disputes between healthcare providers and payors. My professional experience includes serving as:

- Partner of Hyatt, Imler, Ott & Blount, CPAs from 1981 to 1990, responsible for Healthcare Financial Consulting services.  The firm became the 10th largest CPA firm in Atlanta.

- President of Hosplan Micro Systems from 1982 to 1990, which developed and provided software to healthcare providers for rate setting, flexible budgeting, medical record abstracting and coding.

- President of Healthcare Management Advisors (HMA) from 1990 - 2002, which served over 1,500 hospitals nationwide, as well as hundreds of other healthcare providers and organizations.

- President of American Benefit Advisors (ABA) since 2003, which provides group health and other employee benefit insurance consulting and broker services to public and private employers.

- President of Health Law Network (HLN) since 2003, which serves as financial, reimbursement and compliance consultants to hospitals, physicians, state agencies, and attorneys nationwide.

In addition to having published newsletters and serving on multiple other newsletter editorial boards in the healthcare industry, I am the co-author of *Mastering the Reimbursement Process*, Second & Third Edition books, published by the American Medical Association.

During the past 30+ years, I have served as a consultant and expert witness in over 200 cases or projects, testified in over 50 cases, and been admitted as a medical billing, healthcare financial and reimbursement expert in multiple federal and state courts. Appendix B contains information on all of the cases where I have testified as an expert witness since 2010.

Health Law Network is being compensated at its standard hourly rate of $395 per hour for my research, evaluation, and report preparation time, $525 per hour for depositions and trial testimony time, plus out of pocket expenses for any travel and other related expenses in this case. Those are the standard rates and fees charged by Health Law Network when the engagement began, and neither the firm's billing rates nor my personal compensation amounts are contingent upon the outcome of this case.

## III.  INFORMATION CONSIDERED IN FORMING OPINIONS

During my 30+ years of experience in the healthcare industry, I have served as a CPA and consultant to multiple medical and other healthcare providers, government agencies, and insurance carriers. In serving these clients, I have frequently researched rates charged for services and have been consulted on usual, customary and reasonable charges. This experience has given me a reasonable basis for my opinions in this case.

In addition to the above, the documents and information that were considered in forming the opinions in this report include the specific sources listed in this report and attachments and those listed below:

- Plaintiff's Complaint & Second Amended Complaint

- Defenses and Answers of Defendant to Plaintiffs' Complaint & Second Amended Complaint

- *Current Procedural Terminology* (CPT), 2016 Professional Editions, published by American Medical Association

- *Medical Fees 2016*, published by Practice Management Information Corporation (PMIC)

- *Physicians' Fee Reference 2016*, published by Medical Publishers, LTD

- US Department of Veterans Affairs, VHA Chief Business Office, Outpatient Facility Reasonable Charges, 2016

- American Hospital Directory's AHD.com for hospital facility charges

- http://professional.medtronic.com/wcm/groups/mdtcom_sg/@mdt/@neuro/documents/documents/scs-codes.pdf

## IV.   SUMMARY OF PROCESS

My findings and opinions are presented to a reasonable degree of certainty based upon: (1) a comparison of the amounts projected to publicly available medical charge data for the same types of services billed by other medical providers, using methodologies and standards that are consistent with those used in medical billing and generally accepted in the healthcare industry; and (2) my 30+ years of experience and expertise in the fields of medical billing and accounting.

Overview of Process

1. I independently reviewed and evaluated the plaintiff's experts' reports of projected medical charges. I was not asked to audit the accuracy or test the authenticity of the records provided to me, but rather relied on them as submitted.

2. In the process of independently comparing the projected charges for specific professional fees to usual, customary and reasonable amounts for other similar providers, I researched and relied upon two independent UCR sources:

   a. *Medical Fees 2016*, published by Practice Management Information Corporation (PMIC)

   b. *Physicians' Fee Reference 2016*, published by Medical Publishers, LTD

3. I consulted with Dorothy Steed, CPC, and Jessica Schmor, CCS, two of HLN's Senior Coding Consultants, on the appropriate Diagnosis Related Group (DRG) for the inpatient equivalent for the planned Spinal Cord Stimulator surgery.

4. We used Current Procedural Terminology (CPT), published by the American Medical Association as the authoritative source to evaluate the appropriateness of the CPT codes for the projected professional fees.

5. Medicare allowable amounts and the applicable GAF were recorded from the Medical Fees 2016, published by Practice Management Information Corporation (PMIC).

6. As an additional test of the reasonableness of the Professional Fee Charges, I compared the actual charges to the amounts allowable by Medicare.

7. In the process of independently comparing the projected charge amounts for ambulatory surgery center facility services to usual, customary and reasonable amounts for other similar providers, I researched and relied upon the Reasonable Charge Data published by the U.S. Department of Veterans Affairs, which publishes the 80th percentile of charges.

8. To determine comparable hospital inpatient charges for the planned Spinal Cord Stimulator surgery, we used the equivalent inpatient Diagnosis Related Group MS-DRG 029 - SPINAL PROCEDURES W CC OR SPINAL NEUROSTIMULATORS based upon Medtronic's Nerostimulator Commonly Billed Codes, Effective January 2016.

9. We researched the American Hospital Directory (AHD) database for acute care hospitals in Georgia, South Carolina and North Florida reporting inpatient cases of Spinal Cord Stimulator surgery – DRG 029 in 2015.

10. We researched the American Hospital Directory (AHD) database for hospitals in Savannah reporting outpatient CPT procedure codes 63650 or 63685 in 2015.

