1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JACQUELYN ORR and WILLIAM      )
ORR,                           )
                               )   CIVIL ACTION FILE
            Plaintiffs,        )
                               )   NO.: 4:16-cv-00052-
        vs.                    )       WTM-GRS
                               )
MACY'S RETAIL HOLDINGS,        )
INC.,                          )
                               )
            Defendant.         )
_____)


DEPOSITION OF

MARKUS NIEDERWANGER, M.D.


4:16 p.m.

June 20, 2016


Optim Healthcare
460 Mall Boulevard, Suite B
Savannah, Georgia


Annette Pacheco, RPR, RMR, CCR-B-2153


EXHIBIT
7

2

1                    APPEARANCES OF COUNSEL

2    On behalf of the Plaintiffs:

3         R. SCOT KRAEUTER, Esq.
          JOHNSON KRAEUTER & DUNN
4         104 West State Street
          Suite 200
5         Savannah, Georgia  31401
          912-421-2900
6         scot@jkdlaw.com

7
     On behalf of the Defendant:
8
          GARRET W. MEADER, Esq.
9         DREW ECKL-FARNHAM, PPP
          777 Gloucester Street
10        Suite 305
          Brunswick, Georgia  31520
11        912-280-9662
          gmeader@deflaw.com

12

13

14                         - - -

15

16

17

18

19

20

21

22

23

24

25

                      GILBERT & JONES

3

1                     INDEX TO EXAMINATIONS

2

3              Examination                           Page

4

5    Examination by Mr. Meader                         4

6    Examination by Mr. Kraeuter                      136

7    Examination by Mr. Meader                        143

8    Examination by Mr. Kraeuter                      144

9

10

11                        - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1            (Reporter disclosure made pursuant to
2        Article 8.B. of the Rules and Regulations of the
3        Board of Court Reporting of the Judicial Council
4        of Georgia.)
5            MR. MEADER:  Please swear in the witness.
00:07  6            MARKUS NIEDERWANGER, M.D.,
00:07  7  having been first duly sworn, was examined and
00:07  8  testified as follows:
00:13  9                    EXAMINATION
00:13 10            MR. MEADER:  You want to agree to reserve
00:14 11        all objections except to the form of the
00:16 12        question, responsiveness of the answer until
00:17 13        first use of the deposition?
00:18 14            MR. KRAEUTER:  That's fine.
00:19 15            MR. MEADER:  All right.
00:20 16  BY MR. MEADER:
00:22 17        Q.    Dr. Niederwanger, my name is
00:23 18  Garrett Meader.  We met just a few minutes ago.  I'm
00:26 19  an attorney.  I represent Macy's in the case, the
00:29 20  defendant in this case.  We're here to take your
00:30 21  deposition, which obviously involves me asking you
00:34 22  lots of questions.  So if at any time you don't
00:36 23  understand what I've asked, please stop me and let me
00:38 24  know and I'll ask it another way.  If you ever need a
00:40 25  break, let me know.  We can always accommodate you.

5

00:44  1         Have you ever had your deposition taken

00:45  2  before?

00:45  3      A.    I don't think so.

00:46  4      Q.    This is the first time?

00:47  5      A.    Yes.

00:48  6      Q.    Okay. So as you can see -- I'll kind of

00:50  7  go over the ground rules -- as you can see, we've got

00:52  8  our court reporter here today.

00:53  9      A.    Yes.

00:53 10      Q.    She's taking down everything that's said

00:55 11  between you and I and what goes on back and forth. A

00:58 12  couple things make her job a little bit easier. We

01:00 13  all say uh-huh and huh-uh. Unfortunately, that

01:03 14  doesn't come through real well on a transcript. So

01:05 15  yes's and no's help her out.

01:09 16         Head nods, that's another thing we all do

01:13 17  naturally. But, again, those don't really come

01:15 18  through on the transcript.

01:19 19         All right. Could you please state your

01:20 20  name for the record.

01:20 21      A.    Markus Niederwanger.

01:22 22      Q.    Okay. And have you seen this document

01:26 23  before, Dr. Niederwanger?

01:28 24      A.    Yes.

01:30 25      Q.    Okay. And I believe page 2 or page 3 of

6

01:34 1    that document asks that you bring certain things with

01:37 2    you to your deposition today.

01:39 3         A.    Yes.

01:40 4         Q.    Have you read through that?

01:42 5         A.    Yep.

01:43 6         Q.    Okay.  And what all did you bring with you

01:45 7    today?

01:45 8         A.    I brought as much as I could.

01:47 9         Q.    All right.  Is this everything you've

01:49 10   brought right here?

01:49 11        A.    This is everything I brought, yes.

01:51 12        Q.    Okay.  It looks like it's broken out in

01:53 13   file folders there.  Is that how it's organized in

01:57 14   sort of a category?

01:58 15        A.    Yes.  I tried to put my notes in one,

02:00 16   billing notes in another one, the literature I used

02:03 17   in another one, Dr. Kamaleson notes in another one,

02:13 18   his notes in another one.  Then a couple of documents

02:16 19   I reviewed for today but didn't use for the report I

02:20 20   brought in as well.

02:21 21        Q.    Okay.

02:21 22        A.    I was supposed to bring everything.

02:24 23        Q.    Okay.

02:25 24        A.    The referral notes from the previous

02:27 25   treating physician.  The new note I just received

GILBERT & JONES

7

| | | |
|---|---|---|
| 02:32 | 1 | from the Mayo Clinic that you probably don't have |
| 02:35 | 2 | yet.  He doesn't have yet. |
| 02:36 | 3 | Q.    Okay. |
| 02:37 | 4 | A.    I brought that in.  That's the blue one |
| 02:39 | 5 | just was handed to me when I walked in. |
| 02:41 | 6 | Q.    Okay. |
| 02:46 | 7 | A.    What else?  My report that I wrote. |
| 02:55 | 8 | Q.    Okay. |
| 02:56 | 9 | A.    Yep. |
| 02:57 | 10 | Q.    All right.  So, yeah, you've been |
| 03:01 | 11 | disclosed as an expert and we've got a copy of your |
| 03:04 | 12 | report along with supporting documents.  I think |
| 03:08 | 13 | there's a total of about four exhibits that are |
| 03:10 | 14 | attached to this report. |
| 03:12 | 15 | Now, is there anything that is with you |
| 03:18 | 16 | that you brought today that's not contained in here? |
| 03:21 | 17 | It sounds like there's a couple things. |
| 03:22 | 18 | A.    There's several things. |
| 03:23 | 19 | Q.    The Mayo thing and some additional stuff |
| 03:25 | 20 | that you reviewed? |
| 03:26 | 21 | A.    Well, No. 1 is the Mayo thing. |
| 03:28 | 22 | Q.    Okay. |
| 03:29 | 23 | A.    No. 2 is the literature I reviewed for the |
| 03:31 | 24 | report.  If there's only four references in there, I |
| 03:34 | 25 | have a lot more than that, but all disclosed in my |

8

03:37 1   report.  And I have this, all this printout.

03:39 2            Q.    Okay.

03:40 3                 MR. KRAEUTER:  I would interrupt.  I think

03:42 4       what he's saying is he listed the literature in

03:45 5       his report, but now he's physically brought the

03:49 6       copies.  Am I saying that correctly?

03:52 7                 THE WITNESS:  Correct.

03:53 8            Q.    (By Mr. Meader) Because there are three

03:55 9   copies of three different journal articles?

03:56 10           A.    No, there's more than that.  This is it.

03:59 11  This is what I used.

04:01 12                MR. KRAEUTER:  Four journal articles.

04:03 13                THE WITNESS:  This is what I used.

04:03 14                MR. MEADER:  Okay.  So this --

04:06 15                THE WITNESS:  And then you have a copy of

04:08 16      my report; correct?

04:08 17                MR. MEADER:  I do.  Thank you.

04:11 18                THE WITNESS:  Page 10 of 10, there's an

04:13 19      attachment with the literature.

04:15 20                MR. MEADER:  Yes.

04:15 21                THE WITNESS:  Those articles are all in

04:17 22      this folder.

04:17 23                MR. MEADER:  Okay.  Great.

04:19 24                THE WITNESS:  Also, I even think they're

04:21 25      in order.

9

04:22  1          MR. MEADER:  Okay.

04:22  2          THE WITNESS:  I believe.

04:23  3      Q.    (By Mr. Meader) All right.  So just out of

04:26  4   curiosity, there were three or four articles that

04:28  5   were disclosed as part of your report to us.  And

04:33  6   here, I'll let you have this.

04:40  7      A.    Okay.

04:40  8      Q.    And those articles start at the top here.

04:46  9   We've got some page numbers.

04:47 10      A.    Okay.

04:47 11      Q.    Page 104 is -- actually go back one page.

05:00 12   I think it may start with that, if I'm not mistaken.

05:04 13      A.    Okay.

05:05 14      Q.    So how did you decide, I guess, which ones

05:07 15   to produce with your report?  You know, it looks like

05:10 16   you went through about 10 or so there, but I think

05:13 17   we've got three or four produced.  How did you decide

05:16 18   which three or four to produce in your report?

05:17 19      A.    I produced them all here.  This is the

05:20 20   literature summary.

05:22 21      Q.    Okay.  Sure.  So what was provided to us

05:26 22   and what was filed with the Court were actual copies

05:29 23   of three or four --

05:31 24      A.    Uh-huh.

05:31 25      Q.    -- articles.  And I'm just curious what is

10

05:34 1    unique or, you know, what is it about these three or
05:38 2    four articles that, you know, is the reason that they
05:40 3    were produced as opposed to all, you know, 10 that
05:44 4    you looked at there?  I guess I'm trying to figure
05:47 5    out if these are the more important ones.
05:49 6         A.    No.
05:50 7              MR. KRAEUTER:  I'll cut to the chase, if I
05:53 8         may.
05:53 9              MR. MEADER:  Sure.  Sure.
05:54 10             MR. KRAEUTER:  Those were four articles
05:55 11        that I provided Dr. Niederwanger and Kamaleson.
06:00 12        Therefore, I had them and I attached them to the
06:01 13        report because that seemed easiest.
06:04 14             THE WITNESS:  I did not attach any
06:05 15        original literature to the report.  I attached a
06:08 16        literature summary with the original sources.
06:13 17        And here are the original research literature
06:16 18        papers.
06:17 19        Q.    (By Mr. Meader) Okay.
06:18 20        A.    This here is -- some of those are used.  I
06:22 21   don't even know if they used all of those.  I don't
06:24 22   know.  You can look through them if you want to.
06:26 23        Q.    Okay.  So these, just so I'm clear, the
06:29 24   ones that were filed and served with your report were
06:32 25   provided by the plaintiffs' counsel; correct?

11

06:36 1      A.      Correct.

06:37 2      Q.      Okay.  Had you ever reviewed them prior to

06:40 3  the time that they were given to you by plaintiffs'

06:43 4  counsel?

06:44 5      A.      Probably in residency or fellowship, but

06:50 6  not pulled them out specifically, no.

06:52 7      Q.      Okay.  When did your residency and

06:54 8  fellowship, when did those end?

06:57 9      A.      2004 and 2005.

06:59 10     Q.      Okay.  So if these were published after

07:02 11  then, it's unlikely you would have read them?

07:04 12     A.      Might have glanced at them because I look

07:07 13  at some things, and if it's a journal article, I get

07:09 14  the articles.  You know, I get the magazines at home,

07:12 15  Pain Journal and -- well, two of them.  So if they're

07:15 16  in there, I look through it, yes.  But not that I

07:18 17  pull them out on purpose, no.

07:19 18     Q.      No independent recollection of having

07:20 19  reviewed them before they were given to you?

07:23 20     A.      Correct.

07:23 21     Q.      Okay.

07:27 22     A.      I think that's correct, yeah.

07:29 23     Q.      All right.  And so you've got these

07:32 24  articles here?

07:32 25     A.      Yes.

12

07:33  1        Q.    And this is what you relied upon --

07:34  2        A.    Yes.