11. We researched the CMS public data files for DRG Summary for Medicare Inpatient Prospective Payment Hospitals, FY2014 to determine the GA statewide average charges for DRG 029.

12. I performed an online search for published studies on the cost of Spinal Cord Stimulator surgery procedures and devices in peer reviewed professional journals.

13. The sources of comparative usual, customary and reasonable charge data and the methodologies that I used in this engagement are consistent with

those I have used in similar engagements in the past and are generally
accepted in the healthcare industry.

## V.   ANALYSIS OF FACTS, FINDINGS & OPINIONS

Facts

1.  The PMIC Physician Fees is an annually published listing of medical
    procedure codes and descriptions, and it includes UCR fees at the 50th, 75th
    and 90th percentile levels.[1]

2.  The PMIC database was derived from over 400 million actual submitted
    charges obtained from a variety of sources, including third-party payers,
    group practices, clinics, universities, and practice management system
    vendors.[2]

3.  Over 100,000 physicians, hospitals, insurance carriers, and other healthcare
    professionals use PMIC's publications for guidance in coding, billing and
    evaluating their fee schedules.[3]

4.  The Physicians' Fee Reference (PFR) is a nationwide compendium of fees
    based on public sources, including the most recent CMS Limited Data Set
    (LDS) Standard Analytical Files of actual Medicare claims and additional
    independent research.[4]

5.  The U.S. Department of Veterans Affairs Reasonable Charge Data is based
    on the 80th percentile of charges for all types of inpatient and outpatient
    services.  It is based on the gross amount of billed charges in Medicare
    claims, as well as claims submitted by 7 million employees and dependents
    covered by the health benefit programs for large employers and collected
    from over 200 different insurance companies, Blue Cross and Blue Shield
    plans, and third-party administrators. [5]

6.  The U.S. Department of Veterans Affairs is required by Congress to:

    > "...establish VA charges that replicate, insofar as possible, the
    > 80th percentile of community charges, adjusted to the market
    > areas in which VA facilities are located, and trended forward to
    > the time period during which the charges will be used." [6]

---

[1] Medical Fees 2016, Forward
[2] Medical Fees 2016, Sources of Data, page 2
[3] Medical Fees 2016, Contributors, page v
[4] 2016 Physicians' Fee Reference (PFR), Introduction, published by Medical Publishers, LTD
[5] General Accounting Office, Health, Education and Human Services Division, GAO/HEHS-99-124, page 16
[6] Federal Register, Vol. 68, No. 244, December 19, 2003, page 70714

7.  The U.S. Government Accountability Office (GAO), Health, Education and Human Services Division, has studied the Veterans Affairs Reasonable Charge Data on the 80th percentile of charges and reported:

    "In our opinion, VA used a sound methodology...." [7]

8.  The DRG system is a way to categorize similar hospital inpatients and has been used in the United States since 1982 for most acute care hospitals to group patients for management purposes and to determine how much Medicare pays per case for each inpatient stay for all facility services, including operating room, lab tests, x-rays, drugs, supplies, implants, nursing services, etc.   Patients within each DRG category are clinically similar and are expected to use the same level of hospital resources. Groups of patients in DRGs who are expected to require above average resources have a higher weight than those who require fewer resources. [8]

9.  The American Hospital Directory provides data and statistics about more than 6,000 hospitals nationwide. AHD.com's hospital information includes both public and private sources such as Medicare claims data, hospital cost reports, and commercial licensors. AHD.com's data are evidence-based and derived from the most authoritative sources. [9]

10. The American Hospital Directory's database of average inpatient charges includes room and board for overnight stays, as well as operating room, lab tests, x-rays, drugs, supplies, implants, nursing services, etc. for each reported Diagnosis Related Group (DRG). [10]

11. The American Hospital Directory's database of average outpatient charges includes operating room, lab tests, x-rays, drugs, supplies, implants, nursing services, etc. for each reported CPT code. [11]

12. The Medical University of South Carolina - University Hospital was the only hospital for which we found inpatient cases reported in 2015 for DRG 029 - SPINAL PROCEDURES W CC OR SPINAL NEUROSTIMULATORS, and their average charge was $79,307 for an average 7.4 day length of stay. [12]

13. The Georgia state-wide average charge for 87 cases reported in 2014 (the most recent year available) for DRG 029 - SPINAL PROCEDURES W CC OR SPINAL NEUROSTIMULATORS was $82,594. [13]

---

[7] Ibid, page 8
[8] Medicare Hospital Prospective Payment System, Office of Inspector General, August 2001 OEI-09-00-00200
[9] www.AHD.com
[10] Ibid.
[11] Ibid.
[12] Ibid.
[13] https://data.cms.gov/Public-Use-Files/Inpatient-Prospective-Payment-System-IPPS-Provider/9zmi-76w9

Findings

1.  The Plaintiff's projected professional fees for Stellate Ganglion Blocks are
    $2,000 per unit. However, the average of the 75th percentile of usual,
    customary and reasonable charges in the Savannah area is only $766 or
    38% of the Plaintiff's projected charge.

2.  The Plaintiff's projected charges for the drug Nucynta for Dr. Harben's
    dosages are 37% higher per mg than the projected charges for the same
    drug for Dr. Niederwanger, with no explanation for the variance.

3.  The Plaintiff's projected charges include $16,477.08 for Oxycodone
    although Dr. Niederwanger's Amended Report excluded Oxycodone.