07:35  3        Q.    -- when doing your report?  Great.  We got

07:37  4    the report from Mayo Clinic?

07:39  5        A.    Yes.

07:40  6        Q.    Okay.  Could I have a look at that?

07:42  7        A.    Sure.

07:49  8              MR. KRAEUTER:  And Garrett, just so you

07:51  9    know, I looked at this five, ten minutes ago

07:53 10    when I met with the doctor.

07:54 11              MR. MEADER:  Oh, yeah, yeah, yeah.

07:55 12              MR. KRAEUTER:  I've never seen that

07:58 13    before.

07:58 14              MR. MEADER:  He said that, yeah, he just

07:59 15    got it.

08:08 16        Q.    (By Mr. Meader) And then we've got

08:09 17    e-mails, I think, that were sent back and forth

08:11 18    between you and Mr. Kraeuter?

08:12 19        A.    I have tried to print that out as much as

08:18 20    I could and I couldn't print out from my e-mail

08:21 21    directly.  So I had everything transferred to Word

08:25 22    document and printed Word document.

08:26 23        Q.    Okay.

08:28 24              MR. KRAEUTER:  I have also, Garrett,

08:31 25              endeavored to go through my e-mail --

13

08:33 1              THE WITNESS:  And I printed out his side.

08:35 2              MR. KRAEUTER:  -- and find out what I had

08:36 3        which I've given you.

08:38 4              THE WITNESS:  There's one more.  There's

08:39 5        two.

08:39 6              MR. KRAEUTER:  And as we discussed, the

08:42 7        only thing that's not in there is the e-mails

08:43 8        where there's transmittals or drafts.

08:45 9              MR. MEADER:  Right.  Which is subject

08:46 10       to --

08:46 11             MR. KRAEUTER:  Which we all agree is --

08:46 12             MR. MEADER:  Privileged.

08:47 13             MR. KRAEUTER:  Right.

08:48 14             MR. MEADER:  Yes.

08:50 15             MR. KRAEUTER:  That's everything I could

08:51 16       locate on my e-mail.

08:54 17             MR. MEADER:  Okay.  Thank you.

08:55 18        Q.     (By Mr. Meader) What else do we have?

08:56 19     Anything else that you brought with you today that

09:00 20     isn't included with this report?

09:02 21        A.     Yes.

09:03 22        Q.     That you haven't already --

09:04 23        A.     Yes.  Well, I did bring some of the notes

09:16 24     from Chatham Orthopaedics and imaging results.  And I

09:21 25     do not think that you have the original reports for

GILBERT & JONES

14

09:23 1  that.

09:24 2      Q.    Let's see.  Chatham Orthopaedics?

09:26 3      A.    That's the one -- that's the -- I think

09:31 4  the patient went to Urgent Care first and then saw

09:35 5  the orthopedic specialist at Chatham Orthopaedics.

09:39 6  They ordered some MRIs and X-rays and the nerve test.

09:42 7      Q.    The EMG?

09:43 8      A.    Yes.  I have that all here.

09:45 9      Q.    I think that may have been included, yeah,

09:47 10  unless there's two MRI's and two EMGs.

09:52 11      A.    No.  This is nothing new in here.  That's

09:55 12  the reports I had available when I saw the patient.

09:58 13      Q.    Okay.  All right.  I'll put them here so I

10:07 14  don't get them mixed up.  Anything else?

10:08 15      A.    Yes.  Well, you want to put this over

10:10 16  here.  No, no.  This is the same.  This is just

10:13 17  the --

10:13 18      Q.    Just the imaging?

10:15 19      A.    This belongs to this.

10:16 20      Q.    Okay.  We'll put this here.

10:19 21      A.    Dr. Kamaleson notes I printed out.  He was

10:22 22  the first one at Optim saw the patient.

10:25 23      Q.    Right.  Now, would that have been like on

10:27 24  August the 10th and the 23rd of September?

10:32 25      A.    Yes, that's what I have.  August 10,

15

| | | |
|---|---|---|
| 10:36 | 1 | 11/18/2015, I have a note.  12/30/2015. |
| 10:42 | 2 | Q.    Okay.  I think there are more.  Do you |
| 10:44 | 3 | have any others? |
| 10:44 | 4 | A.    I have 9/23. |
| 10:46 | 5 | Q.    Okay. |
| 10:46 | 6 | A.    10/21. |
| 10:48 | 7 | Q.    Okay. |
| 10:48 | 8 | A.    11/18 and 12/30. |
| 10:51 | 9 | Q.    Okay.  And a 10/27.  That's you. |
| 10:55 | 10 | A.    Yes. |
| 10:55 | 11 | Q.    All right.  11/18.  11/23 is you.  12/30? |
| 11:07 | 12 | A.    Yeah. |
| 11:16 | 13 | Q.    Okay.  I've got those.  That's fine. |
| 11:19 | 14 | A.    Okay.  Some billing information. |
| 11:27 | 15 | Q.    Okay. |
| 11:28 | 16 | A.    And that was handed to me today.  So I |
| 11:32 | 17 | have not had a chance to look through that because |
| 11:34 | 18 | I'm not involved with the billing. |
| 11:35 | 19 | Q.    Okay.  Fair enough. |
| 11:36 | 20 | A.    But since I got an e-mail over the weekend |
| 11:40 | 21 | that I should bring the billing, I asked my staff |
| 11:43 | 22 | this morning to get in contact with the billing |
| 11:45 | 23 | office and went ahead out the door.  That's what they |
| 11:50 | 24 | handed me. |
| 11:51 | 25 | Q.    Okay.  Thank you. |

16

11:52 1      A.      And the patient's insurance, I was told to

11:56 2    bring that, too, in your request --

11:58 3      Q.      Okay.

11:59 4      A.      -- as well.

11:59 5      Q.      All right.  I'm going to put this aside.

12:02 6    I don't know that I'll have any questions about it.

12:04 7      A.      And then my clinic notes.  And there might

12:10 8    be starting 10/27/2015.

12:13 9      Q.      Okay.

12:13 10     A.      From the dates --

12:15 11     Q.      Yes.

12:16 12     A.      -- 10/27/2015.

12:18 13     Q.      Okay.

12:18 14     A.      11/23/2015.

12:22 15     Q.      Okay.

12:23 16     A.      1/19/2016.

12:25 17     Q.      Okay.

12:26 18     A.      3/9/2016.

12:31 19     Q.      3/9.

12:34 20     A.      Oh.  Okay.  Sorry.  3/9 is a letter.  It's

12:38 21   not a clinic note.  It's from Mayo Clinic because

12:41 22   they needed a letter that I referred her otherwise

12:44 23   for them to see her.  So that's just a letter.

12:46 24     Q.      I've got that.

12:47 25     A.      I don't know if you have that.

17

| | | | |
|---|---|---|---|
| 12:48 | 1 | Q. | Yes.  Thank you. |
| 12:49 | 2 | A. | 3/22/2016. |
| 12:51 | 3 | Q. | Okay. |
| 12:52 | 4 | A. | 5/23/2016.  And then 6/14/2016.  I saw her |
| 13:04 | 5 | | last week. |
| 13:05 | 6 | Q. | Okay. |
| 13:06 | 7 | A. | I don't know if you have that. |
| 13:06 | 8 | Q. | I don't think we've got the 5/23. |
| 13:09 | 9 | A. | Okay.  You have the 6/14? |
| 13:17 | 10 | Q. | I don't have the 6/14. |
| 13:19 | 11 | A. | That might make sense because they were |
| 13:20 | 12 | | just recent. |
| 13:21 | 13 | | MR. KRAEUTER:  I don't believe I've got |
| 13:22 | 14 | | the 6/14. |
| 13:24 | 15 | | THE WITNESS:  You do or not? |
| 13:25 | 16 | | MR. KRAEUTER:  No. |
| 13:26 | 17 | | THE WITNESS:  It'll take several days for |
| 13:29 | 18 | | the transcription to come back.  This came back, |
| 13:31 | 19 | | I don't know when.  6/15, 6/16 maybe.  That's |
| 13:45 | 20 | | two different dates, 5/23 and 6/14. |
| 13:52 | 21 | Q. | (By Mr. Meader) Is there a copy machine? |
| 13:54 | 22 | A. | Sure.  It's an office. |
| 13:55 | 23 | Q. | Right.  The trick is finding someone who |
| 14:00 | 24 | | knows how to use it probably.  Scot, do you think we |
| 14:03 | 25 | | can get some copies of those? |

18

14:05 1          MR. KRAEUTER: Yeah. Would you like these

14:06 2    two.

14:07 3          MR. MEADER: Yeah. We can go off the

14:09 4    record.

14:10 5          (Recess from 4:30 p.m. to 4:43 p.m.)

27:22 6    Q.    (By Mr. Meader) Now, Dr. Niederwanger, if

27:26 7  we could, just go through your background. Where

27:28 8  were you born?

27:29 9    A.    Germany.

27:30 10    Q.    What part of Germany?

27:32 11    A.    Stuttgard.

27:33 12    Q.    Where'd you go to school?

27:34 13    A.    I went to Tubingen Medical School in

27:37 14  Germany.

27:37 15    Q.    Okay.

27:39 16    A.    Did a year in exchange with UCLA for

27:42 17  research, which also ended up being my doctoral

27:46 18  thesis. Then did my residency in Germany in

27:50 19  orthopedics for one and a half years. Did my intern

27:54 20  year in San Antonio in surgery. Did my residency at

27:58 21  the University of Kentucky in Lexington in physical

28:03 22  medicine and rehabilitation. Did my fellowship

28:05 23  through Emory University in Atlanta. That's my

28:09 24  education background.

28:10 25    Q.    Okay. What was your thesis?

19

28:12 1      A.    Bone morphogenetic protein.  It's a

28:19 2 bone-inducing protein.

28:19 3      Q.    Okay.  And do you have any certifications?

28:22 4      A.    Yes.  Board certified through the American

28:26 5 Board of Medical Specialty, Physical Medicine and

28:29 6 Rehabilitation.  And then subspecialty pain medicine

28:32 7 as well, board certified.

28:34 8      Q.    Okay.  And is that what your practice

28:38 9 consists of today --

28:39 10     A.    Correct.

28:39 11     Q.    -- is pain management?

28:40 12     A.    Correct.  Interventional pain medicine,

28:42 13 pain medicine, yes.

28:43 14     Q.    And how long have you been with Optim?

28:45 15     A.    Since February 2014.

28:52 16     Q.    Okay.  And it looks like you basically

28:59 17 have been doing pain management since 2005 up until

29:03 18 present?

29:03 19     A.    Yes.

29:05 20     Q.    Is that fairly accurate?

29:06 21     A.    Yes.

29:07 22     Q.    Okay.

29:08 23     A.    A little bit more than pain medicine.

29:10 24 There's a lot of things that are included from the

29:12 25 physical medicine and rehabilitation standpoint, but,

20

29:15  1    yes.

29:16  2            Q.      Okay.

29:16  3            A.      Heavy emphasis on pain medicine, yes.

29:19  4            Q.      Fair enough.   And are you being

29:24  5    compensated by the plaintiff in this case?

29:26  6            A.      Just for the time.

29:28  7            Q.      And what is your rate that you're

29:30  8    charging?

29:31  9            A.      The rate is $1500 an hour.

29:35  10           Q.      And I believe you had a meeting or a

29:36  11   teleconference with the plaintiffs' attorney back in

29:40  12   March; is that right?   March 3rd, somewhere around

29:44  13   then?

29:44  14           A.      I don't remember the day but sounds right.

29:47  15   In March, yes.

29:48  16           Q.      Your fee was $1500?

29:51  17           A.      It was no teleconference.   It was a

29:53  18   meeting.

29:53  19           Q.      In-person meeting?

29:54  20           A.      Yes.

29:55  21           Q.      Where did that meeting take place?

29:57  22           A.      This was in our Derenne office, 210

30:01  23   Derenne.

30:02  24           Q.      Okay.   Is this the first time that you've

30:04  25   worked with Mr. Kraeuter?

21

30:04  1      A.    Yes.