4.  The Plaintiff's projected charges for the drug Gabapentin (per Dr. Harben)
    are $55.00 for a 30-day supply. However, the average of the four lowest
    cost pharmacy sources published by GoodRx.com is only $25.98 or 47%
    of the Plaintiff's projected charge.

5.  The Plaintiff's projected Ambulatory Surgery Center charges (or Hospital,
    as stated by Dr. Plumly) for the "Trial" Spinal Cord Simulator are $69,000.
    However, the 80th percentile of usual, customary and reasonable charges
    for the same type of outpatient ambulatory surgery center services in the
    Savannah area are only $17,979 or 36% of the Plaintiff's projected charge.

6.  The Plaintiff's projected Ambulatory Surgery Center charges (or Hospital,
    as stated by Dr. Plumly) for the "Permanent" Spinal Cord Simulator and
    Insertion of the Pulse Generator are $119,660. However, the 80th
    percentile of usual, customary and reasonable charges for the same type
    of outpatient ambulatory surgery center services in the Savannah area are
    only $48,865 or 41% of the Plaintiff's projected charge.

7.  The Plaintiff's projected Ambulatory Surgery Center charges (or Hospital,
    as stated by Dr. Plumly) for both the "Trial" and "Permanent" Spinal Cord
    Simulator are $188,660.  The Medical University of South Carolina -
    University Hospital reported that their average inpatient charge for DRG
    029 - SPINAL PROCEDURES W CC OR SPINAL NEUROSTIMULATORS
    in 2015 was $79,307 or 42% of the Plaintiff's projected charges.

8.  The Georgia state-wide average charge for 87 cases reported in 2014 (the
    most recent year available) for DRG 029 - SPINAL PROCEDURES W CC
    OR SPINAL NEUROSTIMULATORS was $82,594 or 44% of the Plaintiff's
    projected charges.

Independent Research on Spinal Cord Stimulation Costs

9.  An article titled "Financial Impact of spinal cord stimulation on the
    healthcare budget: a comparative analysis of costs in Canada and the
    United States" published in The Journal of Neurosurgery: Spine provides

independent evidence of annual maintenance costs. This article resulted from the researchers' study of the initial implementation and annual maintenance costs for patients who had a spinal cord stimulation implant. The total cost of patient workup, initial implantation, annual maintenance, and resources necessary to resolve complications were assessed for each of 197 patient cases studied. This article reported that the cost in the United States was $57,896 for the initial implantation, and $7,277 for annual maintenance cost of an uncomplicated case (in 2007 USD). [14]

10. An article titled "Recent Average Price Trends for Implantable Medical Devices, 2007-2011" published by Analysis Group, Inc. in September 2013, by Genia Long, Richard Mortimer, and Geoff Sanzenbacher, reports on empirical evidence on reported average price trends for several major categories of implantable medical devices (IMDs) based on a sample of selling prices reported by 294 hospitals. This article reported that from 2007 to 2011 the average price of the electronic implantable medical devices declined by 14% to 16%. [15]

11. The US Bureau of Labor Statistics Data shows that the Consumer Price Index for all South Urban Consumers for Medical Care increased from 333.994 in July 2007 to 440.883 in July of 2016, which is a 32% increase. [16]

12. The US Bureau of Labor Statistics Data shows that the Consumer Price Index for all South Urban Consumers for Medical Care Commodities increased from 278.467 in July 2007 to 352.624 in July 2016, which is a 27% increase. [17]

13. Using the US Bureau of Labor Statistics Data inflation rates described in above, applied to the $7,277 in 1977 dollars for annual maintenance cost, the projected annual maintenance cost in 2016 would be $9,241 to $9,606.

14. Three studies were found in peer reviewed professional journals that disclosed the cost of neurostimulation or neuromodulation for treatment of back pain was generally in the $30,000 to $40,000 range. Copies of abstracts of those reports are shown in Appendix C – Independent Cost Studies for Neurostimulation Treatment of Back Pain.

   a. Clinical Journal of Pain (2004) study of 220 patients at the Cleveland Clinic Foundation found, "The mean per patient total reimbursement of spinal cord stimulation/peripheral nerve stimulation absent pharmacotherapy was $38,187.

   b. Neurosurgery (2007) study of collected charge data for the first 42 patients in a randomized controlled crossover trial found,

---

[14] http://thejns.org/doi/abs/10.3171/2009.2.SPINE0865
[15] http://advamed.org/res.download/365
[16] http://data.bls.gov/pdq/querytool.jsp?survey=cu
[17] Ibid

"The mean per-patient costs were US $31,530 for SCS (spinal cord stimulation)..."