30:05  2      Q.    In this case?

30:06  3      A.    Yes.

30:06  4      Q.    Okay. Do you know how he came to find you

30:09  5  or how the plaintiff came to find you?

30:11  6      A.    Yes. The plaintiff came to find me

30:14  7  because she knows Dr. Kamaleson and he referred her

30:19  8  to me.

30:20  9      Q.    Okay. Fair enough. All right. And we've

30:22  10  kind of talked about this a little bit already, but

30:24  11  what did you do to prepare for your deposition today?

30:27  12      A.    Well, I prepared a report.

30:29  13      Q.    Okay.

30:29  14      A.    And, of course, I read some literature. I

30:32  15  read through the patient's notes. I read through the

30:35  16  referring physician notes. I read through the

30:38  17  imaging results that I had available. Yeah.

30:42  18      Q.    Okay. And did you do that today just

30:47  19  immediately prior?

30:47  20      A.    No. No. No. This is how I spent my

30:51  21  weekend.

30:51  22      Q.    Okay. I'm sorry.

30:52  23      A.    That's all right.

30:53  24      Q.    And as I understand it, correct me if I'm

30:58  25  wrong, but in your report you've diagnosed the

22

31:02  1  plaintiff with a CRPS Type 1?

31:05  2       A.    Correct.

31:06  3       Q.    Okay.  And in your own words, what is

31:09  4  CRPS?

31:10  5       A.    CRPS, well, if you, you know, use the word

31:15  6  complex regional pain syndrome.  When I started my

31:21  7  residency, it used to be called RSD, reflex

31:24  8  sympathetic dystrophy.  It had several different

31:27  9  other names before.  It's a pain syndrome that's

31:30 10  basically characterized by pain that is out of

31:35 11  proportion to what you would expect from the noxious

31:39 12  event of the trauma that happened.  Pain that

31:42 13  continues.  Pain that oftentimes is a burning,

31:46 14  tingling, sharp pain that can be debilitating and

31:53 15  oftentimes causes disuse, atrophy of the muscles and

31:57 16  typically is long-lasting, a lot longer than you

32:04 17  would expect after regular trauma.

32:07 18       So typical case, someone has a forearm

32:11 19  fracture.  You would expect it to be up four, six,

32:16 20  eight weeks.  You would expect the pain to go away.

32:19 21  There's some pains, some group of patients that the

32:23 22  pain does not improve.  The pain actually worsens and

32:26 23  the pain is separate from the inciting event.

32:28 24       The event had already been healed.  If you

32:30 25  look at the X-ray, the bone would be healed.  And the

GILBERT & JONES

23

32:33  1    pain is still there with certain physical

32:37  2    correctories and other things that the patient tells

32:39  3    you.  Causing debilitating pain.  That's what CRPS

32:45  4    is.

32:45  5            The problem with CRPS was that in the past

32:48  6    it was called RSD.  They had a lot of conferences

32:53  7    about that.  The contention was that it's not always

32:56  8    sympathetically maintained, so they wanted to get

32:58  9    away from the S in the RSD and wanted to call it

33:02 10    something different.  Call it complex regional pain

33:05 11    syndrome, which the word already tells you it's not

33:08 12    as easy as a broken bone because they would call it a

33:11 13    broken bone.

33:11 14        Q.    Uh-huh.

33:12 15        A.    But if it's already in the name, the word

33:15 16    complex in it, it tells you that it's not as easy.

33:17 17        Q.    Sure.

33:18 18        A.    And that's where we are right now.  So

33:21 19    what we do is you go by the consensus conference when

33:24 20    they have a meeting and they come up with criteria.

33:25 21    They come up with guidelines.  They come up with the

33:28 22    way you should diagnose it and treat it.  That's what

33:31 23    you have to go by.

33:32 24        Q.    Okay.  How many times over the course of

33:34 25    your career would you say that you diagnosed CRPS?

GILBERT & JONES

24

33:37  1          A.     Multiple times.

33:40  2          Q.     Dozens?  Hundreds?  Thousands?

33:41  3          A.     Dozens at least.  Several dozen, I would

33:49  4     think.

33:49  5          Q.     Okay.

33:49  6          A.     Not thousands.  Definitely not.  Is it a

33:56  7     hundred?  It might well be, but I don't know.  I've

33:58  8     been in practice since 1998.

34:00  9          Q.     Okay.

34:01 10          A.     Okay.  So that's close to 20 years.

34:03 11          Q.     Okay.  So a moment ago you gave an example

34:09 12     of a hypothetical.  It can arise in the forearm where

34:12 13     there's a fracture.  The fracture heals and then CRPS

34:14 14     symptoms can later develop.  How many instances have

34:18 15     you seen where there was no fracture, no broken bone

34:21 16     in the forearm, yet CRPS developed as a result of

34:24 17     some other trauma that did not result in a fracture?

34:28 18     How common or uncommon is that?

34:30 19          A.     The most common one is after fracture, but

34:34 20     not far behind is after any kind of trauma.  Soft

34:37 21     tissue trauma is a big one.  It doesn't have to lead

34:41 22     to a fracture as early.  We probably have better

34:47 23     numbers available for fractures because they're

34:49 24     documented versus non-fracture.  But it clearly

34:54 25     exists with, you know, soft tissue trauma and

25

34:58  1    non-fractures.

34:58  2         Q.    Okay.  Can you put a rough percentage on

35:00  3    it and say ten percent of the time it arises from a

35:03  4    soft tissue injury as opposed to a fracture or 15

35:06  5    percent or 5 percent or 40 percent?

35:08  6              MR. KRAEUTER:  Let me object to the form

35:10  7         and ask are you saying what he sees in his

35:13  8         practice or what the literature says?

35:14  9              MR. MEADER:  What he sees on a day-to-day

35:17 10         basis.

35:21 11         A.    50/50 probably.

35:27 12         Q.    (By Mr. Meader) Okay.  And so you

35:28 13    mentioned that there's certain criteria, I guess,

35:31 14    that are used to reach a diagnosis, a differential

35:35 15    diagnosis of CRPS?

35:36 16         A.    Correct.

35:37 17         Q.    And is that the Budapest criteria that

35:39 18    you're referring to?

35:40 19         A.    Those are the most recent ones, yes.

35:42 20         Q.    Okay.  Are those the ones that you use in

35:44 21    your practice?

35:44 22         A.    Yes.

35:45 23         Q.    Okay.  And let's talk about that a little

35:51 24    bit.  I'm going to refer to some literature that was

35:54 25    produced and attached to your expert report.  And I

GILBERT & JONES

26

35:57  1      believe it's going to be in this stack of documents

36:00  2      right here.  Let's start with this article here,

36:19  3      which is document No. 292-2 as part of your expert

36:27  4      report.  It's page No. 104.

36:33  5                   And this is an article from DMJ and on

36:41  6      page 2, it talks about how is it diagnosed.

36:50  7           A.   Okay.

36:51  8           Q.   Okay.  And right under -- let's look at

37:01  9      this first.

37:01  10          A.   Yes.

37:02  11          Q.   The second paragraph says:  "Although

37:03  12     there are no specific diagnostic tests for CRPS,

37:06  13     several ancillary tests are useful to rule out other

37:11  14     diagnoses."

37:12  15          A.   Yes.

37:12  16          Q.   So basically it's, you know, it's a

37:17  17     diagnosis of exclusion, it sounds like.  You're

37:19  18     ruling out other things in order to arrive at this

37:22  19     CRPS.  Is that a fair assessment of how --

37:24  20          A.   Correct.

37:24  21          Q.   -- this diagnosis is done?

37:25  22          A.   Correct.

37:26  23          Q.   What are these tests, if you could just

37:28  24     kind of explain them to me just briefly.

37:31  25          A.   You want me to go down the list?

27

37:32 1     Q.    Sure.  Please, yes.

37:34 2     A.    Full blood count, just regular blood draw.

37:37 3  You look for inflammation markers, any abnormalities.

37:41 4       C reactive protein would be the same

37:43 5  thing.  It's a very nonspecific inflammation mark in

37:47 6  your blood.  It tests the same as ESR, you know, the

37:53 7  sedimentation rate.  It's the same thing.  Different

37:57 8  test but the same reason to do it.

38:01 9       Here it is.  Serum autoantibodies due to

38:06 10  infection or rheumatologic disorders.  Duplex

38:15 11  scanning for deep vein thrombosis.  Standard

38:22 12  radiograph, which is X-rays.  Nerve conduction

38:26 13  studies.

38:27 14     Q.    Is that like an EMG?

38:31 15     A.    Yes.  They're the same setting.  It's two

38:35 16  different tests.

38:36 17     Q.    Okay.  How about a bone scan?  Is that

38:43 18  something that can be done as well?

38:44 19     A.    A bone scan can be done.  It's not part of

38:46 20  the criteria, though.

38:48 21     Q.    Not a part of the Budapest criteria?

38:49 22     A.    Correct.

38:51 23     Q.    And should I assume when you say "the

38:53 24  criteria," that you're referring to the Budapest

38:56 25  criteria?

28

38:56   1      A.     Yes.   That's how the diagnosis is.

38:58   2      Q.     Okay.

39:01   3      A.     There's a lot of controversy if a bone

39:04   4  scan is indicated or not. There's no consensus.

39:08   5  Probably multiple years ago it was more common and

39:11   6  it's probably less common to do now because it is not

39:14   7  part of the -- the expert consensus view in the

39:18   8  Budapest criteria was that you do not need a bone

39:21   9  scan or any interventional procedures to diagnose

39:26 10  CRPS. It means it doesn't add on to your diagnostic

39:31 11  criteria, the formal criteria. So it's --

39:33 12      Q.     Okay.

39:36 13      A.     Some people do it. Some people do not do

39:39 14  it.

39:39 15      Q.     Okay. The list that you've just kind of

39:42 16  gone through, those are some, I guess, objective

39:44 17  tests that can be done as opposed to listening to

39:53 18  subjective complaints of pain. Is that a fair

39:55 19  assessment?

39:55 20      A.     Yes.

39:56 21      Q.     Okay. And why is it important to have or

40:02 22  is it important to have objective, I guess, evidence

40:04 23  or objective test results when making a diagnosis?

40:08 24      A.     Ideally, yes, you want as much objective

40:13 25  data as you can get. The medicine, of course, a big

29

40:19  1    part of any diagnosis; the history taking, that's

40:22  2    always subjective by itself because you have to

40:24  3    listen to what the patient tells you.  So that's all

40:28  4    subjective.  I mean, you got to go by what you hear

40:30  5    and then make your own opinion.

40:32  6            Then on the exam, you can hopefully get

40:35  7    more objective data and more findings and signs.  So

40:38  8    those two things come together.

40:39  9        Q.    Okay.  And I think what you said it's

40:42 10    important to get as much as you can objective?

40:44 11        A.    Yeah, if it's reasonable and if it adds

40:48 12    onto your picture and if it adds onto the diagnosis.

40:51 13        Q.    Why is that?  What is it about be

40:53 14    objective test results that assist you?

40:57 15        A.    It doesn't always assist me but it makes

41:03 16    it easier to deal with some insurance companies or

41:07 17    lawyers or the legal side.  If you have a broken bone

41:12 18    and you have an X-ray with a broken bone, it's hard

41:14 19    to argue there's no broken bone.

41:15 20        Q.    Right.

41:16 21        A.    Okay.  If he has pain, you have all the

41:18 22    signs of pain.  It sounds very reasonable, but all

41:22 23    you got to go by is what the patient tells you.  It

41:25 24    makes it a little harder to say, yes, this person has

41:29 25    true pain.

41:29  1     Q.    Okay.

41:30  2     A.    So that's the reason that, I mean, if

41:32  3  there was an objective test that's the reason for

41:39  4  CRPS.  There's no gold standard test.  If this comes

41:42  5  back positive, you have CRPS.  If it comes back

41:45  6  negative, you do not have CRPS.  That does not exist.