c. Neurosurgery (2002) study "determined the average cumulative cost for SCS therapy for 5 years was $29,123 per patient..." [18]

~~~~~~~~~~~~~~~~~~~~~~~

I reserve the right to supplement or revise my opinions expressed in this report based on review of additional documents, depositions, testimony, or other information that becomes available prior to my trial testimony, without any obligation to revise and reissue this written report. For purposes of providing testimony at trial, I may illustrate my testimony with demonstrative aids such as graphs, charts, and/or slides. I also expressly reserve the right to rely on the opinions expressed by any other expert retained in this case. This report should be read in its entirety.

*L. Lamar Blount* (signature)

L. Lamar Blount, CPA/CFF, FHFMA

---

[18] HLN Attachment 6

Appendix A
# L. Lamar Blount, CPA/CFF, FHFMA

<u>Professional Experience</u>

2003 – Present                                                    President & Founder

- American Benefit Advisors, Inc. (ABA) – Independent insurance broker and benefits consulting firm providing innovative solutions to employers through improved benefit plan designs and communications, including Health, Disability, Life, Dental, LTC and other benefits for privately held and public organizations with 2 to 1,000+ employees & individuals. Licensed in 10+ states.

- Health Law Network, Inc. (HLN) – Consulting firm providing compliance and litigation support in: Medicare & Medicaid, medical billing disputes, clinical documentation, ICD & CPT coding, reasonableness of hospital & professional fee charges, statistical sampling, EHR, medical damages, health insurance and forensic accounting. Served as consulting expert in 100+ cases, and provided expert testimony in multiple US District Courts and State Courts in 30+ states. Clients represented include privately held and publicly traded organizations, hospitals & health systems, physicians, insurance companies, government agencies and healthcare law firms nationwide.

1990 – 2002        Healthcare Management Advisors        Chairman & Founder

- Developed national consulting firm, which included MD, RN, RHIA, JD, MHA, and CPA consultants who served more than 1,600 hospitals and healthcare providers in 50 states.

- Directed 100+ person staff who provided: training for physicians, coders, and billers; DRG and APC reviews; Medicare compliance services; medical record, UR & QA consulting services; reimbursement planning and appeals; operational reviews; contract coding; and litigation support.

- Clients included Memorial Hermann Health System, Emory Healthcare, Veterans Administration, Hospital Corporation of America, American Medical International, HealthSouth, Tenet, North Broward Hospital District, Baptist Healthcare System, Inova Health System, Baptist Health System, Methodist Healthcare, and other healthcare organizations and law firms nationwide.

1981 – 1990        Hyatt, Imler, Ott & Blount - Atlanta        Partner & Co-Founder

- Co-founding partner of the tenth largest CPA firm in Atlanta (as of 1990). Developed the firm's audit and healthcare financial consulting practice, including reimbursement planning, financial projections, medical record and utilization reviews, receivables management, litigation support, CON assistance, rate setting, chargemaster analysis, and feasibility studies.

- President of HOSPLAN Micro Systems (an affiliate) which developed and sold medical records, budgeting, rate setting and reimbursement software to 600+ hospitals nationwide. Designed RatePlan procedural rate optimization system in 1983 and used by 3M Consulting through 2010.

1974 – 1981        Ernst & Young - Atlanta        Healthcare Audit Manager

- Supervised substantially all financial audits and reimbursement consulting engagements of Georgia healthcare clients as well as Hospital Corporation of America (HCA) and Adventist Health System. Served as office coordinator for the firm's computerized cost report system and assisted national office in revisions of the KOSTPAK system and user support material.

# L. Lamar Blount, CPA/CFF, FHFMA

## Education/Licenses/Certifications

- BBA with Major in Accounting - 1974 - Georgia Southern University
- Certified Public Accountant - 1976 - Georgia # 3625
- Certified Healthcare Financial Professional (HFMA) -- 1997
- Fellow Healthcare Financial Management Association (HFMA) – 1998
- Property & Casualty Insurance Agent -- 2001 - Georgia # 595707
- Life, Accident & Sickness Insurance Agent -- 2002 - Georgia # 595707
- Certified in Financial Forensics (AICPA) - 2010 - # 4509
- Life, Accident & Sickness Insurance Counselor - 2011 - Georgia # 595707
- Registered Life Settlement Broker -- 2014 - Georgia

## Publications

- *Mastering the Reimbursement Process* – Second & Third Edition books - Co-author for AMA
- *HMA Strategy Advisor* – Newsletter Editor and Publisher 1990 - 2002
- *Strategy Advisor News* – Newsletter Editor and Publisher 2003 - 2004
- *Hospital Payment & Information Management* - Newsletter Editorial Advisory Board 1990-95
- *Medical Office Manager* - Newsletter Editorial Board 1992 - 2016
- *Medical Records Briefing* - Newsletter Editorial Advisory Board 1992 - 2001
- *Physician's Payment Update* - Newsletter Editorial Advisory Board 1990 - 1995
- *Report on Medicare Compliance* - Newsletter Editorial Advisory Board 1997 - 2001

## Professional Societies and Associations

- American Institute of CPAs
- American Health Lawyers Association
- Association of Healthcare Auditors and Educators
- Georgia Society of CPAs
    - Ethics Committee 1995-1997
    - Forensics & Valuations Task Force 2013
- Health Care Compliance Association
- Healthcare Financial Management Association
    - Georgia Board Member 1988-1989
    - Awards - Follmer Bronze, Reeves Silver, Muncie Gold, and Founders Medal of Honor
- National Association of Health Underwriters