41:49  7     Q.    Right.  So the objective stuff helps kind

41:53  8  of take the guesswork out of making a diagnosis?  It

41:56  9  sheds more light on the symptoms and the issues and

42:01  10  the problems and assists you in making a diagnosis?

42:04  11     A.    If there were clear objective tests, then

42:07  12  that's correct.  Yes.

42:07  13     Q.    Okay.  Let's talk a little bit about --

42:25  14  let's turn to page 125 at the top.  This is an

42:43  15  article that's titled "Complex Regional Pain

42:46  16  Syndrome" from the BMJ.  What is the BMJ?

42:51  17     A.    British Medical Journal.

42:54  18     Q.    Do you review that regularly on your own?

42:57  19     A.    I used to, yes.  But not anymore.

42:59  20     Q.    Okay.

43:00  21     A.    I used to review it a lot more but not as

43:04  22  much anymore.

43:04  23     Q.    Okay.  It's not one of the two that you

43:12  24  referenced awhile ago saying that you read?

43:14  25     A.    Every month, no.

31

43:15  1        Q.      Okay.  Which ones do you read every month?

43:20  2        A.      The Pain Journal and the other one is the

43:25  3   Physical Medicine Rehabilitation Journal.

43:27  4        Q.      All right.  So let's look at where it says

43:30  5   125 at the top.  It goes through your diagnosis here

43:34  6   again.  Starting with during, it's on the left side

43:49  7   about midway through.

43:53  8        A.      Yes.  "During the diagnostic process,

43:55  9   objective tests may be needed to rule out other

43:58 10   conditions.  This could account for the signs of

44:01 11   symptoms that would be otherwise used to support

44:03 12   diagnosis of CRPS."

44:04 13        Q.      Right.

44:05 14        A.      "Given that CRPS is a diagnosis of

44:07 15   exclusion."

44:08 16        Q.      Okay.  And you agree with that?

44:09 17        A.      Yes.

44:09 18        Q.      Okay.  Are you familiar with the IASP 2012

44:25 19   criteria for diagnosis of CRPS?

44:27 20        A.      The IASP is involved with the Budapest

44:33 21   criteria.

44:33 22        Q.      Yeah.  It's the same thing; is that right?

44:35 23        A.      I believe it's the same thing.  It's

44:36 24   published through the ISPA.

44:38 25        Q.      Okay.

32

44:39  1          A.     As far as I know.

44:40  2          Q.     Okay.

44:44  3          A.     Correct.

44:45  4          Q.     All right.  Are you at all familiar with,

44:50  5     it looks like the IASP discussed a more stringent, I

44:57  6     guess, decision tool for the diagnosis of CRPS in

45:00  7     research settings?

45:02  8          A.     Yes.  I know.

45:04  9          Q.     What are your thoughts on that?

45:05 10          A.     There's a paper out that shows that those

45:13 11     two are really not different as much as people

45:15 12     thought initially.

45:16 13          Q.     Okay.

45:16 14          A.     One extra, one extra sign or one extra

45:21 15     symptom out of the two boxes that you have to fulfill

45:24 16     for the research criteria.

45:25 17          Q.     Okay.

45:26 18          A.     The only reason that they did this was

45:30 19     they wanted to increase the specificity -- the

45:35 20     sensitivity is the same almost.  Basically the same.

45:38 21     But it's more specific with the research criteria

45:41 22     that's supposed to go up a little bit higher.

45:43 23          Q.     Okay.

45:44 24          A.     Which is what they thought was important

45:45 25     for the research.

33

45:46  1      Q.    Okay.  And I was actually going to ask you
45:49  2   about that here in a minute.  What is the difference
45:52  3   between specificity and --
45:54  4      A.    Sensitivity.
45:54  5      Q.    Sensitivity, yes.  Yes.
45:56  6      A.    To explain it in easy words is sensitivity
46:04  7   is you want to have criteria that catch everyone that
46:10  8   has CRPS.  Okay?  If you've got a thousand people
46:14  9   here and you know a hundred out of those thousand
46:19  10  people have CRPS, the sensitivity is supposed to pick
46:23  11  up all hundred.  So you might pick up 200 people, but
46:27  12  you're not supposed to miss anyone.
46:29  13     Q.    Okay.
46:29  14     A.    Okay?  In other words, make it easy for
46:33  15  everybody to understand, for example, HIV.  If you do
46:37  16  a screening test, you don't want to miss anyone that
46:41  17  has the infection.
46:43  18     Q.    Right.
46:44  19     A.    So if you catch a couple more people,
46:48  20  you're fine with it because then you look closer.
46:50  21     Q.    Okay.
46:50  22     A.    But you want to catch everyone that has
46:53  23  it.  You don't want to have any false negatives.
46:56  24     Q.    Right.  False positives, you'd rather have
46:58  25  a false positive?

34

46:59 1        A.      You'd rather have a false positive as

47:01 2    compared to a lot of false negatives.  That's

47:04 3    sensitivity.

47:05 4        Q.      Okay.

47:05 5        A.      The more specific test, this means that

47:10 6    out of the people that you catch, how many truly have

47:12 7    that.  So that the, for example, the confirmation

47:17 8    testing in HIV, you really don't want to give someone

47:21 9    a false positive if they don't have it.

47:25 10       Q.      Uh-huh.

47:26 11       A.      You don't want to tell someone, hey, you

47:28 12   got HIV.  You're infected, infected or not.  The

47:32 13   screening test, you're fine because you want to catch

47:34 14   everyone.  You want to have a wide net.

47:39 15               But the second test for HIV, you really

47:43 16   want to don't tell patients, oh, yeah, you're

47:45 17   positive for something if you don't have it.

47:46 18       Q.      Right.

47:47 19       A.      That's specificity.

47:50 20       Q.      So it's a different test that's maybe more

47:52 21   expensive for something that wasn't done the first

47:52 22   time around?

47:52 23       A.      For HIV, that would be correct because

47:55 24   you've got to test.  Correct.

47:57 25       Q.      And so the case of this, I guess,

GILBERT & JONES

35

47:59 1   heightened criteria here, what they're trying to do

48:03 2   was increase the specificity; is that right?

48:05 3       A.   That's what they're hoping to, yes.

48:08 4       Q.   Okay.  And do you have any opinion as to

48:12 5   whether or not that there's any merit to that?

48:15 6       A.   I don't have an opinion of that.  I have

48:21 7   somewhere a paper that deals with that.  So maybe

48:24 8   find it.

48:24 9       Q.   Sure.

48:26 10      A.   Give me one second.  I don't know if you

48:44 11  have that in your file but it was useful.  My report,

48:49 12  it's in the literature there.

48:50 13      Q.   Okay.  Thank you.

48:51 14      A.   Okay.  I will quote from the Pain 2010

49:23 15  August which is -- the first author is Norman Harden

49:34 16  and Validation to Proposed Diagnostic Criteria For

49:39 17  Complex Regional Pain Syndrome.  "In conclusion, the

49:43 18  current studies supports the validity of the Budapest

49:47 19  criteria for CRPS and further highlights the

49:51 20  superiority of the current IASP criteria.  These

49:55 21  results did not strongly support utility of separate

50:00 22  Budapest criteria for research purposes

50:03 23  specifically."  So I think that answers your

50:08 24  question.

50:08 25      Q.   Okay.  So they've concluded that --

36

50:10 1      A.    They concluded we do two different things

50:12 2   but we really don't need two different things.

50:14 3      Q.    Okay.

50:15 4      A.    So that -- yeah.

50:16 5      Q.    Okay.  Fair enough.

50:21 6      A.    And results of the study provides support

50:23 7   for proposals to adopt the Budapest criteria as a

50:32 8   standard for clinical CRPS diagnosis.

50:39 9      Q.    Okay.  So let's look a little bit at the

50:42 10  Budapest criteria.

50:44 11     A.    Yes.  Okay.

51:18 12     Q.    Okay.  So in your own words, if you don't

51:23 13  mind, explain to me how the Budapest criteria works.

51:28 14     A.    The Budapest criteria work that you have

51:37 15  some symptoms that the patient reports to you and

51:39 16  some signs that you observe or find on the

51:42 17  examination.

51:43 18     Q.    Okay.

51:44 19     A.    Just basically two different boxes.  One's

51:46 20  for the symptoms.  One's for the signs.  Symptoms is

51:49 21  reported to me in the history taking.  And then, of

51:53 22  course, I ask the proper questions.  And signs are

51:57 23  typically what you would find on the exam.

51:58 24     Q.    Okay.  Now, are there four different

52:02 25  categories of symptoms or four different

37

52:04  1    categories --

52:05  2         A.    Yes.

52:05  3         Q.    -- of --

52:06  4         A.    Correct.

52:07  5         Q.    Criteria, I guess?

52:07  6         A.    Yes.

52:08  7         Q.    I'm trying to think of the appropriate

52:09  8    word to use.

52:10  9         A.    Categories.  Four different categories.

52:12 10         Q.    Call them four categories of things that

52:14 11    you're looking for.

52:15 12         A.    That is correct.

52:15 13         Q.    All right.  And those are -- let me pull

52:21 14    it up.  We have vasomotor, pseudomotor, motor/trophic

52:24 15    and pain.  Are those the four?

52:27 16         A.    Well, if you replace the word pain with

52:32 17    sensory.  My four criteria are sensory, vasomotor,

52:40 18    pseudomotor/edema and motor/trophic.

52:46 19         Q.    All right.  Explain to me what vasomotor

52:49 20    is.  What does that mean?

52:50 21         A.    Any kind of asymmetry, skin color changes,

52:56 22    temperature changes.  Vasomotor means anything that

53:00 23    has to do with the blood vessels.  So any changes in

53:04 24    the blood vessel findings.

53:06 25         Q.    Okay.

38

53:09 1      A.    It can be -- that can be red skin.  That

53:12 2  can be spots on the skin.  That can be temperature

53:17 3  changes.  That can be possibly even some asymmetry

53:21 4  that you can see almost like an edema type of

53:24 5  findings.

53:24 6      Q.    Okay.  So talk about temperature

53:27 7  differences.  Would thermograph, would that be a

53:30 8  useful tool to determine whether or not there's a

53:33 9  difference in temperature between, say, a patient's

53:35 10  left arm and their right arm?

53:36 11      A.    You can use that, yes.

53:38 12      Q.    Okay.  And would you agree one degree

53:45 13  Celsius is sort of the difference that you're looking

53:49 14  for or the minimum, Delta or change between the two

53:53 15  or difference?

53:54 16      A.    Yes.  I think between half a degree to one

53:58 17  degree Celsius, yes.

53:59 18      Q.    Okay.  All right.  Now we're going to go

54:06 19  to pseudomotor/edema.

54:10 20      A.    Yeah.

54:11 21      Q.    Which edema is swelling; is that correct?

54:13 22      A.    Swelling, sweating changes, asymmetry.

54:17 23  Correct.

54:17 24      Q.    Okay.  And then we got motor/trophic.

54:20 25  What is that?

39

54:21  1       A.      Any kind of tremor, weakness, range of

54:28  2  motion changes, any kind of muscle atrophy later

54:35  3  stages, nail changes, skin changes, hair changes.

54:41  4       Q.      Okay.  And sensory?

54:50  5       A.      Report of hyperalgesia or allodynia which

54:55  6  means -- allodynia means pain to a stimulus that's

54:59  7  not really painful.

55:01  8       Q.      Out-of-proportion pain?

55:02  9       A.      If you want to call it out of proportion

55:05 10  pain, yes.  Hyperalgesia just means it is more

55:08 11  painful than you would expect it to be.  Any stimulus

55:10 12  that you do.

55:11 13       Q.      All right.  The vasomotor, that's

55:15 14  something that you could observe, is that correct, if

55:17 15  it were present?

55:18 16       A.      Yes.

55:18 17       Q.      Okay.  And pseudomotor, that's something

55:21 18  that --

55:21 19       A.      Well, you've got to be careful.  That's

55:24 20  the difference between signs and symptoms.

55:25 21       Q.      Correct.

55:26 22       A.      The first thing -- are you talking about

55:28 23  signs now or are you talking about symptoms?