# L. Lamar Blount, CPA/CFF, FHFMA

## Lectures/Seminars/Programs Presented

"Code of Conduct & Compliance Training" – June 2002, Neurology Associates

"Compliance & Benefit Solutions" – February 2002, HBA & Colonial Life

"Compliance – Getting Physicians' Buy-In" – April 2000, HMA

"Compliance Issues Ending in Court Cases" - 2011 National AHCAB Conference

"Compliance Risks & Solutions for MDs" – July 2003, MCCG Family Practice Residency

"Controlling Compliance Risks" – 2002, Association of American Physicians & Surgeons

"Employee Benefit & ERISA Compliance Issues" – January 2013, Georgia HFMA

"Hot Topics in Compliance" – January 2000, GHA; and February 2001, GA HFMA

"Improving Coding Accuracy & Compliance" – September 2000, Covenant Health System

"Knowing and Avoiding the OIG Compliance Targets" – January 2003

"Medicaid Forum – CFO Update" – December 1999, Georgia HFMA

"Minimizing HIM Fraud and False Claim Risks" – March 1999, HMA

"ObamaCare – Employers Beware" – August 2013, Atlanta CPA Alliance

"OIG & Auditing Issues" – 2010, National AHCAB Conference

"OIG Compliance Targets" – February 2002, HFMA Dixie Institute

"Reducing PFS Compliance Risks" – April 2000, HSI PFS Roundtable

"Reducing Risks for Providers & CPAs" – August 2000, NY Society of CPAs

"Self-Disclosure Protocol - Advantages and Pitfalls" – 1998 Health Care Compliance Institute

"Small Business Survival & ACA Update" – May 2014, MS CPAs

"Strategic Options for Employers Under the ACA" – May 2015, SHRM Atlanta

"State of Compliance in Healthcare" – April 1999, Kentucky HFMA

# Appendix B

## L. Lamar Blount, CPA/CFF, FHFMA
## Expert Witness Testimony 2011 - 2016

**Kimberly Blackmon vs. Timothy Hairstin and Hobart Corporation**, in Case No. 2015cv00032E in State Court of Clayton County, GA.  Testified in August 2016 deposition on expert report regarding proper billing and reasonable charges for Ambulatory Surgery Center and professional fees. Engaged for the defendants by Nikolai Makarenko, Esq. with Groth & Makarenko in Suwanee, GA.

**US ex rel. Suzanne Balko v. Senior Home Care, Inc.**, Case 8:13-cv-03072 in US District Court, Middle District of Florida, Tampa Division. Testified in June 2016 deposition on expert report regarding proper billing and reimbursement for home health services. Engaged for the plaintiff by Donald Schutz, Esq. in St. Petersburg, FL.

**Mindy Sullivan v. Yasviel Gonzalez, Junior Rivera, and North American Transport**, Case 1:15-cv-00439 in US District Court, North Georgia. Testified in May 2016 deposition on expert report regarding proper billing and reasonable charges. Engaged for the defendants by Matt Stone, Esq. with Smith Moore Leatherwood in Atlanta.

**Odom v. Schlueter Pipe Organ, Westfield Insurance, et al.**, Civil Action No. 13A – 49540 in State Court for DeKalb County, Georgia.  Testified in July 2015 deposition and trial on the comparison of billed charges to published UCR amounts.  Engaged for the defendants by Chris Penna, Esq. of Penna & Mendicino in Conyers, GA.

**Kimberly Prive vs. Toole Industrial Supplies, Inc. and Douglas Harold Davis**, Case No.: 2010-CA-3764 in Circuit Court, Fourth Judicial Circuit for Duval County, Florida.  Testified in June 2015 deposition on billed medical charges, the reasonableness of certain charges, and worked time data.  Engaged for the defendant by Kevin Jakab, Esq. of Jakab Law Firm in Jacksonville, FL.

**USA v. Sardar Ashrafkhan** in No. 11-CR-20551 in US District Court, Eastern District of Michigan, Southern Division.  Testified in June 2015 trial on Medicare billing requirements and CPT code definitions for physician services to home bound patients. Engaged for the defendant by Gregory Moore, Esq. and Martin Crandall, Esq. of Clark Hill in Detroit, MI.

**Sarkis Karunyan v. Special Agent Lauren Hanover and the United States of America**, in No. CV-10-00198-PHX-ROS in United States District Court, District of Arizona.  Testified in April 2015 deposition on Medicare DME coverage requirements. Engaged for the plaintiff by Peter Akmajian, Esq. of the Udall Law Firm in Tuscon, AZ.

**Santrell L. Bell v. Celio O. Burrowes, M.D., and The Georgia Center for Bariatric Surgery, Inc.** in Civil Action File No. 13-EV-018048-E in the State Court of Fulton County, GA. Testified in March 2015 deposition on Medicare coverage and billing requirements.  Engaged for the plaintiff by Eddie Cooper, Esq. in Atlanta, GA.

**Dr. Amado Viera v. FL Agency for Health Care Administration**, in Final Audit Report No. 14-0412-000 before Administrative Law Judge in West Palm Beach, FL. Testified in December 2014 hearing on expert report regarding Medicaid reimbursement issues, challenging the State on their statistical sample, CPT coding and medical necessity determinations. Engaged for the plaintiff by Michael Keenan, Esq. in West Palm Beach, FL.

**Shawn Rosenbaum, et al. v. IMC-Heartway, et al.**, in Cause No. 2009-Ci-01757, in the District Court of Bexar County, Texas. Testified in September 2014 deposition on expert report regarding Medicare coverage and limitations for motorized wheelchairs and accessories. Engaged for the defendants by Erin Westendorf-Boyd, Esq. of Chamberlain McHaney in Austin, TX.

**Leslie and Adam Karwowski vs. Adam Kopelan, M.D., et al.**, in Docket No. ESX-L-69-10, in Superior Court of New Jersey, Essex County. Testified in July 2014 deposition on expert report evaluating the reasonableness of one patient's $4.8 million in medical bill charges by hospitals, sub-acute, home health, physician, radiology, laboratory and other professional fees, TPN supplements and medications. Engaged for the plaintiffs by Carol Forte, Esq. with Blume, Goldfaden, Berkowitz, Donnelly, Fried & Forte in Chatham, NJ.