55:31 24       Q.      I'm talking about signs.

55:33 25       A.      Signs in my exam.

40

55:34  1        Q.    Yes.

55:35  2        A.    Yes.

55:35  3        Q.    I'm talking about things that you can

55:37  4   potentially observe in your exam.

55:39  5        A.    Yes.

55:39  6        Q.    The vasomotor, those types of things you

55:42  7   could observe in your exam, the presence of

55:44  8   difference in skin color, temperature, that's

55:46  9   something you could see.  The pseudomotor which is

55:49 10   swelling or sweating is something that you can

55:51 11   observe or see in your examination.  The

55:54 12   motor/trophic tremors, that's something you can see.

56:00 13        I guess to a certain extent you have to

56:02 14   rely on your patient for complaints of weakness or is

56:06 15   that something you can measure?

56:07 16        A.    You measure that.

56:08 17        Q.    Okay.

56:08 18        A.    You measure.

56:09 19        Q.    Like grip strength?

56:10 20        A.    Yeah.   Yeah.

56:11 21        Q.    Okay.  And range of motion changes, that's

56:13 22   something to be measured by a physical therapist?

56:16 23        A.    Yes.  And you can also, if you see them in

56:19 24   clinic and you examine them, you will see that as

56:22 25   well.

41

56:22 1      Q.    And then sensory, now that's something you

56:24 2 have to rely purely upon your patient for; is that

56:28 3 correct?  Or are there ways --

56:29 4      A.    There's ways.  There's ways to measure

56:32 5 that as well.  You see if they guard their arm.  You

56:34 6 see if you inadvertently touch the area and it causes

56:38 7 pain.  So you need some cooperation with the patient

56:47 8 for that as well.  But you -- there is patients you

56:53 9 can't even touch their skin and you can tell it's

56:55 10 very painful.  So that counts as a positive, yes.

57:00 11      Q.    So that you're relying, I guess, on their

57:03 12 response to the stimulus?

57:05 13      A.    Correct.

57:06 14      Q.    It's not something that you can just look

57:08 15 at and say --

57:09 16      A.    Correct.  You cannot put a probe on there

57:13 17 and the probe gives you a number.  Correct.

57:15 18      Q.    Okay.  All right.  So we have gone

57:20 19 through, I guess, some of the objective tests that

57:24 20 can be used, the blood test, thermography, the bone

57:28 21 scan, the X-rays, those types of things.  And then we

57:32 22 just talked about, I guess, the more subjective

57:34 23 things which constitute the Budapest diagnostic

57:37 24 criteria, which is sort of the gold standard in

57:41 25 diagnosing CRPS; is that correct?

42

57:42  1        A.     Yeah.  But I would not call that

57:43  2    subjective.

57:44  3        Q.     Okay.

57:44  4        A.     Budapest criteria are all those things

57:47  5    which we talked about.

57:48  6        Q.     Which can be objective?

57:49  7        A.     There are two different categories.  And

57:54  8    the Budapest criteria, one of the points they have is

57:57  9    that there's no other diagnosis that can explain it

58:01 10    better.  That's when a differential diagnosis comes

58:03 11    in.  That's why you do some of the other tests that

58:06 12    we did, that were done even before I saw the patient

58:09 13    to make sure there's nothing else going on.  Budapest

58:13 14    criteria is four different points that you have to

58:16 15    fulfill.

58:17 16        Q.     Okay.  And the other stuff is helpful

58:21 17    stuff.  The other objective tests?  They assist you

58:26 18    in ruling out other potential --

58:28 19        A.     Correct.  Correct.  Yes.  That's the, you

58:30 20    know, the last criteria for the Budapest criteria.

58:33 21    There's no other diagnosis that better explains the

58:35 22    signs and symptoms.  So that brings us in and then we

58:39 23    have to decide is it reasonable, for example, to do

58:42 24    an MRI of the cervical spine.  Is it reasonable to do

58:46 25    an EMG and a nerve conduction test?  Is it reasonable

43

58:50 1   to do an X-ray?  That's what we have to decide.

58:54 2   Clinically, is it reasonable to do that?  Does it

58:57 3   look like it could come from the cervical area?  Then

59:00 4   you better get an MRI to make sure you don't have any

59:04 5   herniated discs or a compressed nerve --

59:08 6        Q.    Okay.

59:08 7        A.    -- that could explain that.  You think,

59:10 8   oh, this looks like it could be carpal tunnel

59:13 9   syndrome.  Well, then, you look clinically and maybe

59:16 10  you ought to get an EMG nerve conduction test to see

59:21 11  if that's what's going on, if the median serve is

59:24 12  damaged.

59:24 13       Q.    Okay.

59:25 14       A.    That's one of the criteria, including the

59:29 15  Budapest criteria.  They don't tell you exactly what

59:31 16  to do to rule out other things.  That's based on your

59:37 17  clinical diagnosis.  It's based on your education and

59:40 18  background.  That's why we do a residency.  That's

59:42 19  why we do a fellowship.  And that's part of the

59:45 20  criteria.  That's included in those.

59:46 21       Q.    Okay.

59:47 22       A.    It's not only the signs and symptoms.

59:49 23  It's more than that.

59:50 24       Q.    Okay.  I appreciate you clarifying that.

59:57 25  You're talking about this distinction between

44

59:59 1    symptoms that are reported and signs.

00:00 2         A.    Yes.

00:00 3         Q.    And in order to, I guess, reach a

00:05 4    diagnosis of CRPS, you've got to have the presence of

00:08 5    a certain number of signs and a certain number of

00:10 6    symptoms.

00:10 7         A.    Yes.

00:11 8         Q.    And what are those numbers?

00:13 9         A.    One symptom in three of the four

00:23 10   categories that we talked about and one sign in two

00:29 11   or more of the four categories.

00:39 12        Q.    Okay.  We'll come back to some of this

00:52 13   literature here in a moment.  But what I'd like to do

00:55 14   now is -- well, let me ask you a couple more

01:02 15   questions before we turn to the medical records.

01:04 16        Typically how long does it take for these

01:06 17   signs and symptoms to arise or develop after the

01:11 18   traumatic injury?

01:13 19        A.    Well, it's variable.  It's not -- there's

01:17 20   not one rule that fits everything.  Oftentimes it's

01:24 21   fairly soon, within weeks, yeah, typically.

01:31 22        Q.    Okay.

01:31 23        A.    Sometimes I'd say someone has a total knee

01:37 24   replacement, they are expected to have pain.  So it's

01:39 25   very, you know, three days, five days, ten days

GILBERT & JONES

45

01:42  1    afterwards might be very difficult to say, oh, this

01:46  2    is CRPS.

01:48  3        Q.    Right.

01:48  4        A.    And that's -- and if you look at the

01:50  5    Budapest criteria, again, is there anything that

01:54  6    better explains that, you know, exclusion?  Well, you

01:57  7    had a knee replacement, we expect you to have this

01:59  8    pain right now.  So that explains it until proven

02:03  9    otherwise.

02:05 10        But typically that's not -- it's not you

02:09 11    have a trauma and then one year later --

02:13 12        Q.    Okay.

02:13 13        A.    -- this shows up.  That is unlikely and

02:15 14    uncommon.

02:16 15        Q.    Okay.  So let's ask it this way.  So would

02:20 16    it be safer to say then that the less the trauma is,

02:26 17    the sooner you would expect to see CRPS signs and

02:31 18    symptoms because the chance that they're being

02:35 19    masked, going back to your example with the knee

02:37 20    replacement, the chance that they're being masked by

02:39 21    something else would be less because you would expect

02:42 22    them to recover from a trauma that is less than a

02:46 23    total knee replacement?  Does that make sense?

02:49 24        A.    I know what you're trying to say but I'm

02:51 25    not sure if I can support that.

46

02:52  1      Q.    Okay.

02:53  2      A.    Because, you know, when you say would mean

02:55  3    the lesser trauma, the more you have CRPS, that's not

02:59  4    correct.

02:59  5      Q.    Or the sooner you would expect to see

03:01  6    CRPS?

03:02  7      A.    No.

03:02  8      Q.    No?

03:03  9      A.    I don't think you can say that.

03:05 10      Q.    Okay.  Okay.

03:06 11      A.    I don't think you can say that.

03:08 12      Q.    Okay.  How about let's turn back to an

03:18 13    article that was printed off the JEBMH --

03:23 14            MR. KRAEUTER:  What page are we on?

03:25 15      Q.    (By Mr. Meader) -- Web site.  So this

03:26 16    would be page 134.  Change that.  133.

03:47 17            Okay.  So have you reviewed this article

03:49 18    before?

03:49 19      A.    I have seen the article.  I'm not sure if

03:54 20    I reviewed it in detail.  I do not believe so.  I've

03:57 21    seen it, yes, because it was provided to me.  Yes.

04:03 22      Q.    Okay.

04:03 23      A.    I've seen it.  But I do not believe that I

04:06 24    thought it was -- I did not include it in my report

04:13 25    because I did not think that it added anything from

47

04:18  1    my understanding.

04:18  2          Q.    Okay.  Let me ask you this:  Let me direct

04:21  3    your attention to, it's got the different stages.

04:26  4    Okay?

04:26  5          A.    Yeah.

04:26  6          Q.    Stage 1, Stage 2, stage 3?

04:29  7          A.    Yes.

04:30  8          Q.    Are you familiar with the different stages

04:32  9    of CRPS?

04:33 10          A.    I am familiar that this used to be common

04:38 11    to use the stages, which is not common anymore.

04:42 12          Q.    Okay.  I want to ask you about that.  That

04:44 13    was my understanding, too, that it had been sort of

04:48 14    rebutted, I guess, by some literature.  But I'd like

04:51 15    to direct your attention to the date of this article.

04:55 16          A.    Yes.

04:56 17          Q.    It looks like --

04:58 18          A.    Yes.

04:58 19          Q.    -- August or, I'm sorry, October of 2015?

05:04 20          A.    Okay.

05:04 21          Q.    Which, correct me if I'm wrong, but I

05:12 22    believe is after the point in time where sort of the

05:15 23    three-stage progression was thrown to the wayside?

05:19 24          A.    Well, I didn't think it was thrown to the

05:23 25    wayside.  It was just more.-- looked at it more

GILBERT & JONES

48

05:26 1    critically.

05:26 2         Q.    Okay.

05:27 3         A.    Noted, you know, noticing that patients

05:29 4    don't progress always Stage 1, then Stage 2, then

05:33 5    Stage 3.

05:34 6         Q.    Okay.

05:35 7         A.    So . . .

05:36 8         Q.    Is this article then refuting that and

05:38 9    saying that they do go through Stage 1, Stage 2,

05:45 10   Stage 3, since this was published after, several

05:47 11   years after, I believe, that other research?

05:49 12        A.    I didn't think -- I did not review this

05:59 13   article very detailed, but, for me, this was more

06:26 14   just that person's opinion.  I don't think -- I don't

06:28 15   know if this article was peer reviewed.  It wasn't a

06:31 16   research article.  I think this was more a summary

06:37 17   what this person thought.

06:38 18        Q.    Okay.

06:38 19        A.    So if he puts in stages, maybe he believes

06:41 20   in it still.  I can't say.  I know that a lot of

06:45 21   other people got away somewhat from starts with 1

06:50 22   then it goes to 2, then it goes 3.  It's always a

06:53 23   linear progression.  That's not the current thinking

06:57 24   anymore.

06:57 25        Q.    Okay.

49

06:58  1         A.    You might still think typically it starts

07:02  2    out a certain way and progresses a certain way, but

07:05  3    I'm not sure that people use a lot of stages like

07:09  4    that anymore.

07:09  5         Q.    Now, the first stages that came out, were

07:22  6    they based on temperatures changes in the skin, going

07:24  7    from the first stage it was hot, second stage it was

07:26  8    cold?

07:26  9         A.    That used to be the thinking, yes.

07:26  10         Q.    Okay.

07:30  11         A.    Yeah.  But I do not believe that it is

07:32  12    still their thinking on that.