**Cathy A. Mitchell v. Conseco Life Insurance Company**, Civil Action No. 8:12-548 in US District Court for South Carolina. Testified for the defendant in March 2014 deposition on expert report regarding health insurance policy benefits and coverage issues; engaged by Jamie Moore, Esq. and Gary Howard, Esq. of Bradley Arant Boult Cummings, LLP, in Birmingham, AL.

**City of Clinton Iowa vs. Hopkins and Michael Walker**, in Case No. LACE 123660 before Iowa District Court for Scott County. Testified for the defense in October 2013 legal malpractice trial regarding a prior $4.5 million False Claim Act settlement for Medicare and Medicaid ambulance service billing by Clinton, Iowa; engaged by Robert Waterman, Esq. of Lane & Waterman in Davenport, IA.

**Flores and Villacorta v. Georgia Power Company**, in Civil Action File No. 11-C-09903-06 before State Court of Gwinnet County, GA. Testified for the defendant in June 2013 deposition on expert report regarding reasonableness of medical charges for hospital and physician claims; engaged for the defense by Scott Farrow, Esq. and Michael Rafi, Esq. of Troutman Sanders in Atlanta, GA.

**In the Matter against Reginald Buford, MD & Gary Killyon, MD**, in SOAH CASES: 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MD & 8759MD before the Texas Medical Board. Testified in April 2013 hearing on expert report regarding reasonableness of charges for physician claims; engaged by Barbara Jordan, Esq. for Texas Medical Board, in Austin, TX.

**USA ex rel. Reynolds v. Planned Parenthood Gulf Coast**, in Civil Action No. 9-09-CV-124, before the US District Court for the Eastern Division of TX. Testified for the plaintiff in deposition in October 2012 on expert report on documentation, coding and billing Medicaid, Titles V, X & XX for clinic services, in which HLN performed a forensic audit on a statistically valid sample of 478,000 claims containing 1.8 million items;

engaged by Frank Manion, Esq. of American Center for Law & Justice in New Hope, KY.

United Biologics, et al v Texas Allergy, Asthma and Immunology Society (TAAIS), et al, Cause No. D-1-GN-11-002421, in the District Court of Travis County, Texas, 353rd Judicial District. Testified for the defendant in deposition in September 2012 on proper billing for allergen and immuno-therapy services; engaged by Catherine Kyle, Esq. of Chamberlain McHaney in Austin, TX.

Oklahoma Heart Hospital, LLC, v. OneBeacon Insurance Company, in CIV-11-739-F before the US District Court for the Western District of OK. Testified for the defendant in deposition in July 2012 on expert report on the proforma amount of Medicare reimbursement for hospital and physician charges; engaged by Tarron Gartner, Esq. of Cooper & Scully in Dallas, TX.

New York vs. Herschman, in Case 01548N-2011 before the Nassau County Supreme Court, New York. Testified for the defendant on Medicare reimbursement, coding and billing for physician services in insurance fraud trial in May 2012; engaged by Samuel Karliner, Esq. of Adler & Karliner in Brooklyn, NY.

Medical Center of Central Georgia, Inc. vs. The City of Macon, Georgia, Inc., in Civil Action No. 05-CV-31168, before the Superior Court of Bibb County, Georgia. Testified in deposition in March 2012 for the defendant on expert report regarding documentation, coding and billing for hospital and physician services; engaged by William Noland, Esq. and Amy Dever, Esq. of Childs & Noland in Macon, GA.

U.S. ex rel. Sharp v. Eastern Oklahoma Orthopedic Center, in Case No. 05-CV-572-TCK-TLW, before the United States District Court for the Northern District of OK. Testified in deposition in March 2012 for the defendant on expert report regarding documentation, coding and billing Medicare for physician services; engaged by Richard Mullins, Esq. of McAfee & Taft in Oklahoma City, OK.

Glenwood Systems, LLC vs. Augment Technology Solutions Pvt. Ltd., and Augment Technology Solutions, LLC d/b/a ATS Health Care, et al., in US District Court, Central District of CA, Case No. 2:10-cv-08910-CAS. Testified in deposition in February 2012 for the defendants on expert report regarding business practices of outsourced medical billing firms; engaged November 2011 by Michaël Fischer, Esq. of McKasson & Klein in Irvine, CA.

Andalusia Regional Hospital v. Steven M. Hults, D.O., in arbitration before the AHLA ADR Service, AHLA No. A-062110-839. Testified in October 2011 deposition and November 2011 hearing for the defendant on expert report regarding Medicare and Medicaid Conditions of Participation and proper billing for anesthesia services; engaged by Kirk Goettsch, Esq. with Parsonage Vandenack Williams, Omaha, NE.

HLN Appendix C - Independent Cost Studies for
Neurostimulation Treatment of Back Pain



RUBENSTEIN PUBLIC RELATIONS, INC.

NORTH AMERICAN NEUROMODULATION SOCIETY
4700 W. Lake Avenue
Glenview, IL 60025
www.neuromodulation.org

Rubenstein Public Relations
Contact: Eve McGrath  Tel: 212-843-8490
Email: emcgrath@rubensteinpr.com

## FOR IMMEDIATE RELEASE

### 10 Things to Know About Neuromodulation
Minimally Invasive Procedures to Reduce or Alleviate Pain

NEW YORK – February 24, 2010 – Robert Foreman, Ph.D., president of the North
American Neuromodulation Society (NANS), stated, "Neuromodulation is among the
most rapidly growing fields in medicine today. It can help to relieve chronic back pain,
pain from cancer and other nerve injuries, pain from Complex Regional Pain Syndrome
(CRPS) and Reflex Sympathetic Dystrophy (RSD) greatly improving the quality of life for
patients."

Neuromodulation encompasses the application of targeted electrical, chemical and
biological technologies to the nervous system in order to improve function and quality of
life. The appropriate therapy (low level electrical pulses or micro-doses of medicine) are
targeted to nerves along the spinal cord to block pain signals to the brain

According to Joshua Prager, MD, MS, former president of NANS, "Neuromodulation can
give people their lives back.  Patients have gone from wheelchairs back to the tennis