07:34  13         Q.    Okay.  And what I'm seeing here is these

07:36  14    look like different stages.  I don't see hot versus

07:41  15    cold, Stage 1, Stage 2.  I guess what I'm getting at,

07:45  16    maybe you can just look at them and tell me if you

07:48  17    disagree or agree with how he's kind of got these

07:50  18    things broken out into stages.

07:51  19         A.    Well, he might have just looked at some

07:57  20    old papers and just copied it over.

07:59  21         Q.    Okay.  Do you disagree or agree kind of

08:14  22    what he's got there for Stage 1, Stage 2 and Stage 3?

08:15  23         A.    Well, I don't see it in stages anymore.  I

08:19  24    see it here.  I don't see it in stages anymore.

08:20  25         Q.    Okay.  All right.

50

08:23  1        A.    So I'm not going by clear of Stage 1 we

08:25  2   only expect this, Stage 2 we only will expect this.

08:29  3   It's not how you classify it.

08:31  4        Q.    Okay.  How about -- and this is maybe

08:35  5   asking the same thing, just a little bit different

08:37  6   way.  But it says three months from onset, okay, you

08:41  7   expect severe burning pain at the site of injury,

08:44  8   muscle spasm, joint stiffness, restricted mobility,

08:47  9   rapid hair and nail growth and vasospasm affecting

08:51 10   color and temperature of skin.

08:53 11        A.    Yes.

08:54 12        Q.    And you would expect to see that, you

08:55 13   know, three months from onset.  Would you agree with

08:59 14   that or disagree with that?

09:00 15        A.    No, I don't agree with that.  I don't

09:18 16   agree that they say -- he said it's the first three

09:20 17   months you don't see anything.  I don't agree with

09:22 18   that.

09:23 19        Q.    Okay.

09:24 20        A.    So if he says Stage 1 starts three months

09:28 21   from onset, what happens the first three months?

09:31 22        Q.    I think what he's saying is zero to three

09:34 23   months is my understanding.  Somewhere between zero

09:37 24   and three months.

09:37 25        A.    He says Stage 1 three months from onset.

GILBERT & JONES

51

09:41  1      So, well, maybe --

09:43  2            Q.    I guess my interpretation was --

09:44  3            A.    From onset, maybe from onset of symptoms?

09:47  4            Q.    I interpreted onset to mean from the

09:53  5      event.

09:54  6            A.    Yeah, but he can also say maybe onset of

09:57  7      symptoms.

09:57  8            Q.    Maybe that's just not clear what he's

10:01  9      saying.

10:01  10           A.    Again, I think, again, the way he -- and

10:04  11     you also have to look at the -- one second.  Okay.

10:09  12     So the way he puts the stages in here, I know this is

10:12  13     published 2015.  But if you look at the literature,

10:16  14     he quotes something from 2009.  This looks like a

10:28  15     pain review.  And this is only one two-page article.

10:34  16     Then he quotes something from a textbook of Pain from

10:38  17     2006.

10:40  18           So it's in Waldman he quotes.  I think, I

10:47  19     notice Steve Waldman I believe is the same Waldman

10:51  20     that wrote a lot of books.  So he might have quoted

10:55  21     this from a textbook.  I'm not sure.  Textbooks are

10:58  22     always, by the time they're published, they're kind

11:00  23     of outdated because it takes years to publish one.

11:02  24     And so I -- it used to be driven by Stage 1, 2, 3.

11:08  25           Q.    Right.

52

11:08  1          A.     Dystrophy, atrophy stage.  But, again,

11:13  2   nowadays it's more of a continuum and it's more of

11:19  3   stages running to one another.  It's not separated

11:21  4   anymore.

11:22  5          Q.     All right.  Do you agree --

11:23  6          A.     Hot and cold.  The vascular symptoms,

11:30  7   there's no reason that you have to have a hot

11:33  8   extremity right away.  You couldn't possibly have a

11:36  9   cold extremity.  I mean, it's the same vascular

11:40 10   response.  One constricts the vessels.  One opens the

11:45 11   vessels more.

11:46 12          Q.     Okay.  So do you know, I guess, as we sit

11:56 13   here today, what part, if any, of this article you

12:00 14   may have relied upon in forming your opinion?

12:02 15          A.     I'll be honest.  I don't think I relied at

12:06 16   all on this article.  I can tell you that -- I can

12:09 17   tell you exactly -- this is from Dr. Palta Saroj.

12:17 18   Let me tell you because I don't think I did.  No, I

12:21 19   did not look at that.

12:22 20          Q.     Okay.

12:23 21          A.     I did not -- I did not feel that it met my

12:27 22   standard for literature.

12:29 23          Q.     Okay.

12:30 24          A.     That I felt that it adds anything to me or

12:35 25   that it's peer reviewed, I just did not feel that.

53

12:37 1     Q.    Okay.

12:38 2     A.    And so I did not look at that.

12:40 3     Q.    Fair enough.

12:41 4     A.    Well, I looked at it but I did not include

12:44 5  it in my report.

12:45 6     Q.    Sure.  I got you.  So you said you

12:52 7  diagnosed CRPS around a hundred times maybe over the

12:56 8  past or more possibly.  We don't know exactly.  It's

12:59 9  been 20 years.

13:00 10     A.    I'm sure I've seen more than a hundred,

13:02 11  yes.  It doesn't mean I was the first one to diagnose

13:06 12  it in every single patient.  In fellowship, you see a

13:08 13  lot of patients that are already in the practice with

13:11 14  CRPS.

13:13 15     Q.    Out of the 100 that you've either

13:18 16  diagnosed or seen of CRPS, have there been any

13:21 17  patients where they've gotten better, their CRPS

13:25 18  symptoms have resolved and they've made a recovery?

13:27 19     A.    I've seen patients that have improved,

13:37 20  yeah.  I don't know if it -- I don't know if I've

13:42 21  seen patients that had true CRPS with complete

13:47 22  resolution.  I've seen patients that have improved.

13:49 23  I might have seen some patients that got very, very

13:53 24  good results, yes.

13:54 25     Q.    Okay.

54

13:54  1        A.    Yes.

13:55  2        Q.    All right.  Let's go through Ms. Orr's

14:01  3   medical records here, the ones provided by your

14:03  4   office.

14:06  5        A.    My clinic notes?

14:07  6        Q.    Yes.  And also I'm going to go through

14:10  7   Kamaleson's, too.  We'll start with those.  We'll

14:13  8   kind of just go through them in chronological order.

14:15  9        A.    Okay.  Let me get those.  Kamaleson's.

14:35 10   They're somewhere.

14:35 11        Q.    Okay.  First one I have is August 10,

14:37 12   2015.

14:59 13        A.    I know I've reviewed it.  I don't know --

15:01 14        Q.    It's page 1 of 137.

15:06 15        A.    Oh, you've got it here.  Okay.

15:37 16        Q.    And so this August 10, 2015, this is when

15:40 17   she was seen by Dr. Kamaleson.

15:42 18        A.    Okay.

15:42 19        Q.    And how long have you worked with

15:46 20   Dr. Kamaleson?

15:48 21        A.    Well, I started in my job February 2014.

15:55 22   So he works in a different part of the office and

16:00 23   I'll be in a different office altogether.  So I don't

16:03 24   work with him.  He's one of the orthopedic

16:07 25   physicians.  I'm one of the pain physicians.  We are

55

16:09 1    in different parts of the office.  So I don't

16:11 2    think -- we did not work next to one another.

16:13 3         Q.   Okay.  You're familiar with his abilities,

16:15 4    I take it?

16:15 5         A.   Yes.  He's one of the partners.  I know --

16:20 6    I believe he's fellowship trained, as far as I know.

16:22 7    He's board certified, as far as I know, yes.

16:24 8         Q.   Qualified, good doctor?

16:26 9         A.   Yes.

16:27 10        Q.   Okay.  If I could direct your attention to

16:36 11   the right hand --

16:37 12        A.   Yes.

16:37 13        Q.   -- section there.

16:39 14        A.   Yeah.

16:40 15        Q.   And just to be clear -- let me back up

16:43 16   before we go through this.  What's your understanding

16:46 17   of how Ms. Orr was injured?

16:49 18        A.   My understanding is when I asked her that

16:51 19   a dressing room frame or door frame fell on her right

16:55 20   forearm in, I believe, April 2015.  That's my

17:03 21   understanding.

17:04 22        Q.   Okay.  Are you aware of whether or not she

17:07 23   told you it struck her on her body anywhere else

17:10 24   before it hit her forearm?

17:11 25        A.   Let me look at my note because that's --

56

17:17　1　the patient reports that in April a door frame fell

17:20　2　on the right forearm and then she developed right

17:22　3　forearm pain.  This has been worsening.  I'm not

17:29　4　aware it struck her anywhere else.  Not in my notes.

17:35　5　I can't recall if she told me anything different, but

17:37　6　I have to go by my note of October 27, 2015, and

17:41　7　that's what she told me.

17:42　8　　　　　Q.　　Okay.  Would it be important to know if it

17:45　9　struck her anywhere else before it struck her right

17:47　10　forearm?

17:48　11　　　　　A.　　No.

17:48　12　　　　　Q.　　Why not?

17:49　13　　　　　A.　　Because if she -- if it struck her right

17:56　14　forearm and she has pain developing from that area,

17:59　15　that's what I need to know.  For me it would be not

18:04　16　as important if it hit her in the back, but she

18:09　17　doesn't have any back pain.  That would not be

18:11　18　important for me.

18:12　19　　　　　Q.　　What if she had lied on your understanding

18:15　20　of the force that struck her if you knew it struck,

18:20　21　you know, a different part of her body first?

18:22　22　　　　　A.　　No.  Because I don't know what door frame

18:25　23　it was.  I don't know the weight of it.  I don't know

18:27　24　the details of it.  If you get hit by a stray bullet

18:34　25　that hits something else before it hits you, it can

57

18:36   1    still kill you.  So the force itself I don't think

18:41   2    determines the CRPS.

18:43   3         Q.   Okay.  All right.  So let's go back.

18:47   4    Let's look at what we've got.  Right hand and left

18:49   5    hand here in this record.  And if you wouldn't mind,

18:56   6    just take a moment and look through that.

19:01   7         A.   Okay.  Okay.

19:20   8         Q.   All right.  And if you don't know the

19:24   9    answer to this, just please tell me you don't know,

19:26  10    but when -- because I'm assuming you weren't present

19:29  11    when Dr. Kamaleson did this, you know, did this

19:31  12    examination.  But what would he have done as part of

19:35  13    his examination to get the information he needed to

19:39  14    fill in each of these sections here?  Would they just

19:42  15    be a visual examination or would it be hands-on and

19:45  16    examine her that way?  What in your experience would

19:49  17    he have likely done?

19:49  18         A.   I don't know.

19:50  19         Q.   You don't know?

19:51  20         A.   I've never seen him examine patients.  So

19:54  21    I don't know how he came to this.

19:56  22         Q.   Okay.  Would you agree with me then that

20:00  23    his findings were identical for the left hand and

20:03  24    right hand?

20:04  25         A.   For the written note from August 10, 2015,

58

20:22  1      the report for the right hand is identical to the

20:27  2      report from the left hand.  Yes.

20:29  3           Q.    Okay.  So if we turn back to these

20:35  4      Budapest diagnostic criteria, were there -- let's

20:41  5      start with the vasomotor -- were there any positive

20:46  6      symptoms or signs for vasomotor indicators which

20:50  7      would support a finding of CRPS?

20:52  8           A.    You have to ask him that.

20:56  9           Q.    Just based on what's in the note here.

21:01  10          A.    For the signs, no.

21:04  11          Q.    Okay.

21:05  12          A.    It's normal.

21:08  13          Q.    Same for the symptoms, too?

21:09  14          A.    Wait.  I didn't look at the symptoms

21:14  15     because symptoms would be history.

21:16  16          Q.    History.  Okay.

21:28  17          A.    Well, in the symptoms there's no positive

21:30  18     signs, no negative signs.