court, back to the sidelines of their children's soccer games, back to their jobs.  There are
few treatments that can improve the activity level and the psychological outlook of a
patient in pain like neuromodulation techniques."  NANS has compiled ten things
everyone should know about neuromodulation:

1. Neuromodulation alleviates or lessens pain without putting patients into a
"drug fog."
By relieving pain with neuro-stimulation or a drug-delivery system, that provides micro-
doses of medicine, the patient can avoid some side effects, including excessive sedation
or clouding of thoughts.

**2. Potential neuromodulation patients can "test drive" the modality.**

Neuromodulation is administered via minimally invasive techniques and it is a rare medical treatment that the patient can "test drive" during an incisionless trial before final consideration of the device's insertion.

**3. Neuromodulation is FDA approved and has been used in practice for two decades.**

Extensive research and clinical trials have documented neuromodulation's ability to decrease chronic pain and improve the quality of life for patients.

**4. Neuromodulation can be applied through different techniques.**

Neuromodulation comprises four treatment modalities: spinal cord stimulation, spinal drug delivery systems, brain stimulation and peripheral nerve stimulation. These treatments should only be administered or provided by a trained <u>Physician</u> who specializes in this type of care.

**5. Neuromodulation implants can be removed.**

Once implemented, if the patient chooses to stop the treatment, the device can be removed. The procedure is reversible.

**6. Neuromodulation improves the quality of life for patients in pain.**

The American Pain Foundation estimates that chronic pain affects 76.5 million people in the U.S., while the National Institutes of Health estimates that chronic pain costs the U.S. economy $100 billion a year in lost work time and medical expenses.

<u>Therapeutic Effectiveness</u>
* In a national registry of patients with low back pain, implanted with an intrathecal drug deliver (IDD) system:
    * At the 6 and 12 month follow-up evaluations, pain scores had decreased significantly both for back and leg pain compared to baseline. At 12 months, back pain had declined by 48% and leg pain by 32%.
    * At 6 and 12 months, improvements in functional abilities had occurred in 60% and 65% of the patients.
      Deer T, et al. Pain Med 2004

* According to a study conducted by North et al. in 2005, 47% of patients who received Spinal Cord Stimulation (SCS) found that it relieved their pain by 50% or more; this is significantly more than the 12% who achieved the same effect through reoperation.
  North RB, Kidd DH, Farrokhi F, Piantadosi SA. Spinal cord stimulation versus repeated lumbosacral spine surgery for chronic pain: a randomized, controlled trial. *Neurosurgery*. 2005;56:98-106; discussion 106-107.

* Back pain accounted for 40% of absences from work, second only to the common cold.
  Guo HR, Tanaka S, Halperin WE, Cameron LL. Back pain prevalence in US industry and estimates of lost workdays. *Am J Public Health*. 1999;89:1029-1035.

* Recent systematic reviews of many trials with thousands of patients also verify the benefits of SCS. A 2005 review of 74 studies of 3300 patients with chronic leg and back pain and FBSS found that:
    * 62% of implanted patients achieved at least 50% pain relief.
    * 53% needed no analgesics post-SCS.

- 40% returned to work.
- 70% were satisfied with SCS.

Taylor RS, Van Buyten JP, Buchser E. Spinal cord stimulation for chronic back and leg pain and failed back surgery syndrome: A systematic review and analysis of prognostic factors. *Spine.*2005;30:152-60.

Cost-effectiveness
- SCS pays for itself within 2.1 years with patients who have clinically effective SCS.
Bell GK, Kidd D, North RB. Cost effectiveness analysis of spinal cord stimulation in treatment of failed back surgery syndrome. J Pain Symptom Manage. 1997;13:286-295. Cited by: Stojanovic MP, Abdi S. Spinal Cord Stimulation. Pain Physician. 2002;5(2): 156-166.

- Another study by Kumar determined the average cumulative cost for SCS therapy for 5 years was $29,123 per patient, less than the per-patient cost of $38,029 for conventional pain therapy.
Kumar K, Malik S, Demeria D. Treatment of chronic pain with spinal cord stimulation versus alternative therapies: cost-effectiveness analysis. Neurosurgery 2002;51:106-116.

- A cost-benefit analysis by Mekhail et al. in the *Clinical Journal of Pain* revealed that the cost savings associated with SCS was $30,221 per patient per year.
Mekhail NA, Aeschbach A, Stanton-Hicks M. Cost benefit analysis of neurostimulation for chronic pain. Clin J Pain. 2004;20:462-468.

## 7. There are neuromodulation specialists in your area.

There are approximately 600 members of NANS located across the United States. Membership includes physicians of different backgrounds, all of whom specialize in pain, spasticity and movement disorders.  A member in your local area can be found by visiting http://www.neuromodulation.org/

## 8. Neuromodulation procedures are covered by most medical insurance and Medicare programs.

As with all medical procedures, the patient must check with their insurance plan to receive proper approvals.

## 9. Patient care is of the utmost importance to neuromodulation specialists.

Members of NANS are concerned first and foremost with the care given to their patients and the impact the neuromodulation program has on their patients' lives.

## 10. Neuromodulation is NOT SCIENCE FICTION.

New scientific advances and expanding clinical indications will continue to fuel the growth of this dynamic field in the coming decade but the results it can bring to pain sufferers is real today.

About the North American Neuromodulation Society (NANS):