21:32  19          Q.    Okay.  And let's go to pseudomotor.  Would

21:40  20     you agree with me that using the Budapest diagnostic

21:44  21     criteria, there's no signs or symptoms indicating, I

21:47  22     guess, the presence of those pseudomotor criteria?

21:52  23          A.    Correct.

21:53  24          Q.    Same thing with the motor/trophic

21:58  25     criteria.  No signs or symptoms?

GILBERT & JONES

22:01 1      A.    There is no signs or symptoms; correct.

22:04 2      Q.    Okay.  And there is no sign, I guess, of

22:15 3 sensory as well; is that true?

22:20 4      A.    Well, he did not report sensory exam, so I

22:32 5 cannot answer that.

22:33 6      Q.    But it's just not present in this report?

22:37 7 Nothing indicating that; correct?

22:38 8      A.    In the report, there's no sensory exam;

22:41 9 correct.

22:41 10      Q.    Have you spoken with Dr. Kamaleson about

22:44 11 Ms. Orr?

22:44 12      A.    Specifically I don't think so.

22:58 13      Q.    Okay.

22:59 14      A.    I do not believe.  I might have talked

23:00 15 with him at a meeting with Mr. Kraeuter, I believe,

23:06 16 when -- I believe when I left, he came in or the

23:10 17 other way around.  But I do not believe that we had a

23:19 18 true discussion about the findings, no.

23:20 19      Q.    All right.  And I guess what I'm getting

23:23 20 at is it looks like you, in your expert report, you

23:29 21 relied on his examinations and his records and his

23:33 22 notes when you reach a conclusion.  And I just want

23:36 23 to make sure that there weren't any conversations

23:38 24 that you may have had with him that gave you

23:41 25 additional information that's not contained in these

60

23:43 1    notes.

23:43 2         A.    I do not believe that there was any

23:45 3    discussion beyond, no.

23:47 4         Q.    All right.  So using the Budapest

23:54 5    diagnostic criteria, as of August 10th, 2015, you

23:58 6    couldn't say that she had CRPS, correct, based on

24:01 7    what's in these notes?

24:02 8         A.    Correct.  I couldn't say anything because,

24:11 9    again, his note -- just based on his note only, yes.

24:15 10        Q.    Right.  But he doesn't, I guess, report

24:18 11   the signs and symptoms necessary to support CRPS

24:22 12   diagnosis in his notes?

24:24 13        A.    Correct.

24:25 14        Q.    And that would have been roughly four

24:33 15   months, give or take, after the incident; correct?

24:40 16        A.    Yes.  Except for the assessment which he

24:44 17   reports right upper extremity RSD.

24:47 18        Q.    Correct.  But he does not --

24:50 19        A.    He does not specify.

24:52 20        Q.    The presence of the symptoms or signs?

24:54 21        A.    Correct.

24:54 22        Q.    Basically he's just, it looks like, and

24:57 23   you may not know this, but my take on it is that's

25:00 24   what she told him her diagnosis was from another

25:03 25   physician?

GILBERT & JONES

61

25:04  1          A.    I don't know.

25:04  2                MR. KRAEUTER:  Object to form.

25:05  3                MR. MEADER:  Okay.  I'll have to ask him

25:07  4          that question, I guess.

25:08  5                THE WITNESS:  You'll have to ask him, yes.

25:11  6                MR. MEADER:  He's the best person to

25:13  7          answer that one.

25:14  8          Q.    (By Mr. Meader) The Phalen's test, is that

25:28  9    used to diagnose carpal tunnel syndrome?

25:30 10          A.    It's one part of the test, yes.

25:32 11          Q.    What would be the significance of the

25:36 12    positive Phalen's test?

25:38 13          A.    The idea behind the Phalen's test is to

25:47 14    put some pressure on the median nerve of the wrist to

25:50 15    cause a stress on the median nerve of the wrist and

25:53 16    see if you get the typical -- well, that's this one

25:56 17    and this one.  Two different Phalen's and reverse

25:59 18    Phalen's, yes.

26:00 19          Q.    Okay.

26:00 20          A.    It's just a test that gives you a first

26:07 21    screening for carpal tunnel syndrome.

26:10 22          Q.    Okay.  All right.  So let's move on to her

26:16 23    next visit.  And I believe it, again, was this

26:20 24    Dr. Kamaleson and I don't think those are -- although

26:27 25    these pages are in order, the records are not in

62

26:29  1    order.  So it's page 27.  Okay.  So this is the visit

26:40  2    from September 23rd, 2015.

26:44  3            A.    Yes.

26:45  4            Q.    And it looks like the right upper

26:47  5    extremity pain is improving, according to his note.

26:55  6            A.    No.  She had limited motion.  She feels

26:58  7    the pain has not quite improved that.

27:00  8            Q.    Okay.

27:01  9            A.    She feels the pain has not quite improved

27:12 10    yet.

27:13 11            Q.    Okay.  But she's had an improvement in her

27:17 12    range of motion?

27:17 13            A.    Yes.

27:20 14            Q.    And this looks like this was after some

27:24 15    physical therapy, I guess, that she went to?

27:26 16            A.    She was going through physical therapy;

27:29 17    correct.  She started physical therapy.

27:30 18            Q.    Okay.  And then again it looks like

27:38 19    Dr. Kamaleson reviewed or examined her right elbow,

27:42 20    left elbow, right hand and left hand, and both the

27:49 21    right and left elbow and the right hand and left

27:52 22    elbow were noted as being the same?

27:56 23            A.    Correct.

28:04 24            Q.    All right.  Now, I know that RSD is, is

28:15 25    that still a different diagnosis than CRPS or is CRPS

63

28:19  1    sort of enveloped RSD?

28:22  2         A.    No, it's not enveloped.  RSD is reflex

28:28  3    sympathetic dystrophy and that was replaced by

28:32  4    complex regional pain syndrome Type 1.

28:35  5         Q.    Okay.

28:36  6         A.    Because it was concluded that there

28:43  7    doesn't have to be a sympathetic component to it.

28:45  8    And RSD has the "S" for sympathetic in the word.  And

28:50  9    that's one of these conferences where the experts

28:52  10   meet together and they felt, from my understanding,

28:59  11   that the RSD word does not completely accurately

29:06  12   describe what's going on.

29:07  13        Q.    All right.

29:08  14        A.    So in the clinic setting, a lot of

29:13  15   orthopedic specialists still call it RSD.  That's

29:16  16   what they -- when they were training it was RSD.  So

29:20  17   it hangs with you.  You call it RSD.  You mean CRPS

29:25  18   Type 1.

29:26  19        Q.    Got it.

29:26  20        A.    So it's typically interchangeable.

29:29  21        Q.    Yeah.  So explain to me, if you could,

29:34  22   you're using the term "sympathetic."  And what does

29:37  23   that connotate in the way that you're using it?

29:45  24             MR. KRAEUTER:  Object to the form.

29:46  25        A.    I'm not using the word sympathetic --

64

29:48  1      Q.     (By Mr. Meader) RSD --

29:49  2      A.     Correct.

29:50  3      Q.     -- I'm trying to figure out, I guess, what

29:52  4  the sympathetic -- it's a medical term, it's medical

29:54  5  jargon.  I'm trying to understand what it is.

29:56  6      A.     Sympathetic nerve system.

29:56  7             MR. KRAEUTER:  Object to the form.  You

29:58  8      can answer.

29:59  9             MR. MEADER:  Okay.

30:01 10      Q.     (By Mr. Meader) Okay.  What is sympathetic

30:06 11  nerve system?

30:06 12      A.     It's part of the nerve system in the body

30:09 13  and what started the sympathetic nerve system and

30:14 14  it's causing RSD, a malfunction of the sympathetic

30:20 15  nerve system.  And the more consensus now is that the

30:23 16  sympathetic nerve system does not have to be

30:26 17  involved.

30:26 18      Q.     Thank you.

30:27 19      A.     That's why it's called CRPS, complex

30:31 20  regional pain syndrome.  The sympathetic was taken

30:33 21  out of that.

30:34 22      Q.     It's not limited to sympathetic?

30:35 23      A.     Correct.

30:35 24      Q.     It's more expansive now?

30:37 25      A.     Correct.

65

30:38  1        Q.    Okay.  Thank you.  Now I understand.

30:39  2    Thank you.  All right.  So going back to the Budapest

30:44  3    diagnostic criteria.  If we were to go to the

30:49  4    vasomotor -- and I'm going to ask the same series of

30:51  5    questions as I did for the August 10th visit.

30:54  6        Going through the vasomotor criteria,

30:58  7    you'll agree with me the notes do not reflect any of

31:01  8    those symptoms or signs?

31:02  9        A.    Correct.

31:02  10       Q.    And the same with pseudomotor?

31:05  11       A.    The notes, correct.

31:07  12       Q.    And the same with motor/trophic?

31:09  13       A.    Correct.

31:10  14       Q.    And so based on the contents of these

31:13  15   notes, it would be insufficient to reach a CRPS Type

31:19  16   1 diagnosis?

31:20  17       A.    Based on the note itself, correct.

31:22  18       Q.    And it looks like Dr. Kamaleson notes that

31:36  19   the skin on the dorsum of her hand has a normal sheen

31:39  20   to it and that her motion, I guess, range of motion

31:43  21   is normal now.

31:45  22       A.    Which means it was not normal before.

31:47  23       Q.    Okay.

31:47  24       A.    Which I don't have any records from him.

31:51  25   You have to ask him.

GILBERT & JONES

66

| | | |
|---|---|---|
| 31:51 | 1 | Q.    Okay.  So now we're on to October 21st. |
| 32:00 | 2 | A.    Okay.  Tell me the page number. |
| 32:06 | 3 | Q.    I'm sorry.  It is 26. |
| 32:08 | 4 | MR. KRAEUTER:  What was the date again? |
| 32:10 | 5 | MR. MEADER:  October 21st. |
| 32:12 | 6 | A.    Okay.  Yes. |
| 32:29 | 7 | Q.    (By Mr. Meader) Okay.  At this point he |
| 32:43 | 8 | notes there's no swelling, edema or I think he also |
| 32:50 | 9 | says -- okay.  He does mention that the trophic |
| 32:54 | 10 | changes of the skin have improved, although I don't |
| 32:59 | 11 | recall seeing any reference to any trophic changes in |
| 33:02 | 12 | any prior records here. |
| 33:07 | 13 | So let's kind of go through the Budapest |
| 33:10 | 14 | diagnostic criteria.  I'll start with vasomotor.  Are |
| 33:14 | 15 | there any signs or symptoms that are contained in his |
| 33:20 | 16 | notes? |
| 33:20 | 17 | A.    No, not in the note. |
| 33:22 | 18 | Q.    How about the pseudomotor? |
| 33:23 | 19 | A.    He says trophic changes of skin have |
| 33:31 | 20 | improved. |
| 33:33 | 21 | Q.    That might be one I have to ask him about |
| 33:35 | 22 | because it's tough to say what he -- |
| 33:37 | 23 | A.    Because we don't see in the previous |
| 33:39 | 24 | notes.  He doesn't mention it.  And she's likely |
| 33:43 | 25 | hypersensitive.  You should ask him for that. |

67

33:46  1        Q.    Okay.   Yeah.   I agree.   It's not as clear

33:49  2    in these as it is in the others.

33:51  3              Okay.   Down there at the bottom, it

33:56  4    references you and your plan in No. 2.   Going to have

33:58  5    her see Dr. Niederwanger to discuss interventional

34:02  6    options including stellate ganglion block.

34:08  7        A.    Okay.

34:08  8        Q.    What is a stellate ganglion block?

34:12  9        A.    That's an injection that is done either

34:15 10    under ultrasound or fluoroscopy where local

34:20 11    anesthetic is placed typically around the C6

34:23 12    vertebral body from an anterior approach, which is

34:30 13    supposed to numb the stellate ganglion, which is a

34:36 14    relay station for sympathetic nerve fibers.

34:39 15        Q.    Okay.   And how long does that numbness

34:44 16    last once it's done?