The North American Neuromodulation Society (NANS) is dedicated to being the premier organization representing neuromodulation. NANS promotes multidisciplinary collaboration among clinicians, scientists, engineers, and others to advance neuromodulation through education, research, innovation and advocacy. Through these efforts NANS seeks to promote and advance the highest quality patient care.   http://www.neuromodulation.org/

# # #

Spinal cord stimulation versus reoperation for failed back surgery syndr...          http://www.ncbi.nlm.nih.gov/pubmed/17762749

PubMed

Abstract                                                                        Full text links

                                                                               (X) Wolters Kluwer

Neurosurgery. 2007 Aug;61(2):361-8; discussion 368-9.

## Spinal cord stimulation versus reoperation for failed back surgery syndrome: a cost effectiveness and cost utility analysis based on a randomized, controlled trial.

North RB[1], Kidd D, Shipley J, Taylor RS.

### Author information

### Erratum in
Neurosurgery. 2009 Apr;64(4):601.

### Abstract
OBJECTIVE: We analyzed the cost-effectiveness and cost-utility of treating failed back-surgery syndrome using spinal cord stimulation (SCS) versus reoperation.

MATERIALS AND METHODS: A disinterested third party collected charge data for the first 42 patients in a randomized controlled crossover trial. We computed the difference in cost with regard to success (cost-effectiveness) and mean quality-adjusted life years (cost-utility). We analyzed the patient-charge data with respect to intention to treat (costs and outcomes as a randomized group), treated as intended (costs as randomized; crossover failure assigned to a randomized group), and final treatment costs and outcomes.

RESULTS: By mean 3.1-year follow-up, 13 of 21 patients (62%) crossed from reoperation versus 5 of 19 patients (26%) who crossed from SCS (P < 0.025) [corrected]. The mean cost per success was US $117,901 for crossovers to SCS. No crossovers to reoperation achieved success despite a mean per-patient expenditure of US $260,584. The mean per-patient costs were US $31,530 for SCS versus US $38,160 for reoperation (intention to treat), US $48,357 for SCS versus US $105,928 for reoperation (treated as intended), and US $34,371 for SCS versus US $36,341 for reoperation (final treatment). SCS was dominant (more effective and less expensive) in the incremental cost-effectiveness ratios and incremental cost-utility ratios. A bootstrapped simulation for incremental costs and quality-adjusted life years confirmed SCS's dominance, with approximately 72% of the cost results occurring below US policymakers' "maximum willingness to pay" threshold.

CONCLUSION: SCS was less expensive and more effective than reoperation in selected failed back-surgery syndrome patients, and should be the initial therapy of choice. SCS is most cost-effective when patients forego repeat operation. Should SCS fail, reoperation is unlikely to succeed.

### Comment in
Spinal cord stimulation versus reoperation for failed back surgery syndrome: a cost effectiveness and cost utility analysis based on a randomized, controlled trial.  [Neurosurgery. 2008]

PMID: 17762749 [PubMed - indexed for MEDLINE]

### Publication Types, MeSH Terms

### LinkOut - more resources

PubMed

Abstract

Clin J Pain. 2004 Nov-Dec;20(6):462-8.

Full text links

Wolters Kluwer

# Cost benefit analysis of neurostimulation for chronic pain.

Mekhail NA[1], Aeschbach A, Stanton-Hicks M.

Author information

## Abstract

**OBJECTIVES:** To assess the healthcare utilization of patients with intractable chronic neuropathic pain treated with spinal cord stimulation and peripheral nerve stimulation and to provide a cost-benefit analysis.

**METHODS:** The case records of 222 consecutive patients who received spinal cord stimulation or peripheral nerve stimulation implants at the Cleveland Clinic Foundation between 1990 and 1998 were reviewed retrospectively. Patients were asked to complete a Neurostimulation Outcome Questionnaire designed to gather data on utilization of healthcare resources starting 1 year before surgical implantation. These data were pooled and net differences in events per patient per year, before and after device implantation were calculated and modeled to 2000 cost data obtained from the Medicare Fee Schedule and Healthcare Financing Administration.

**RESULTS:** Neurostimulation Outcome Questionnaires were returned by 128 patients. The mean patient age was 46 +/- 12.5 years (range 21-71 years) and the mean implant duration was 3.1 +/- 2.3 years (range 0.5-8.9 years). The mean per patient total reimbursement of spinal cord stimulation/peripheral nerve stimulation absent pharmacotherapy was $38,187. Patients treated with spinal cord stimulation/peripheral nerve stimulation for pain management achieved reductions in physician office visits, nerve blocks, radiologic imaging, emergency department visits, hospitalizations, and surgical procedures, which translated into a net annual savings of approximately $30,221 and a savings of $93,685 over the 3.1-year implant duration. The large reduction in healthcare utilization following spinal cord stimulation/peripheral nerve stimulation implantation resulted in a net per patient per year cost savings of approximately $17,903.

**DISCUSSION:** The reduced demand for healthcare resources by patients receiving neurostimulation suggests that peripheral nerve stimulation and spinal cord stimulation treatment, although associated with relatively high initial costs, demonstrates substantial long-term economic benefits. Thus, neurostimulation should be considered as a viable option for the early treatment of patients with intractable chronic neuropathic pain.

PMID: 15502691 [PubMed - indexed for MEDLINE]

Publication Types, MeSH Terms

LinkOut - more resources

## PubMed Commons

PubMed Commons home

0 comments