34:45 17        A.    It depends what local anesthetic is used.

34:48 18    It lasts 30 minutes to several hours.

34:53 19        Q.    What is the reason for doing one of these

34:56 20    blocks?

34:56 21        A.    Previously stellate ganglion blocks were

35:04 22    done to find out if the pain has meted through the

35:12 23    sympathetic nerve system.   More recent research

35:22 24    questions the true benefit for diagnosis.

35:28 25        Q.    So is it a diagnosis or is it a treatment?

68

35:31  1      A.    It's a diagnosis.

35:32  2      Q.    It's a diagnostic tool?

35:34  3      A.    It's a, it's supposed to be a diagnostic

35:38  4   tool, yes.  The stellate ganglion block is not

35:44  5   included in the criteria anymore just because the

35:48  6   results were questionable.  Some of the patients that

35:52  7   got positive benefits was more -- was likely placebo

35:58  8   related and negative outcomes, meaning no change in

36:02  9   the pain.  Did not mean they do not have CRPS.

36:08  10        And I have a paper here because I figured

36:10  11  that you would ask it honestly and that's what I did

36:14  12  on the weekend.  I do have a paper here that explains

36:16  13  this very nicely as well.  And you do not have a copy

36:19  14  of that yet.

36:20  15     Q.    Okay.

36:21  16     A.    But it's, it's not part of diagnostic

36:24  17  criteria.  It's done probably less frequent now than

36:29  18  it used to be done.  And the diagnostic value has

36:37  19  been questioned more.

36:40  20     Q.    Okay.  And you have a quote from this

37:10  21  Cochrane Library.  Are you familiar with that?

37:12  22     A.    I'm not.

37:13  23     Q.    Okay.  Yeah.  Go ahead.

37:16  24     A.    It's a database of systematic reviews that

37:18  25  look at all available studies that cover one topic or

69

37:24 1  one specific procedure.  And then they look what's

37:29 2  the evidence for it, what's the evidence against it.

37:31 3  They classify the studies by quality.

37:34 4         This is an article that was published

37:42 5  fairly recent, within the last three years, 2013.

37:52 6  And the results were that the conclusion is there's

38:01 7  limited data available to suggest -- the limited data

38:06 8  available do not suggest that local anesthetic

38:08 9  sympathetic block is effective for reducing pain in

38:13 10  CRPS.

38:14 11         Overall, the evidence is very limited,

38:18 12  precludes a drawing of any strong conclusion.  The

38:21 13  evidence does not provide support for the efficacy of

38:26 14  local anesthetic sympathetic blocks in managing

38:29 15  people with CRPS.  And I'm -- this is the summary.

38:35 16  This is the whole paper.  And they included every

38:38 17  available study is all in here.

38:42 18         So the trend is probably to go more away

38:48 19  from sympathetic block as a diagnostic criteria for

38:53 20  CRPS.

38:53 21         Q.    All right.

38:54 22         A.    And it kind of plays in the same scene

38:59 23  that we had before.  The reason is possibly that CRPS

39:04 24  doesn't have the sympathetic in it anymore.

39:06 25         Q.    Uh-huh.

70

39:06 1      A.    In the olden days we thought sympathetic

39:09 2 nerve system, something is wrong.  Call it RSD.

39:13 3 Well, now we are more educated and it's not on the

39:17 4 sympathetic nerve system.  And, obviously, there was

39:20 5 a lot of placebo effects with those sympathetic

39:28 6 blocks.

39:29 7      Q.    So I guess the stellate ganglion block, it

39:35 8 would let you know, I guess, if it was the

39:37 9 sympathetic nerve system?

39:38 10      A.    No.

39:39 11      Q.    Not necessarily?

39:40 12      A.    No.

39:40 13      Q.    Okay.  Any idea why he would recommend or

39:47 14 ask that you discuss that with her?

39:49 15      A.    Yes.  I'm sure -- no, I'm not sure.  I

39:53 16 assume that it's when he trained, he's probably done

39:57 17 more, and it was called RSD.

39:59 18      Q.    That's right.

39:59 19      A.    His note says RSD.

40:01 20      Q.    Yeah.

40:02 21      A.    And so it is not, it is not the wrong

40:06 22 thing to do.  It is something to consider.  But you

40:10 23 also have to discuss with the patient this is the

40:13 24 benefits we expect.  This is the outcome that we

40:16 25 might get.  These are the risks involved with the

71

40:19  1    procedure.

40:19  2              And on the first visit, I think I

40:21  3    discussed this with her.  I do remember that.  We can

40:24  4    look at.  If it's in my note or not, I'm not sure.

40:27  5    But I know I discussed it with her and she was

40:29  6    hesitant to undergo it and I agreed with her.  I do

40:32  7    agree that for a clinical diagnosis, it's not part of

40:38  8    the criteria anymore.  It is not a long-term

40:42  9    treatment typically.  It is not something you do a

40:46  10   stellate ganglion block, pain goes away and stays

40:49  11   away.  That would be very uncommon.

40:53  12             So then the question really becomes you

40:56  13   want to take the risk of doing this with the limited

41:00  14   outcome data that we can get or do you want to say

41:04  15   this is not part of the workup that I would

41:08  16   recommend.

41:08  17       Q.    So based on, I guess, what I'm hearing you

41:13  18   say, based on the fact that it's a risky procedure,

41:15  19   that was part of what played into her decision of not

41:18  20   wanting to do it or part of why your --

41:21  21       A.    I think that was part of why I recommended

41:23  22   not to do it.

41:23  23       Q.    Okay.  What are the risks associated with

41:26  24   the blocks?

41:27  25       A.    Well, any injection, with infection,

72

41:35 1    bleeding, anaphylactic reaction, all very unlikely.

41:40 2    Stellate ganglion block does come from the front of

41:46 3    the neck, so there's nerves that run.  You can get a

41:50 4    hoarseness of the voice.  You can damage the nerves

41:52 5    to the voice box.  If you get an infection deep in

41:55 6    the area of the cervical region, it would be very

41:59 7    difficult.  You have the esophagus where your food

42:04 8    goes down.  If you get the needle close to that or

42:09 9    into that, you likely get bacteria that can be

42:14 10   transported further back in the neck and it can cause

42:16 11   an infection afterwards.  Those are the main reasons,

42:22 12   I would assume.

42:22 13       Q.    What is a riskier procedure, a spinal cord

42:25 14   stimulator or the blocks?

42:27 15       A.    Based on the outcome, spinal cord

42:34 16   stimulator, if it works, it can last a lifetime.  It

42:37 17   can last long term.  It's therapeutic.  Versus a

42:40 18   one-hour benefit.  Then I believe that the stellate

42:46 19   ganglion block is a higher risk -- it's not about

42:48 20   risk.  It's risk/benefit.  The benefit of the

42:50 21   stellate ganglion block is extremely limited.  The

42:56 22   benefit of spinal cord stimulator, if it works, is

42:59 23   very beneficial.

43:05 24            As a patient, you have to choose.  You

43:08 25   don't choose between the two.  Okay?  Because one is

73

43:10 1     not done for a long-term benefit.  The other one is

43:14 2     done for a long-term benefit.  So it's very difficult

43:17 3     to compare.  But spinal cord stimulator has its risks

43:21 4     as well.  There's no doubt about that.  But in the

43:26 5     risk/benefit analysis, I believe that it comes out

43:30 6     ahead because if it gives you benefits, you'd have a

43:33 7     long-term benefit.

43:36 8         Q.    Okay.  We may come back to that.  Let's

43:39 9     look at this record from the 27th that is page 32.

43:43 10     This is from when you first --

43:45 11         A.    Yeah.  My records.

43:46 12         Q.    Yes.  When you first saw Ms. Orr.

43:54 13         A.    Yeah.  10/27/2015.  Yes.

44:02 14         Q.    All right.  Let's go through the physical

44:22 15     examination.

44:22 16         A.    Okay.

44:23 17         Q.    It looks like there is no clear allodynia.

44:32 18         A.    Correct.

44:33 19         Q.    Subtle skin changes?

44:41 20         A.    Uh-huh.

44:41 21         Q.    Did you document any of that?  Did you

44:43 22     take any pictures?

44:44 23         A.    No.

44:44 24         Q.    What did the skin changes look like?

44:47 25         A.    If you compare the right to the left side,

74

44:51 1   they were just different looking.  I do not have any

44:55 2   pictures.  We don't take pictures.  It's not

44:57 3   standard.

44:58 4        Q.   Okay.  Was it red or was it white?

45:03 5        A.   It was, in my recollection, I believe it

45:06 6   was more red.  More reddish, more skin coloring on

45:12 7   the right side versus the left side.

45:14 8        Q.   There have been other reasons that that

45:16 9   was the case besides CRPS?

45:23 10       A.   Well, is one sign by itself, yes.

45:32 11       Q.   Okay.  And some swelling noted --

45:44 12       A.   Uh-huh.

45:44 13       Q.   -- in the right dorsal forearm.  So no

45:58 14  complaints of it being cold or hot?

46:03 15       A.   Yes.  Let me see.

46:16 16       Q.   I see it there.

46:18 17       A.   One second.  She oftentimes feels there's

46:20 18  swelling in the right hand and temperature

46:22 19  differences as well.

46:23 20       Q.   Okay.  So that was a symptom but not a

46:25 21  sign?

46:25 22       A.   Correct.

46:26 23       Q.   You did not observe that?

46:28 24       A.   Temperature difference?

46:30 25       Q.   Yes.

46:30  1        A.    No.  I did not write it down, so I do not

46:34  2    believe -- I typically put my hand on it and compare

46:37  3    right and left, and I could not say there was a

46:40  4    temperature change.  I do know her intake sheet from

46:45  5    the same day she does put cold on there and skin

46:53  6    color and arm changes and red spots.  This is part of

46:56  7    her intake.  I don't know if you have that.

47:02  8        Q.    I think I do.

47:03  9        A.    And this is the review of systems paper.

47:03 10    This is filled out by the patient.

47:06 11        Q.    Right.

47:06 12        A.    And I just review it afterwards.

47:08 13        Q.    Okay.  So you didn't note an usual, I

47:16 14    guess, fingernail growth --

47:17 15        A.    No.

47:17 16        Q.    -- or unusual hair?

47:19 17        A.    No.

47:20 18        Q.    So using the Budapest diagnostic criteria

47:37 19    and applying those criteria to what you observed,

47:40 20    would she have been positive for CRPS at this visit?

47:43 21        A.    I believe, yes.

47:44 22        Q.    Tell me which tests or which criteria you

47:49 23    believe were met.

47:50 24        A.    Well, one second.  Okay.  Let's start with

48:09 25    the criteria No. 1, continued pain disproportionate

76

48:13  1    in time or degree to the use of course of pain after

48:16  2    trauma coinciding event, yes.  This was in October.

48:20  3    The trauma was in April.

48:22  4        Q.    So is it sensory, sensory --

48:26  5        A.    No, no, no, no.  The Budapest criteria are

48:30  6    four different sets that you have to fulfill.  Only

48:34  7    one of them is the signs and symptoms.  The other one

48:38  8    is continuing pain disproportionate to the event.

48:44  9    That's yes.

48:45  10        And then at least one symptom in three of

48:48  11   the four categories which is hyperalgesia or

48:57  12   allodynia.  I did not see any clear allodynia.  She

49:03  13   feels the pain is pins and needles, burning pain,

49:06  14   tingling, sharp, electric shock pain.  It is for me

49:12  15   report of hyperalgesia.  This is a symptom.  This is

49:15  16   what she told me in the history.

49:17  17       Q.    Right.  So out of the four that you have,

49:19  18   that would be sensory?

49:19  19       A.    Correct.

49:20  20       Q.    That's been reported?

49:23  21       A.    Yes.  Vasomotor, report of skin color or

49:27  22   temperature changes, and she did report that to me.

49:31  23   Then report of edema or swelling.  Reported she

49:35  24   oftentimes feels there's swelling in the right hand.

49:40  25       Q.    Okay.  So that's positive as well.  So

GILBERT & JONES