77

49:41   1      you've got three already.

49:41   2          A.     The symptoms.

49:41   3          Q.     Symptoms.

49:43   4          A.     Now the signs.  We need two of the

49:48   5      categories for signs.  And look at my exam.  Yes.

50:01   6      Some swelling noted in the right dorsal forearm.  So

50:03   7      that's pseudomotor edema, positive edema or swelling

50:09   8      on the exam.

50:14   9          Then I say subtle skin changes on my exam.

50:19 10      That's the vasomotor sign.  And the tenderness I

50:31 11      would call with the hyperalgesia would be one of

50:35 12      them.  You need only two.  So she has two of the

50:38 13      signs already.

50:39 14          MR. KRAEUTER:  Two or three?

50:40 15          THE WITNESS:  She has definitely two.  Two

50:42 16          is necessary for a diagnosis.  She has, from my

50:45 17          exam, reports of skin changes, asymmetry with

50:50 18          edema.  So she has two signs that I need.  And

50:58 19          then the last criteria, of course, there's no

51:02 20          diagnosis that better explains the signs and

51:04 21          symptoms.

51:04 22          Q.     (By Mr. Meader) Okay.  Well, let's talk

51:06 23      about that.

51:06 24          A.     Yeah.

51:07 25          Q.     So there was -- let's get back.  We went

78

51:13  1    through a list of things here that was in this

51:16  2    article.   Did you do a full blood count?

51:28  3         A.    No.

51:28  4         Q.    Did you do a C reactive protein?

51:31  5         A.    No.

51:31  6         Q.    Did you do an erythrocyte sedimentation

51:36  7    rate?

51:36  8         A.    No.

51:37  9         Q.    Sero autoantibody?

51:38 10         A.    No.

51:39 11         Q.    What about cellulitis or arthritis?

51:49 12         A.    Cellulitis was per my clinical judgment

51:53 13    not present.   Cellulitis means, in layman's terms, an

51:58 14    infection of the skin.

51:59 15         Q.    Okay.   Arthritis?

52:01 16         A.    Arthritis would be No. 1.   Typically, you

52:09 17    know, she has seen two orthopedic specialists before.

52:14 18    She had X-rays done.   And also arthritis in the

52:16 19    forearm.   There's no choice in the forearm, in that

52:22 20    area, in the midforearm.   So arthritis could be at

52:24 21    the wrist joint, at the fingers or at the elbow.   But

52:28 22    arthritis is not account for the findings in my exam.

52:33 23         Q.    Okay.   Did you do any duplex scanning?

52:37 24         A.    I did not.

52:38 25         Q.    To exclude a deep vein thrombosis?

79

52:41 1    A.    I did not.  I clinically did not feel that
52:43 2  I had a suspicion based on the presentation in the
52:46 3  exam and the time line of the symptoms.
52:48 4    Q.    Okay.  Why is that?
52:50 5    A.    With a blood clot in the upper extremity,
53:02 6  I would expect typically that there is either a
53:14 7  different type of pain with it.  It just clinically
53:17 8  did not sound -- No. 1, it's rare to have upper
53:20 9  extremity blood clots.  She's had the symptoms for
53:27 10  half a year.  I just clinically did not feel there
53:34 11  was a DVT present.
53:36 12    Q.    Any other reasons as to why you felt there
53:39 13  was not a DVT present?  Or is that it?
53:43 14    A.    The typical DVTs in the upper extremity
53:46 15  are more in the arm area, upper arm area.  Not in the
53:56 16  forearm area.
53:56 17    Q.    Okay.  So there was an EMG done?
54:06 18    A.    The patient had an EMG and a nerve
54:09 19  conduction study done at an off-site facility prior
54:13 20  to seeing me, yes.
54:15 21    Q.    And an MRI was done as well?
54:18 22    A.    I believe she had already two MRIs when
54:23 23  she came to me.  One of the right upper extremity and
54:25 24  one of the cervical spine.
54:25 25    Q.    Okay.  Now, a thermograph was not used?

80

54:27  1        A.      No.

54:28  2        Q.      Do you have a thermograph?

54:31  3        A.      No.

54:41  4        Q.      And there was no duplex ultrasound being

54:45  5    done?

54:45  6        A.      No.

54:45  7        Q.      But in looking at this and looking at your

55:00  8    notes, it looks like at this time you did not

55:05  9    diagnose her with CRPS.  And I'm just reading from

55:10  10   your note under assessment, it says, second sentence,

55:13  11   "She may be suffering from CRPS type of syndrome

55:22  12   status post a door frame falling on her forearm in

55:23  13   April of 2015."

55:24  14       A.      Correct.

55:25  15       Q.      So my take it on was at that point in

55:27  16   time, you were not convinced that it was CRPS?

55:31  17       A.      No.  At that point in time, I was just

55:37  18   going to make sure there's not anything else going

55:40  19   on, excluding any other factors or any other reasons

55:44  20   that she could have that and just get an overall

55:48  21   picture as well.  I just didn't want her labeled with

55:51  22   CRPS immediately.  I just wanted to make sure that

55:58  23   there's nothing else that would explain this.

55:59  24       Q.      But you did not tell her at that point in

56:03  25   time that you thought she had CRPS?

81

56:06   1          A.    I told her, yes.  I told her that it might

56:10   2     be CRPS.

56:18   3          Q.    But at that time, it sounds like you

56:21   4     weren't convinced that's what it was?

56:24   5          A.    It's not that I wasn't convinced.  It's

56:26   6     just that sometimes with CRPS, you have several

56:33   7     clinic visits.

56:34   8          Q.    Uh-huh.

56:34   9          A.    And not only one-time visit.

56:36  10          Q.    Okay.  So -- I'm sorry.

56:37  11          A.    And you just, when they excluded is there

56:44  12     anything else going on, could there be something

56:44  13     different.  Due diligence is the medical standard.

56:48  14     And I did not feel I wanted to label her my first

56:52  15     visit with CRPS because CRPS is a diagnosis of

56:57  16     exclusion.

56:58  17          Q.    So at that point in time, at least, you

57:00  18     weren't comfortable diagnosing her with CRPS because

57:04  19     you were still doing your due diligence and ruling

57:09  20     out other things.  Is that what I'm hearing?

57:13  21          A.    I was doing my due diligence, correct, and

57:14  22     did not want to label her with having CRPS; correct.

57:14  23          Q.    Okay.  But you had --

57:15  24          A.    Not the diagnosis of CRPS; correct.

57:17  25          Q.    You had not diagnosed her with CRPS at

82

57:21   1      that point in time, it sounds like.  It sounds like,

57:22   2      correct me if I'm wrong, but it sounds like you

57:26   3      wanted to do more due diligence, maybe see her again

57:26   4      before you said or labeled her with CRPS?

57:33   5             MR. KRAEUTER:  Objection to form.

57:35   6         A.    It looked like CRPS to me.  It felt like

57:41   7      CRPS to me.  I just met her for the first time and I

57:47   8      did feel that see her back, let's go over this again

57:53   9      and let's find out if there's anything else that

57:56   10     could be causing this.

57:57   11            I did not, I did not on 10/27/16 go over

58:04   12     the form with her or even in my note.  I did not

58:08   13     count up if this CRPS or not because at that moment,

58:16   14     I just wanted to see what we can do.  And looking

58:20   15     back, she fulfilled the criteria on her first visit

58:28   16     already, but I didn't calculate all the criteria.

58:32   17            So I did not say you have CRPS, I'm

58:36   18     classifying you with CRPS.  I did not say, oh, you do

58:36   19     not have CRPS.  This was just the initial visit for

58:48   20     evaluation and I did not want to put a label on her,

58:49   21     okay, this is CRPS.

58:51   22        Q.    Also, on 10/27 of 2015, you did not

58:59   23     diagnose her with CRPS?

59:00   24             MR. KRAEUTER:  Object to form.

59:02   25        A.    I diagnosed her with --

83

59:05   1       Q.   (By Mr. Meader) I understand that going

59:06   2   back in hindsight --

59:07   3       A.   No, no, no. I diagnosed her with a she

59:09   4   may be suffering from CRPS type of syndrome.

59:13   5       Q.   But you did not diagnose her with CRPS;

59:16   6   correct?

59:18   7       MR. KRAEUTER:  Object to the form.

59:19   8       A.   I believe that's a -- it's a semantic

59:28   9   difference that we're talking about.

59:31 10       Q.   (By Mr. Meader) Well, what I'm getting at

59:33 11   is the point in time -- because the records, they

59:34 12   kind of speak for themselves here, but they -- you

59:37 13   know, what I'm trying to go t is when you say

59:41 14   diagnose, when you say, hey, this is CRPS. And here,

59:44 15   your words are that she may be suffering from CRPS

59:47 16   type of syndrome. It doesn't say diagnosis and plan,

59:53 17   CRPS Type 1. It doesn't say that.

59:57 18       And what I'm trying to get to, I guess, is

00:00 19   we're talking about this sensitivity versus specific

00:06 20   distinction earlier. And at this point in time,

00:10 21   maybe you were still concerned, you know -- the

00:10 22   sensitivity was satisfied. You have the 200 out of a

00:14 23   thousand. You felt like maybe, you know, she had it,

00:17 24   but you were worried about specificity at this point

00:20 25   in time and not using a false positive. Is that what

84

00:25 1    you were trying to say?

00:26 2                MR. KRAEUTER:  Object to form.

00:26 3        A.    No.  I didn't think it -- the way you're

00:30 4    saying is no.  I just -- I did not think what

00:35 5    sensitivity was specificity at that moment.  The

00:45 6    point was to just get an overall feel for the

00:51 7    evaluation for the impression.  The treatment I

00:52 8    proposed was like it is for CRPS.  So I've been down

01:01 9    the pathway.  And I just also wanted to clarify with

01:03 10   myself is there anything that we're missing.

01:05 11       Q.    What could that have been?  What other

01:07 12   kinds of things were you worried, I guess, you could

01:13 13   have been missing?

01:13 14       A.    Well, could there be anything in the

01:15 15   neurologic system going on.  For example, because she

01:28 16   did report some neurological systems as well that I

01:34 17   do not see frequently associated with CRPS.

01:38 18       Q.    Have you ever seen those associated with

01:41 19   CRPS?

01:41 20       A.    No.  I've seen patients report symptoms

01:45 21   that are -- that don't fit the picture and so they

01:49 22   might be a separate entity.  There might be something

01:55 23   different that has nothing to do with the CRPS.  A

02:00 24   lot of times patients with CRPS have some other

02:00 25   symptoms that are not part of the CRPS and are still

85

| | | |
|---|---|---|
| 02:08 | 1 | present.  So I just want to make sure that there is |
| 02:10 | 2 | nothing else going on. |
| 02:10 | 3 | Q.    Okay. |
| 02:11 | 4 | MR. KRAEUTER:  We've been going about two |
| 02:13 | 5 | hours.  Can we take a little break? |
| 02:14 | 6 | MR. MEADER:  Oh, yeah, sure, yeah.  That's |
| 02:17 | 7 | fine. |
| 02:18 | 8 | (Recess from 6:18 p.m. to 6:23 p.m.) |
| 07:13 | 9 | Q.    (By Mr. Meader) All right.  Did you test |
| 07:17 | 10 | her grip strength at all in your examination? |
| 07:20 | 11 | A.    I did not.  I don't think I reported it in |
| 07:32 | 12 | my note.  I can't say.  I'm sure I asked her to just |
| 07:43 | 13 | make a fist with my finger in it to see, but I did |
| 07:48 | 14 | not document it. |
| 07:49 | 15 | Q.    Okay.  Now, let's talk about the |
| 07:55 | 16 | medications. |
| 07:56 | 17 | A.    Sure. |
| 07:56 | 18 | Q.    You went over her medications, what she |
| 07:59 | 19 | was taking.  And I think you may have prescribed |
| 08:02 | 20 | something new? |
| 08:03 | 21 | A.    Yes. |
| 08:03 | 22 | Q.    Just kind of take me through all that in |
| 08:05 | 23 | your own words, if you wouldn't mind. |
| 08:07 | 24 | A.    Okay.  Okay.  I switched her over -- well, |
| 08:22 | 25 | I continued her on the gabapentin that she was |

GILBERT & JONES

86

08:25　1　already on for neuropathic-type pain.  I added on

08:29　2　Cymbalta at 30 milligrams.  It was supposedly for two

08:35　3　weeks, and then I wanted her to increase to 60

08:38　4　milligrams.

08:39　5　　　　　　And I switched her from hydrocodone to the

08:44　6　Percocet, which is the oxycodone, since I believe she

08:48　7　told me that that worked better before.  She had some

08:53　8　benefits of the hydrocodone before, yes.

08:57　9　　　　　　And I started her on Meloxicam, 5

09:02　10　milligrams once a day.  And she was on Ibuprofen 800

09:09　11　milligrams on and off since April.

09:11　12　　　　　Q.　All right.  So the Cymbalta, is there a

09:18　13　generic Cymbalta?

09:19　14　　　　　A.　Yes.

09:20　15　　　　　Q.　Okay.

09:23　16　　　　　A.　Called duloxetine.

09:26　17　　　　　Q.　Okay.  So the 30 milligrams, is that the

09:29　18　smallest dosage that that comes in?

09:30　19　　　　　A.　It comes in 20 milligrams, 30 milligrams

09:34　20　and 60 milligrams.

09:35　21　　　　　Q.　What is that designed to treat, the

09:39　22　Cymbalta?

09:39　23　　　　　A.　Cymbalta has a lot of indications.  Most

09:44　24　people know it as an antidepressant.  When it was

09:47　25　still brand name, it was very heavy promoted on TV

GILBERT & JONES

09:50  1  for depression.  It is indicated for fibromyalgia.
09:56  2  It is indicated for anxiety.  It is indicated for
09:59  3  diabetic neuropathy.  And I gave to her for
10:05  4  neuropathic pain.
10:06  5       Q.    In layman's terms, what's neuropathic
10:11  6  pain?
10:11  7       A.    Burning, tingling, sharp, electric
10:17  8  shock-type type pain.
10:17  9       Q.    Do depression and pain kind of go
10:20 10  hand-in-hand sometimes?
10:21 11       A.    If someone has chronic pain, oftentimes
10:29 12  they will develop depressive symptoms.  If someone
10:34 13  has depression, it does by no -- does not mean
10:41 14  whatsoever that they develop chronic pain.
10:42 15            But to answer your question a different
10:44 16  way, in chronic pain patients that develop depressive
10:48 17  symptoms, it can be helpful to give them medication
10:53 18  that treats the pain and treats depressive symptoms
10:56 19  at the same time, which I tell patients, for me, I
11:00 20  don't prescribe typically antidepressants.  I use
11:04 21  duloxetine for the neuropathic pain.  And if it
11:08 22  treats any depressive symptoms, it's an added benefit
11:11 23  for me.
11:11 24       Q.    Okay.
11:13 25       A.    But for her it was not for any depression.

88

11:15  1    It was for the pain.

11:17  2        Q.    So did she complain of any symptoms with

11:21  3    the side of her face?

11:23  4        A.    I believe she did.  Let me see.  I believe

11:44  5    that I recall that she complained about that and I

11:48  6    believe she wrote it on her review of systems.

11:50  7    That's where it was.  Facial pain, yes.

11:52  8        Q.    Okay.

11:53  9        A.    Numbness, mouth and lips.

11:55 10        Q.    Is that the intake?

11:56 11        A.    Yes.  Review of systems intake sheet.

12:00 12        Q.    It looks like she was next seen by

12:18 13    Dr. Kamaleson on November 18th, and that's page 97.

12:27 14    This guy over here.

12:42 15        A.    Correct.

12:43 16        Q.    Notes indicate that she was doing better

12:52 17    and that she had taken the Cymbalta.

12:54 18        A.    Yeah.

12:54 19        Q.    Let's talk about that.  She said she took

12:57 20    one Cymbalta and had a GI side effect and then

13:00 21    discontinued the medication.  However, her symptoms

13:03 22    improved significantly with the single dose of

13:10 23    Cymbalta.  Actually, we'll talk about that more in a

13:13 24    moment because I think she discusses that with you as

13:16 25    well --

89

13:16  1      A.     Correct.

13:16  2      Q.    -- about a week later.  Okay.  And it

13:24  3  looks like he does a physical examination of the

13:26  4  right upper extremity and the left upper extremity.

13:28  5  And you'll agree with me that both right and left

13:32  6  were the same?

13:32  7      A.     Per his note; correct.

13:35  8      Q.     Per his note, yeah.  And that using the

13:38  9  Budapest criteria, the notes here would not support a

13:46 10  diagnosis of CRPS?

13:49 11      A.     His note from 11/18; correct.

13:52 12      Q.     So that you'll, I guess, agree with me

14:15 13  that by that point in time, we had five visits to

14:18 14  Optim, five between yourself and Dr. Kamaleson, and

14:23 15  that only one of the five could have supported a

14:27 16  possible CRPS diagnosis.  And that was when you

14:30 17  examined her and what we talked about a few moments

14:34 18  ago?

14:37 19      A.     Yes, correct.  From October, yes.

14:41 20      Q.     Okay.  Then she comes and sees you on the

14:45 21  23rd.  Do you have that record?

14:47 22      A.     Yes.

14:47 23      Q.     Okay.  And she talks about her experience

14:52 24  with Cymbalta.

14:54 25      A.     Yeah.

90

14:54  1          Q.    Had you ever heard of that happening with

14:56  2    any other of your patients where they take it one

14:58  3    time and what it looks like is that the pain was

15:03  4    almost completely gone, and this has lasted until

15:07  5    now, which is almost a month, just shy of a month

15:13  6    after she took it.

15:15  7          Have you ever heard of that kind of relief

15:17  8    from one dose of Cymbalta?

15:18  9          A.    No.

15:19  10          Q.    What do you attribute that to?

15:26  11          A.    I cannot explain that.  She had a pretty

15:31  12    dramatic side effect with it.  I do know that when

15:34  13    she came in, she was torn about trying probably

15:41  14    another Cymbalta because she felt it was good

15:43  15    benefit.  She was torn about taking another one

15:47  16    despite the side effects.  But I cannot explain why

15:51  17    she had the excellent benefit from using it one time

15:54  18    in the evening.  And it continued until I saw her

16:00  19    again.

16:00  20          Q.    And you've never seen anything like that

16:02  21    since you've been practicing?

16:03  22          A.    No.  I do not recall that one tablet of

16:08  23    Cymbalta caused that profound of an improvement the

16:16  24    patients report.

16:17  25          Q.    If she was making complaints of pain, I

91

16:22  1    think, if you go back through some of the PT stuff,
16:25  2    and you can look at some of these notes where, you
16:34  3    know, my take on it, correct me if I'm wrong, but she
16:39  4    was complaining of very significant pain at each of
16:41  5    the visits, you know, to yourself and with your, you
16:45  6    know, visits to you or to Dr. Kamaleson?
16:47  7        A.    Uh-huh.
16:48  8        Q.    But at the same time she was unwilling to
16:52  9    take another Cymbalta, which apparently resolved all
16:55 10    of her pain almost completely because of some
17:00 11    gastrointestinal issues?
17:01 12        A.    Nausea, diarrhea, shakes, sweatiness.  And
17:07 13    the next day she felt horrible.  And then the day
17:10 14    afterwards, the pain was significantly better.  I
17:12 15    guess you -- from what she told me, she got benefit
17:16 16    probably 20 minutes afterwards.  Then felt horrible.
17:19 17    And then the day after that benefit again.
17:22 18        Q.    Okay.
17:23 19        A.    So the question was it the Cymbalta that
17:26 20    helped her or not.  I cannot answer that.
17:29 21        Q.    Is it possible to -- and I note that she
17:32 22    didn't try the Cymbalta again.  Would it have been an
17:37 23    option to cut the Cymbalta dosage or have her take a
17:41 24    half a pill --
17:41 25        A.    No.

92

17:41  1        Q.    -- and work it up --

17:41  2        A.    No.

17:41  3        Q.    -- over time?

17:41  4        A.    No.

17:41  5        Q.    Why is that?

17:42  6        A.    Because the side effects, the way she

17:44  7   described the side effects to me, precludes you from

17:48  8   really recommending that again.  I mean, it was not

17:55  9   just I had some nausea.  I mean, she had profound

17:59 10   side effects.  And, therefore, I did not recommend

18:04 11   her to continue that.

18:05 12        Q.    Now, you did a physical examination of

18:18 13   her?

18:19 14        A.    Yes.

18:20 15        Q.    Now, it looks like there's no swelling

18:26 16   that was noted?

18:27 17        A.    Correct.

18:28 18        Q.    If there had been any of these other

18:30 19   criteria, skin changes, the hair, the fingernails,

18:35 20   positive signs, would those have been included in

18:39 21   your notes?

18:40 22        A.    I can't answer that because I didn't write

18:45 23   it down.  I would assume if I see anything, I would

18:51 24   have included it.

18:53 25        Q.    That's your standard practice, I guess?

93

| 18:54 | 1 | A. Yes. |
| 18:55 | 2 | Q. If you make a finding? |
| 18:57 | 3 | A. If you find anything abnormal, you would |
| 19:00 | 4 | typically include it; correct. |
| 19:01 | 5 | Q. And none of those are included here? |
| 19:04 | 6 | A. Correct. |
| 19:04 | 7 | Q. Do you recall if she gave you any -- let |
| 19:11 | 8 | me ask it a different way. Do you recall if you |
| 19:13 | 9 | indicated the presence of any of the other signs on |
| 19:17 | 10 | this day on November 23rd, 2015, and just didn't put |
| 19:20 | 11 | them in your notes? |
| 19:21 | 12 | A. I don't recall. |
| 19:21 | 13 | Q. Okay. So as we sit here today and look at |
| 19:25 | 14 | this record from November 23rd, the examination and |
| 19:30 | 15 | the results of the examination contained in the notes |
| 19:34 | 16 | and also including your personal recollection, does |
| 19:37 | 17 | not support a CRPS diagnosis; is that correct? |
| 19:46 | 18 | MR. KRAEUTER: Object to the form. |
| 19:51 | 19 | A. Well, she was still under the working |
| 19:52 | 20 | diagnosis of possible CRPS syndrome in my assessment. |
| 19:58 | 21 | Q. (By Mr. Meader) But none of the signs |
| 20:00 | 22 | required for the diagnosis under the Budapest |
| 20:03 | 23 | criteria were present; correct? |
| 20:05 | 24 | MR. KRAEUTER: Object to the form. |
| 20:07 | 25 | A. Well, I believe that with her report of |

94

20:10 1    Cymbalta side effects, that took quite an amount of

20:14 2    time to get through that and to discuss that. So I

20:19 3    do not believe that a detailed all-inclusive exam was

20:30 4    done. This was more a quick exam. And I think we

20:40 5    discussed a lot about the Cymbalta with her.

20:43 6        Q.    So did you examine her to see if there

20:46 7    were any changes in her skin color, on her forearms?

20:49 8        A.    I did the exam that I documented here.  I

20:54 9    cannot recall if I did any other exam.

20:55 10       Q.    Okay.  But as we sit here today and based

21:00 11   on what's in these notes and based on what's in your

21:03 12   personal recollection, you'll agree with me that the

21:05 13   criteria necessary to satisfy a diagnosis of CRPS

21:10 14   under the Budapest criteria are not satisfied?

21:14 15           MR. KRAEUTER:  Object to the form.

21:15 16       A.    They're satisfied from my 10/27 note

21:17 17   already.

21:18 18       Q.    (By Mr. Meader) From from your note and

21:20 19   your memory; correct?

21:20 20       A.    10/27, yes.

21:22 21       Q.    Yes.  And, again, the note notes a

21:34 22   possible CRPS-type syndrome status?

21:37 23       A.    Yes.

21:38 24           MR. KRAEUTER:  Object to the form.

21:46 25       Q.    (By Mr. Meader) And so let's look at the

95

21:48  1    next one.  It looks like she went back to

21:51  2    Dr. Kamaleson on December the 30th.

21:55  3           A.    Do you have a page number?

21:56  4           Q.    Yes.  96.

22:04  5           A.    Correct.

22:04  6           Q.    And it looks like the notes report right

22:07  7    upper extremity pain improved.  She's doing better.

22:12  8    Still having occasional pain.  Her symptoms are

22:15  9    overall improved significantly.  And she's under your

22:19 10    care and the care of her primary care physician.  It

22:23 11    looks like there's an examination done of her right

22:26 12    upper extremity.  No swelling, edema or ecchymosis.

22:33 13    No tenderness.  She's able to make a fist.

22:39 14                  Using, you know, per notes, just what's on

22:44 15    the notes here, you'll agree with me that the

22:46 16    Budapest criteria are not satisfied supporting a

22:50 17    diagnosis of CRPS Type 1?

22:54 18           A.    Dr. Kamaleson's note of 12/30/15; correct.

22:57 19           Q.    Let's go to January 19th.  This is when

23:14 20    she came back and saw you.  And so it looks like you

23:36 21    performed an examination of her?

23:43 22           A.    Correct.

23:43 23           Q.    And you'll agree with me that -- let me

23:49 24    ask you this:  Do you recall making any or observing

23:56 25    any signs which would indicate or support a diagnosis

96

24:01 1   of CRPS which are not included in your notes here
24:06 2   under physical examination?
24:07 3       A.   I don't recall any, anything different
24:10 4   than what I wrote down.
24:11 5       Q.   As we sit here today, you'll agree with me
24:14 6   that what's contained in these notes, it's
24:18 7   insufficient to support a diagnosis of CRPS under the
24:23 8   Budapest criteria?
24:24 9       A.   I disagree.
24:26 10      Q.   Okay.  Explain to me why.
24:28 11      A.   You said what's contained in these notes.
24:30 12  In my notes?
24:31 13      Q.   I'm sorry.  Just from this date.  I'm
24:35 14  sorry.  From this date.  Based on what you observed
24:38 15  on this day.
24:39 16      A.   I didn't think the Budapest criteria have
24:43 17  to be present always in every single note.
24:47 18      Q.   How often do the Budapest criteria need to
24:51 19  be present?
24:51 20      A.   I believe, for example, that the swelling
24:58 21  is present at some time.  I think that's the --
25:00 22  actually the exact phrase that is used somewhere,
25:03 23  appearance of swelling at some time in point, for
25:06 24  example.  So it doesn't mean that the swelling all
25:09 25  the time.

97

25:11  1        Q.     Well, swelling can be caused by things
25:19  2    besides CRPS; correct?
25:20  3        A.     Correct.
25:20  4        Q.     Okay.  Let's go back to my question and
25:25  5    then we can come back kind of where you were going
25:27  6    with your answer there.  But you'll agree with me
25:30  7    here that in your notes and also based on, you know,
25:34  8    your recollection of this examination, January 19th,
25:37  9    2016, just based on what's on the notes, there's no
25:42 10    report of or, you know, what's contained in there
25:49 11    doesn't support a diagnosis of CRPS under the
25:51 12    Budapest criteria?
25:53 13             MR. KRAEUTER:  Objection to form.
25:55 14        A.     The note from 1/19/2016 in isolation by
26:00 15    itself from the exam doesn't support it; correct.
26:04 16        Q.     (By Mr. Meader) Okay.  And the symptoms
26:20 17    that were -- let me ask it this way:  There were
26:24 18    insufficient signs present on January 19th, 2016, to
26:28 19    support a diagnosis of CRPS; correct?
26:33 20             MR. KRAEUTER:  Object to the form.
26:39 21        A.     I don't think I can say that.  I can say
26:41 22    that I did not examine everything based on the
26:43 23    criteria.  I mean, I examined what's in there, but I
26:47 24    didn't examine for the Budapest criteria by itself.
26:55 25    So it's an insufficient exam to make a determination

GILBERT & JONES

98

27:00  1    by itself.

27:00  2          Q.    (By Mr. Meader) So this exam and the exam

27:04  3    from 11/23, you didn't examine her to determine

27:08  4    whether or not she had all of the signs present to

27:12  5    support a CRPS diagnosis?

27:15  6          MR. KRAEUTER:  Object to the form.

27:21  7          A.    I believe the first two visits were done

27:28  8    to see how she responded to treatment.  One visit was

27:33  9    to discuss the side effects from the Cymbalta, which

27:36  10   was a major point and a main point of that visit.

27:41  11   And this visit was to discuss some other changes that

27:48  12   she reported.

27:50  13         So I do not believe that I focused only on

27:54  14   the CRPS on that visit.  I focused more that she also

27:57  15   had some eye problems and right-sided facial

28:03  16   problems.  And this visit was more centered around

28:09  17   that.

28:09  18         Q.    Okay.

28:09  19         A.    Correct.

28:10  20         Q.    So you did not examine her to determine

28:16  21   whether or not the signs of CRPS were present at the

28:20  22   November 23rd and the January 19th visits; correct?

28:23  23         MR. KRAEUTER:  Object to the form.

28:25  24         A.    I did not examine her specifically only

28:27  25   for that; correct.

99

28:28  1        Q.    (By Mr. Meader) You did not examine her at

28:30  2    all for that; correct?

28:31  3              MR. KRAEUTER:  Object to the form.

28:32  4        A.    I examined her.

28:39  5        Q.    (By Mr. Meader) But you didn't either look

28:41  6    for the signs or you looked for them and did not note

28:44  7    them; right?

28:46  8              MR. KRAEUTER:  Object to the form.

28:47  9        A.    Well, other things were talked about in

28:53 10    those two exams, in those two encounters.

28:58 11        Q.    (By Mr. Meader) I understand that.

28:59 12        A.    That is correct, yes.

29:00 13        Q.    Okay.  So then you'll agree with me that

29:18 14    by this point, we had one, two, three, four, five,

29:26 15    six, this was the seventh visit to Optim and only

29:31 16    one, one out of the seven visits were the signs and

29:38 17    symptoms necessary to support a diagnosis of CRPS

29:45 18    observed?

29:46 19              MR. KRAEUTER:  Object to the form.

29:48 20        A.    I will talk to my notes.  One of the three

29:51 21    visits is documented the signs and symptoms necessary

29:55 22    to diagnose CRPS.

30:02 23        Q.    (By Mr. Meader) In your notes.  Fair

30:03 24    enough.  Right.  Okay.  I've got 3/22.  Now, this is

30:29 25    after you met with plaintiff's counsel; correct?

100

30:34   1        A.     I believe that's correct.  I believe the
30:39   2   meeting was mid or early March, I believe.
30:41   3        Q.     And do you remember what was discussed at
30:45   4   that meeting?
30:46   5        A.     Which meeting?
30:47   6        Q.     With plaintiff's counsel.
30:52   7        A.     I believe that was the meeting when, I
31:07   8   think it was at the Derenne office and I believe that
31:14   9   it was discussed, of course, with the lawyers
31:15  10   involved that there's a legal case going on.  Yes.
31:23  11        Q.     Was this the meeting where you were
31:27  12   brought the additional articles about CRPS?
31:28  13        A.     Let me think.  It might have been.  I'm
31:47  14   not sure.  I don't know if I got them the first
31:50  15   visit.  I don't recall.
31:52  16        Q.     Okay.  It sounds like the meeting lasted
31:55  17   for an hour?
31:55  18        A.     The first meeting with counsel?
31:58  19        Q.     Yes.
31:59  20        A.     I thought it was 30 minutes.  Was it an
32:02  21   hour?
32:03  22             MR. KRAEUTER:  I can't answer.
32:04  23             MR. MEADER:  He can't answer.
32:06  24        A.     I cannot answer that.
32:07  25        Q.     (By Mr. Meader) Maybe we can look at the

GILBERT & JONES

101

32:09  1  billing.

32:09  2       A.    No, it's not in there.

32:11  3       Q.    If it was $1500, would it have been 1500

32:14  4  for 30 minutes or an hour?

32:15  5       A.    Anything between 30 minutes and an hour.

32:19  6       Q.    Is $1500?

32:20  7       A.    I think.  I believe the billing, I believe

32:21  8  the billing is 30 minutes at $750 and one hour is

32:26  9  $1500 up to one hour.

32:28 10       Q.    I got it.  Okay.  So do you remember the

32:34 11  substance of that conversation at all?

32:35 12       A.    Of the meeting?

32:37 13       Q.    Yes.

32:38 14       A.    There was a legal case going on.  I think

32:45 15  that Mr. Kraeuter was doing some fact-finding.

32:54 16  That's what I recall.

32:54 17       Q.    And this may have been when you were

33:00 18  provided with additional articles about it?  You

33:02 19  think it was this meeting?  How many meetings were

33:04 20  there?  Was there just that one?

33:06 21       A.    I believe there was two meetings, yeah.

33:10 22  Two meetings.  Two.

33:11 23       Q.    When was the last one?

33:12 24       A.    Give me a second.  Can I look at my cell

33:25 25  phone?

GILBERT & JONES

102

33:25  1        Q.    Sure.

33:26  2        A.    I might have written it down.  I know it

33:31  3   was on a Wednesday morning, the first meeting.  The

33:49  4   first meeting was on March 2nd, 10 a.m., I believe.

33:53  5   We know that.  Let's see about another one.  March

34:00  6   2nd.  And then the second meeting might have been on

34:10  7   March 16.  So it might be there was two meetings

34:14  8   before that.

34:14  9              And I believe -- let me see if there are

34:21 10   other meetings.  I believe those were the two

34:35 11   meetings face-to-face.  Yes.  And I do not recall the

34:45 12   first meeting was half an hour or one hour.  I don't

34:47 13   know.

34:47 14        Q.    Okay.  Do you remember what the need was

34:51 15   for the second meeting or why?

34:53 16        A.    I believe the second meeting, he asked me

34:59 17   to produce a report, a summary that you have in front

35:05 18   of you.  I think that was the second meeting.

35:08 19        Q.    To talk about the expert report?

35:10 20        A.    Yes.  Correct.

35:11 21        Q.    And then is that something that you

35:14 22   drafted?

35:15 23        A.    Yes.

35:15 24        Q.    Or who drafted that?

35:17 25        A.    I did.  I went through my notes and

35:22  1     produced that.

35:23  2          Q.    That's the roughly --

35:27  3          A.    So I would believe I got the articles

35:29  4     probably in the first meeting.

35:32  5          Q.    That would make sense.  All right.  Let's

35:49  6     go back through your notes from the March 22nd --

35:52  7          A.    Yeah.

35:53  8          Q.    -- visit.  It looks like you performed a

35:57  9     physical examination?

35:58 10          A.    Yes.

36:01 11          Q.    It looks like there was no clear

36:09 12     full-blown allodynia noted.  No clear hair pattern

36:13 13     changes or skin changes or swelling or edema.

36:16 14          A.    Correct.

36:17 15          Q.    Now, you'll agree with me that based on

36:30 16     the signs or absence thereof, this examination does

36:35 17     not support a diagnosis of CRPS under the Budapest

36:40 18     criteria?

36:40 19              MR. KRAEUTER:  Object to the form.

36:44 20          A.    Correct.  This would not by itself fulfill

38:02 21     the sign for CRPS.

38:06 22          Q.    (By Mr. Meader) And would not support a

38:09 23     CRPS diagnosis; correct?

38:10 24              MR. KRAEUTER:  Object to the form.

38:11 25          A.    By itself; correct.

104

38:13  1          Q.    (By Mr. Meader) And as per your practice,

38:26  2    had you noted any signs relevant to the Budapest

38:31  3    criteria, it would have been noted in the notes?

38:36  4                MR. KRAEUTER:  Object to the form.

38:37  5          A.    Correct.

38:41  6                MR. MEADER:  All right.  Could we take a

38:56  7          very short break just so I can look at the May

38:59  8          record and the June record.  Maybe I have a

39:01  9          couple questions about those.

39:02  10               MR. KRAEUTER:  Sure.

39:06  11               (Recess from 6:55 p.m. to 7:00 p.m.)

45:08  12         Q.    (By Mr. Meader) All right.  Let's look at

45:10  13    the notes from the May 23rd visit.

45:12  14         A.    Uh-huh.

45:13  15         Q.    It looks like you performed a physical

45:25  16    examination.  There is some paresthesias?

45:29  17         A.    Paresthesias, yes.

45:31  18         Q.    Paresthesias in the right upper extremity.

45:33  19    What is paresthesias?

45:34  20         A.    Paresthesias is basically in layman's

45:42  21    terms a different sensation than you would expect.

45:45  22         Q.    Okay.

45:46  23         A.    So if you put something sharp on there,

45:50  24    you would say this is sharp.  Paresthesias means it's

45:54  25    more vague.  It's a different sensation.

105

45:56  1      Q.      Would that --

45:57  2      A.      Go ahead.

45:58  3      Q.      I'm sorry.  Go ahead.

45:59  4      A.      It isn't in the same group as

46:04  5  hyperesthesia, hyperalgesia, different allodynia.

46:10  6  It's one step different, but same overall type of

46:14  7  finding.

46:14  8      Q.      That was my question actually.  Would that

46:17  9  fall into the sensory category?

46:18 10      A.      Yes.

46:19 11      Q.      Okay.  No clear allodynia was noted.  No

46:26 12  hair pattern changes noted.  Mild swelling noted.  So

46:32 13  using the Budapest criteria, would this physical

46:35 14  examination support a finding of CRPS?

46:43 15      A.      Yes.

46:59 16      Q.      What signs are present?

47:02 17      A.      Hyperalgesia, hypersensitivity and

47:08 18  paresthesias.  That would be that.

47:08 19      Q.      Which is the sensory category?

47:10 20      A.      Correct.  And then mild swelling noted in

47:13 21  the right and left hand would be the two signs that

47:18 22  are present for the category of the signs for the

47:28 23  Budapest criteria.

47:29 24      Q.      Is there any relationship between the

47:48 25  degree of swelling and the level of pain reported by

106

47:53  1    a patient?

47:53  2       A.    No.

47:54  3       Q.    It looks like you changed her from the

48:04  4    Percocet to the Nucynta?

48:06  5       A.    Correct.

48:07  6       Q.    What was the reason for that?

48:08  7       A.    One of the reasons was that Nucynta has

48:24  8    what's called an abuse deterrent formulation.  So you

48:31  9    cannot -- well, it's harder to abuse it --

48:35 10       Q.    Okay.

48:36 11       A.    -- for illicit uses.

48:39 12       Q.    Okay.

48:39 13       A.    Not impossible but harder.

48:41 14       Q.    Did you have those concerns --

48:43 15       A.    No.

48:43 16       Q.    -- with her?

48:44 17       A.    It's not about concerns specifically.  It

48:48 18    is more about if you have a patient that you might

48:52 19    expect that they would need medications for longer

48:59 20    term, you want to make sure that No. 1, those

49:01 21    medications don't lay in the wrong hands, that

49:06 22    they're abuse-deterred possible, that they're -- it's

49:09 23    not easy to abuse.  It's not specific to a patient.

49:12 24    It's specific to society.

49:13 25       Q.    Sure.

107

49:14 1        A.      So it's more general society background

49:20 2    than a, in her case, a specific patient concern.

49:27 3    It's, like I say, you wear a seatbelt.  Are you

49:30 4    afraid you're a bad driver?  No.  It's the law to

49:32 5    wear a seatbelt.  It's the right thing to do.  That's

49:34 6    the same thing here.  It doesn't mean you're a bad

49:38 7    driver because you're wearing a seatbelt.

49:38 8        Q.      Preventing this kind of thing?

49:42 9        A.      Yeah, not even preventive.  Just if it's

49:46 10   available -- you have an air bag in your car, that

49:51 11   doesn't mean you expect to be in an accident.

49:51 12       Q.      Right.

49:53 13       A.      This is the exact same thing.

49:54 14       Q.      Okay.  Let's look at the records from June

49:56 15   the 14th.  It looks like you did a physical

50:01 16   examination.

50:01 17       A.      Yes.

50:02 18       Q.      It looks like there was allodynia noted.

50:10 19   No hair pattern changes.  No swelling.

50:24 20       A.      Yes.

50:24 21       Q.      And would this physical examination

50:32 22   support a diagnosis of CRPS?

50:38 23       A.      Talking only about the signs, she has

50:42 24   allodynia, which is a positive sign for that.  Well,

50:49 25   the guarding of the right upper extremity, you would

108

50:51  1    say reports of decreased range of motion and/or motor

50:55  2    dysfunction.  So, yes, for the signs.  Just for the

51:10  3    signs, yes.

51:11  4        Q.    And take me through that.  You say it's

51:15  5    because she is --

51:16  6        A.    Well, she has the allodynia and

51:19  7    hyperalgesia, hypersensitivity, which is one sign.

51:22  8    And then the patient's guarding the right upper

51:24  9    extremity, which is a kind of a protective mechanism.

51:26 10    She did not let me even go through a full range of

51:30 11    motion due to pain.  So that means it's a motor

51:36 12    dysfunction.

51:56 13        Q.    And so this would have been the first time

52:00 14    that she did not let you go through a full

52:06 15    examination due to pain, due to the limitation on her

52:09 16    mobility?

52:09 17        A.    If I recall correctly, the very first

52:13 18    visit, it was similar that she had severe pain with

52:18 19    range of motion, which then improved some and then

52:22 20    got worse again.

52:23 21        Q.    Okay.  Now let's look at the note from the

52:44 22    Mayo Clinic.

52:45 23        A.    Okay.

52:45 24        Q.    And on page 1 there's a bottom paragraph,

53:09 25    second sentence, and I am just pointing these things

109

53:14  1    out to kind of save time.  You're welcome to read the

53:18  2    whole thing if you'd like.  It says the skin of her

53:21  3    right forearm used to turn red and blotchy, sometimes

53:25  4    swell and become warm.  But this has since resolved.

53:28  5         A.    Okay.

53:29  6         Q.    And then we've got on page 3 under

53:33  7    physical exam, extremities, no obvious color change,

53:37  8    swelling or temperature difference in the right upper

53:40  9    limb compared to the left.

53:42 10         A.    Wait, wait, wait.  You're on page?

53:45 11         Q.    Page -- I'm sorry.  I was counting the

53:48 12    cover letter.  It's page 2.

53:49 13         A.    Okay.  All right.  Go ahead.

53:51 14         Q.    No obvious color change, swelling or

53:53 15    temperature difference in the right upper limb

53:55 16    compared to the left.

53:56 17         A.    Uh-huh.

53:57 18         Q.    So would, based on your review of these,

54:24 19    the notes from this examination, would it support a

54:26 20    finding of CRPS under the Budapest criteria?

54:30 21         A.    Let's talk about the symptoms -- I'm

54:55 22    sorry, about the signs on the exam.  Light touch felt

54:59 23    like a burning feather on the right upper limb, which

55:04 24    is --

55:04 25         Q.    Would be sensory?

55:06  1        A.      Sensory.  Movement of the right upper limb

55:09  2   was slow and guarded due to pain.  If you count it

55:13  3   under the motor function, I mean, you could give one

55:17  4   point for that as well.  Let me look.  So for the

55:27  5   signs, you would have the two out of four signs

55:30  6   positive in the physical exam from the Mayo Clinic.

55:44  7        Q.      Did they diagnose her with CRPS?

55:46  8        A.      They diagnosed her with chronic pain

55:57  9   involving the right upper limb after an injury April

55:59 10   2015.

56:00 11        Q.      Is that something different than CRPS?

56:05 12        A.      CRPS is a chronic pain syndrome.

56:08 13        Q.      Uh-huh.

56:09 14        A.      This was at the Mayo Clinic from my

56:19 15   information.  I sent her there for the facial

56:21 16   abnormalities and the other things that I wasn't

56:26 17   familiar with to treat.  And she was referred to the

56:34 18   pain management at the Mayo Clinic and a consultation

56:40 19   with a pain psychologist was requested as well.

56:45 20        Q.      Do you know if that's taken place?

56:46 21        A.      From my information it has not.

56:49 22        Q.      All right.

56:50 23        A.      Yet.  And they also did some lab studies

56:58 24   which were negative for inflammatory markers.  That

57:06 25   was a question you asked before.

GILBERT & JONES

111

57:07 1     Q.    Which one?

57:08 2     A.    You asked if I did a blood count.  It was

57:13 3  done and it stated there was no inflammatory markers.

57:16 4     Q.    All right.  So your interpretation of this

57:25 5  is that she was diagnosed with CRPS or not diagnosed

57:31 6  with CRPS?  I understand they are referencing chronic

57:35 7  pain here, but I don't see CRPS referenced anywhere.

57:43 8     A.    She was diagnosed with chronic pain

57:46 9  syndrome.  They did not use it as a positive or

57:51 10  negative.  They did not say she does have it or she

57:54 11  does not have it.  That's correct.  They did not even

57:59 12  comment on it, which, in my opinion, when I read it,

58:03 13  was not surprising since I sent her over for the

58:06 14  facial abnormalities.

58:09 15     Q.    I'm looking at the first sentence here.

58:11 16  It says Ms. Orr is a 45-year-old woman referred for

58:14 17  evaluation of RSD/CRPS.

58:17 18     A.    I know that's what it says.  The

58:19 19  interesting part is in my note when I sent over to

58:22 20  the Mayo Clinic from March 9, 2016, I wrote since I

58:36 21  can't -- patient reports that she was diagnosed with

58:40 22  trigeminal neuralgia.  Since I cannot fully explain

58:45 23  her symptoms -- it was about the face -- from a CRPS

58:49 24  type syndrome, I would like to have her evaluated by

58:52 25  a neurologist at Mayo Clinic for the neurologic

112

58:56  1    symptoms as noted above to determine if there's any

58:58  2    etiology.  In my experience, her memory difficulties,

59:01  3    difficulty even getting speech started and sometimes

59:04  4    even inability to say her name is not related to

59:08  5    CRPS.

59:08  6           So I referred her to Mayo Clinic to

59:12  7    evaluate for that.  Now, they took it apparently that

59:14  8    she was referred also for the CRPS.

59:18  9         Q.    We'd have to talk to them, I guess, to

59:20 10    figure out --

59:20 11         A.    Correct.

59:21 12         Q.    Yeah.  Okay.

59:22 13         A.    And it might be that on my referrals, my

59:25 14    staff put on CRPS which is what our diagnosis was in

59:28 15    our clinic.  It might well be.  Per my note if they

59:31 16    needed to see her, I referred her for the neurologic

59:34 17    symptoms that I couldn't explain.

59:36 18         Q.    Did you ever do an alcoholic bath test

59:46 19    with her?

59:46 20         A.    A what?

59:47 21         Q.    Alcohol bath test?

59:50 22         A.    You could enlighten me what that is.

59:54 23         Q.    This is my understanding of the way it's

59:56 24    used.  Is when a patient reports hot or cold skin in

00:02 25    connection with CRPS, you can apply alcohol to it and

113

| | | |
|---|---|---|
| 00:06 | 1 | it will induce a reaction and it will, if the |
| 00:12 | 2 | patient, you know, does suffer from CRPS and that |
| 00:15 | 3 | symptom or that sign has been present previously, the |
| 00:19 | 4 | use of the alcohol bath or taking a little dropper |
| 00:22 | 5 | and dropping alcohol on the affected area will induce |
| 00:24 | 6 | that sign. |
| 00:27 | 7 | A.    Do you have any literature for that? |
| 00:29 | 8 | Q.    Yes.  I think it's actually in what you |
| 00:31 | 9 | provided me or what was provided in your expert |
| 00:33 | 10 | report. |
| 00:33 | 11 | A.    I don't think I provided you that. |
| 00:35 | 12 | Q.    Yeah.  I think it was in -- it may have |
| 00:37 | 13 | been with -- |
| 00:38 | 14 | MR. KRAEUTER:  Where is it? |
| 00:39 | 15 | A.    I mean, if this is a test, I've never seen |
| 00:42 | 16 | it done.  I've never heard about anyone doing this. |
| 00:45 | 17 | Q.    (By Mr. Meader) Okay.  I just thought I'd |
| 00:47 | 18 | ask. |
| 00:47 | 19 | A.    This is new for me. |
| 00:51 | 20 | MR. KRAEUTER:  Garrett, where in the |
| 00:52 | 21 | documents? |
| 00:54 | 22 | MR. MEADER:  I think it's in there |
| 00:55 | 23 | somewhere. |
| 00:56 | 24 | A.    And it might well be in some empirical |
| 00:59 | 25 | that some people do things a certain way.  I have not |

114

01:02  1    heard this to be a standard test that it's accepted

01:06  2    anywhere.

01:06  3         Q.    (By Mr. Meader) Okay.

01:07  4         A.    Because, honestly, I do not know about

01:09  5    that.

01:09  6         Q.    Okay.  I don't know where it is.

01:15  7    Honestly, I don't know if it's that important.  Let

01:18  8    me go back and find it.

01:19  9         A.    To answer your question, I have not done

01:21 10    that.

01:21 11         Q.    That's my question was if you heard of it.

01:23 12         A.    I have not heard of -- I cannot recall

01:26 13    that I've heard of that specific test, no.

01:41 14              MR. KRAEUTER:  Okay.  Where is it in the

01:43 15         literature?

02:29 16              MR. MEADER:  I can't put my fingers on it.

02:31 17         He's answered my question.

03:14 18         Q.    (By Mr. Meader) So is early treatment

03:25 19    important in CRPS, in managing CRPS?

03:29 20         A.    It's common practice to start treatment as

03:34 21    early as possible, yes.

03:36 22         Q.    And what are the accepted treatments?

03:39 23         A.    Medications, physical therapy and

03:47 24    occupational therapy, hypersensitization therapy.

03:51 25    Those are the typical early treatments.

115

03:53  1          Q.     And would you agree that effective

04:02  2     treatment should be functionally focused and center

04:07  3     around physical and occupational therapy?

04:10  4          A.     That's the common answer is it is

04:18  5     difficult to assess how effective treatment is in the

04:24  6     literature, but the consensus is that physical

04:29  7     therapy and occupational therapy is a mainstay of

04:31  8     treatment.

04:32  9          Q.     Okay.

04:32 10          A.     The outcomes, the truly evidence-based

04:39 11     medicine studies are not there to support it fully or

04:42 12     to discredit it.

04:44 13          Q.     But it is the consensus it sounds like?

04:47 14          A.     It's what typically is done, yes.

04:50 15     Correct.

04:50 16          Q.     All right.  And you'll agree with me here

04:54 17     that the physical therapy that Ms. Orr went to, it

04:59 18     improved her range of motion?

05:00 19          A.     I do not know if it improved her range of

05:03 20     motion.  I can't say.

05:04 21          Q.     Okay.

05:06 22          A.     But I know she had probably 11 or 12

05:08 23     sessions, at least, I believe it was occupational

05:11 24     therapy.

05:11 25          Q.     Right.  And would you agree with me that

116

05:15   1    Kamaleson's records showed a trend of improvement in

05:19   2    range of motion?

05:19   3         A.    Per his notes, yes.

05:21   4         Q.    Per his notes, yes.  Which coincided with

05:24   5    the time at least partially that she was going

05:26   6    through physical therapy?

05:27   7         A.    Occupational therapy.

05:28   8         Q.    I'm sorry.

05:28   9         A.    Correct.

05:29  10         Q.    Occupational therapy.  Okay.  And is she

05:31  11    still doing that?  Is she doing any occupational

05:34  12    therapy or physical therapy?

05:36  13         A.    I do not believe she's currently enrolled.

05:39  14         Q.    When is the last time that she did

05:41  15    occupational or physical therapy?

05:42  16         A.    Probably late 2015, but I can't say for

05:53  17    sure.

05:53  18         Q.    Okay.  Why is she not doing it now?

05:56  19         A.    Because overall she did not feel there was

06:01  20    any significant improvement with it.

06:03  21         Q.    Even though her range of motion, it

06:08  22    appears, improved?

06:09  23         A.    I can't say if it improved with it or not.

06:20  24    I can say that her pain is still significant and it

06:23  25    didn't seem that the occupational therapy was able to

117

06:28  1    resolve her pain in a functional role.

06:34  2         Q.    Because it sounds like it's sort of an

06:38  3    accepted, I guess, treatment for it and that it's

06:42  4    encouraged.  I guess I'm trying to figure out why it

06:45  5    is she's not doing it any longer when it appears

06:48  6    to --

06:48  7         A.    I believe she had 12 visits and that's a

06:52  8    pretty good number for a first treatment.

06:57  9         Q.    Okay.  And then so beyond that, you've got

07:07 10    drugs and you've got medications and you've got

07:11 11    occupational or physical therapy.  Then what are some

07:16 12    other options for treatment?

07:17 13         A.    A psychology/cognitive behavioral therapy.

07:26 14         Q.    Which appears to have been recommended

07:28 15    here but not done?

07:29 16         A.    That's correct.

07:31 17         Q.    By the Mayo Clinic?  Recommended by the

07:33 18    Mayo Clinic?

07:34 19         A.    Recommended by me.

07:34 20         Q.    And you as well?

07:35 21         A.    Yes.

07:36 22         Q.    Okay.  When was that recommended by you?

07:38 23         A.    Well, this is the CBT, cognitive

07:52 24    behavioral therapy is recommended for longer term

07:54 25    benefit.  It's more coping mechanisms, how to deal

118

07:58 1    with the pain, how to deal with the effects of the
08:01 2    chronic pain.  And I believe the Mayo Clinic
08:10 3    recommended pain psychology, which might play a part
08:13 4    in that as well.  I don't believe I sent her off for
08:21 5    cognitive behavior therapy yet.
08:23 6        Q.    Any other counseling that you've
08:24 7    recommended for her?
08:25 8        A.    I don't know if I recommended any
08:32 9    counseling at the current time.  I believe right now
08:37 10   we're still in the process with the spinal cord
08:40 11   stimulation to see how much benefit she can get and
08:44 12   then determine what else she needs.
08:46 13       Q.    How many spinal cord stimulators have you
08:48 14   put in?
08:49 15       A.    Since 2004, so that's 10, 12, 11-12 years,
09:01 16   12 years, multiple.
09:04 17       Q.    Ballpark?  Dozens or hundreds or --
09:08 18       A.    Probably hundreds.
09:09 19       Q.    Hundreds?
09:09 20       A.    I would think, yeah.
09:11 21       Q.    How many have you put in to treat CRPS of
09:16 22   the total that you put in?
09:17 23       A.    Put in 10, 12.
09:23 24       Q.    So that's been one a year?
09:25 25       A.    Maybe around one a year possibly.  Maybe a

119

09:50  1    little bit more probably.

09:52  2        Q.    Have you kept track of how many of those

09:59  3    spinal cord stimulators that you put in for CRPS

10:01  4    patients you've gone back and taken out?

10:03  5        A.    I do not -- let me think.  I don't believe

10:11  6    that I've taken out one.

10:13  7        Q.    For CRPS?

10:14  8        A.    I don't think so.  Not to my recollection.

10:19  9    No.

10:20  10       Q.    Now, is the spinal cord stimulator sort of

10:30  11   the final option for treatment?

10:31  12       A.    No.  It's not the final option.  There's

10:35  13   actually a push to do those earlier in the past.  It

10:38  14   used to be, again, in the past that you'd follow an

10:44  15   algorithm with medications, physical therapy,

10:48  16   occupational therapy.

10:51  17       Q.    Blocks?

10:52  18       A.    Blocks possibly.  Then the next step

10:56  19   possibly would be spinal cord stimulators.

10:58  20       Q.    Right.

10:59  21       A.    And now it's proposed to be hopefully done

11:03  22   earlier than later.  Not waiting as a last resort but

11:08  23   waiting as a part of the treatment algorithm to be

11:14  24   done earlier.  So it's not the last resort.  It's not

11:22  25   spinal cord stimulator if everything else does not

120

11:24 1    work.

11:25 2                Oftentimes I'll use spinal cord

11:28 3    stimulators to see if you can get a patient decrease

11:32 4    in her medication, improve the pain, and ideally

11:36 5    would like to improve their functional level, improve

11:39 6    the quality of life with it.  And sometimes pain

11:43 7    medications, especially opiates, cause side effects.

11:47 8    And if you can decrease the amount of pain medication

11:51 9    with a spinal cord stimulator, it's worthwhile to do

11:55 10   it as well.

11:55 11        Q.    What is the likelihood that the

11:57 12   medications will be decreased once the stimulator's

12:04 13   implanted?  What's been your experience with that?

12:06 14        A.    Well, it's typical to estimate because the

12:09 15   way the spinal cord stimulation works is that the

12:12 16   first step would be a trial to determine if the

12:15 17   patient gets benefit or not.  During the trial, you

12:17 18   would look at the pain medication, if they're able to

12:20 19   take less pain medication, if they get benefit.  And

12:25 20   then you determine if the patient's a candidate for a

12:27 21   permanent implant of a spinal cord stimulator.  The

12:33 22   goal is to decrease the pain medications with it.

12:36 23                Some patients, to be fair, have an

12:41 24   increased functional level, do more with the spinal

12:43 25   cord stimulator and then cause more pain doing things

121

12:47  1    they would not be able to do otherwise, but they

12:50  2    hadn't been able to do in a long time.  And,

12:52  3    therefore, they might still need oral pain

12:55  4    medications as well.

12:56  5        Q.    What kind of things would you think that

12:59  6    Ms. Orr would be unable to do now as a result of --

13:02  7        A.    Currently?

13:03  8        Q.    Uh-huh.

13:04  9        A.    She's guarding her right upper extremity.

13:06 10    She told me in the last visit that she's typing with

13:08 11    the left hand on the computer.  She can't use the

13:11 12    right hand anymore.  I think she has enough promise

13:17 13    with the activities of daily living with the right

13:19 14    upper extremity.  She has difficult time using the

13:22 15    right arm.  Right now I don't think she'll be able to

13:26 16    brush her hair with the right arm.  I think she's

13:29 17    doing it with the left hand.

13:30 18            I know that at her job, they reassign her.

13:34 19    She does some different duties now because of that to

13:39 20    substitute the right upper extremity loss of function

13:42 21    with the left side.

13:43 22        Q.    Do you remember specifically what the

13:45 23    change in duties was?

13:47 24        A.    Yes.  I know that she -- I'm not a hundred

13:51 25    percent sure what her job description is, but I do

122

13:53  1    know that her supervisor allowed her to do things

13:56  2    differently and that she's not going to a certain

13:59  3    unit where she works because she couldn't defend

14:02  4    herself.  I think she works in something medical.  I

14:08  5    don't think she's in a medical field, but in some

14:11  6    medical facility.  And I believe that a lot of --

14:16  7    maybe a psychiatric unit or psychiatric patients.

14:19  8    And I believe that they feel it would be too

14:23  9    dangerous for her since she couldn't defend herself

14:26 10    on the unit.

14:27 11            But that's as far as I know.  I don't know

14:30 12    exactly her job duty there.  I don't think it's

14:32 13    patient contact that she has.  She's not a nurse.

14:34 14    She's not doing hands-on patient contact.  But she

14:38 15    did tell me that her supervisors switched her over to

14:42 16    not include that in her job.

14:44 17        Q.    What are the things, I guess, would you be

14:47 18    or would you expect her to be unable to do?  You

14:50 19    mentioned brushing her hair, you know, with her right

14:53 20    hand.  You would expect that she wouldn't do that?

14:55 21        A.    Brushing her teeth with her right hand.  I

14:58 22    think she has a difficult time probably getting

15:01 23    dressed with the right side.  Cooking with the right

15:05 24    arm, cleaning.

15:12 25        Q.    Anything that would involve lifting?

123

15:15  1          A.     Yes.

15:16  2          Q.     Now, what was the limit on her range of

15:22  3     motion?  Was it, you know, she couldn't pick it up

15:27  4     here or out to the side or . . .

15:31  5          A.     On the last visit, she got the right upper

15:34  6     extremity and any attempt to pick it up over 90

15:37  7     degrees abduction caused a lot of pain.  Even before

15:44  8     then it caused pain.  So I would think that any

15:50  9     overhead activity would be extremely difficult for

15:52 10     her.

15:53 11          Q.     What about something that is not overhead?

15:57 12     I mean, just kind of in front of her?

15:59 13          A.     Looking at my last note, only the last

16:04 14     note, she was very guarded.  She developed the

16:06 15     allodynia.  So I think at the current time from the

16:10 16     last visit, which was sometime in June, it would

16:16 17     definitely be very difficult for her to use anything,

16:18 18     to do anything with the right upper extremity.

16:20 19          Q.     It sounds she can't even type any longer?

16:23 20          A.     She types with her left.

16:24 21          Q.     With her left hand, yeah.

16:25 22          A.     Correct.

16:26 23          Q.     Would there be any benefit of trying the

16:39 24     generic version of Cymbalta, see if it doesn't have

16:42 25     the digestive issues?

124

16:46  1        A.      I would assume she received a generic

16:48  2    version.

16:49  3        Q.      If she didn't, would it be worthwhile to

16:51  4    try that again?

16:52  5        A.      No.   It's bioequivalent.   So I, I did not

16:58  6    prescribe her brand name Cymbalta.   I prescribed

17:02  7    Cymbalta because that's a known medication.

17:07  8    Typically at the pharmacy, she would get the

17:10  9    duloxetine.   It's just common practice that you would

17:16  10   get the generic if it's on the market unless I would

17:18  11   write distribute as written.   Then I would

17:23  12   specifically request the brand name only, which I did

17:25  13   not.

17:25  14       Q.      So the difference between the generic and

17:29  15   the brand name is the fillers, I understand, lots of

17:33  16   times, and not necessarily the active compounds or --

17:40  17       A.      Well, the difference between generic and

17:43  18   brand name might be there's no difference.   It might

17:45  19   be the same company producing it possibly.   And the

17:52  20   active ingredient has to have certain standard

17:57  21   compared to the brand name.   There might be a

17:59  22   different system, different matrix that provides the

18:05  23   medication.   That is correct.

18:06  24       Q.      Okay.

18:07  25       A.      But I do not know.

125

18:08  1          Q.      Have you ever seen it where a patient has

18:10  2     taken the name brand one and had an adverse reaction

18:18  3     and taken an off brand and not had an adverse

18:21  4     reaction or vice versa, in that adverse reaction was

18:25  5     caused by, you know, some filler that was in the

18:27  6     medication as opposed to the active ingredient?

18:31  7          A.      I have seen more that some patient in the

18:37  8     past have reported that a certain formulation was

18:43  9     less effective than a different one with the same

18:46  10    medication.  And it not even always between brand

18:51  11    name and generic, but even between two different

18:53  12    generic brands that a patient said I got better

18:57  13    benefit always with this generic brand versus this

19:01  14    generic formulation.

19:06  15              I do not recall if I've ever seen a

19:10  16    patient that had a brand name and was not tolerating

19:18  17    it and got the generic and was tolerating it.  I do

19:23  18    not believe that I can recall that.

19:24  19         Q.      So the spinal cord stimulator, that could

19:30  20    potentially resolve a need for medication or lessen

19:34  21    the --

19:34  22         A.      The hope is that it would definitely

19:36  23    lessen the need for medication.  That's one of the

19:39  24    criteria that I would look at during the trial.  Yes.

19:43  25         Q.      How long does the trial last?

126

19:45  1          A.      Well, my trials last anywhere from five to

19:48  2      seven days.

19:49  3          Q.      Is there any literature out there that

19:53  4      says this percentage of time when the spinal cord

19:56  5      stimulator is successful, that medication usage goes

20:01  6      down?

20:01  7          A.      I don't know if there's any clear

20:06  8      literature out there.  I do not know.

20:10  9          Q.      What is trigeminal -- I apologize if I

20:29  10     mispronounce that -- neuralgia?

20:33  11         A.      Trigeminal neuralgia?

20:36  12         Q.      Yes.

20:36  13         A.      That's a medical term.  It's an

20:38  14     inflammation and painful condition with one of the

20:40  15     facial nerves, the fifth nerve, the fifth cranial

20:44  16     nerve.  It's typically a pain on one side of the face

20:49  17     in a certain distribution.

20:51  18         Q.      Okay.  And that's limited to the face?

20:56  19         A.      Yes.

20:56  20         Q.      All right.

20:58  21              MR. MEADER:  Take about a five-minute

21:00  22     break.  I'm nearing the end.  I just want to

21:03  23     look at my notes real quick.

21:05  24              MR. KRAEUTER:  Sure.

21:06  25              (Recess from 7:37 p.m. to 7:41 p.m.)

GILBERT & JONES

127

25:12  1        Q.    (By Mr. Meader) So the pain that is out of

25:14  2   proportion to the stimulus that you were talking

25:16  3   about, you know, you just like touch her on the arm

25:19  4   and then, you know, the sensation or the pain was

25:22  5   greater than would be expected?

25:24  6        A.    Are you talking about the definition of

25:27  7   CRPS?

25:27  8        Q.    Right.  And what you've observed, I

25:29  9   guess --

25:30 10        A.    Oh, oh.  Okay.

25:31 11        Q.    -- with Ms. Orr here.  That's something

25:33 12   you've observed; right?

25:34 13        A.    Yes.

25:35 14        Q.    Now, when you were doing your examination

25:37 15   of her and you touched her arm, how much pressure

25:39 16   would you put on it?  Would you just lightly touch it

25:42 17   or squeeze it?  What's your standard?  Do you recall?

25:44 18        A.    The standard is to put as much pressure as

25:47 19   the patient allows you to --

25:48 20        Q.    Okay.

25:49 21        A.    -- which in patients with CRPS is to be

25:55 22   limited.  For allodynia, you just do a stroke very

26:02 23   soft on the skin because allodynia means pain to a

26:07 24   non-painful stimulus.

26:09 25        Q.    Sure.

128

26:10  1       A.    For hyperalgesia, you know, pain out of

26:15  2   proportion, you just press down.  They should feel it

26:19  3   and then you just see what kind of pain response they

26:22  4   give you.

26:22  5       Q.    Okay.  So with the allodynia, it sounds

26:25  6   like just a light brush.  Could it be something like

26:29  7   me wearing long-sleeved clothes?

26:31  8       A.    Yes.

26:31  9       Q.    Something that bad or that light?

26:34 10       A.    Yes.  Patients, as an example, that have

26:36 11   CRPS in the lower extremity, one of the findings that

26:41 12   they report oftentimes when you ask them is at night,

26:44 13   they do not like to have a blanket or a bed sheet

26:48 14   touching their foot.  They hang their foot out of the

26:51 15   bed just because it's so uncomfortable.

26:53 16       Q.    All right.

26:54 17       A.    Yes.

26:55 18       Q.    So you would expect her then to avoid

26:57 19   doing activities or getting things that would, you

27:01 20   know, apply pressure or any type of touch to the

27:05 21   affected area, assuming it's allodynia?

27:10 22       A.    If it's allodynia; correct.  Oh, yes.

27:14 23   Allodynia, you would expect that a patient that's --

27:16 24   anything that they can do to guard that extremity or

27:20 25   that area, trying to avoid any pressure on it, any

GILBERT & JONES

129

27:25  1    touch on it, any trauma to it, yes, that's correct.

27:30  2         Q.    I think in your notes you referenced some

27:34  3    allodynia.  And was that something that your

27:38  4    understanding for her is that at least -- I think

27:41  5    it's referenced more recently --

27:42  6         A.    Yes.

27:43  7         Q.    -- that is constant, that is the allodynia

27:47  8    constant?

27:47  9         A.    Okay.  The difference between allodynia

27:58 10    and hyperalgesia is fluid, okay, in one way.  So you

28:05 11    expect pain to palpation to be there most of the time

28:11 12    at least.  Yes.  Allodynia, I've had some patients

28:15 13    that have it all the time, very same area and you

28:20 14    have some other patients that it waxes and wanes in a

28:24 15    way.  Fluctuates somewhat.

28:27 16         Q.    How about with Ms. Orr?  Does it wax and

28:30 17    wane?

28:30 18         A.    I don't know if it waxes and wanes.  I

28:38 19    only diagnosed her with allodynia one time.  That was

28:41 20    the last visit.  She had pain before to palpation.

28:47 21    The last time she maybe almost did not want me to, I

28:51 22    remember, didn't want me to even examine the forearm

28:54 23    because she knew it was going to cause pain.  She was

28:57 24    very clearly emotionally like please don't touch me

29:00 25    there.

29:02 1          So last time, then, of course, I did just
29:06 2   touch her there and she had significant pain with it.
29:09 3   That's the definition of the allodynia, yes.
29:11 4          Q.   Now, do you know whether or not that stage
29:15 5   with her, did she express to you one way or another
29:17 6   whether or not --
29:18 7          A.   I think she -- I think in my note for the
29:21 8   last time, I did report that she said it was for
29:26 9   three or four weeks that it got worse.  But if you
30:30 10  want, I can look that up.
29:37 11         Yes.  She reports pain with touch in the
29:38 12  right hand and wrist area and some in the forearm.
29:54 13  Let me see.  I believe that she told me it's gotten
30:06 14  worse over a couple weeks.
30:09 15         I do not see that in my note anywhere
30:12 16  might be -- yeah.  I don't know how long the
30:26 17  allodynia had been going on.
30:28 18         Q.   Okay.  Have you ever heard of mural
30:33 19  therapy?
30:33 20         A.   Yes.
30:34 21         Q.   Can that be an effective way to treat
30:37 22  CRPS?
30:42 23         A.   Some people propose it as part of PTOT.
30:47 24         Q.   Uh-huh.
30:48 25         A.   There are some case reports that some

131

30:54 1    patients have benefitted with it and others have not.

30:58 2    Yes.  I've heard about it, yes.

30:59 3         Q.    Was she recommended to do that?

31:02 4         A.    Not by me.  Not specifically mural

31:07 5    therapy.

31:07 6         Q.    Would that have been something you

31:09 7    recommended or something that the therapist just sort

31:11 8    of --

31:12 9         A.    The therapist.

31:12 10        Q.    That would have been something the

31:13 11   therapist would have come up with?

31:14 12        A.    Yeah.

31:15 13        Q.    Okay.

31:16 14        A.    If I felt strongly that is an actual

31:21 15   treatment that can be recommended as part of therapy,

31:24 16   but typically therapists would possibly incorporate

31:29 17   that in their treatment plan.

31:32 18        Q.    CRPS, is that a progressive condition?

31:36 19        A.    It can be, yes.

31:40 20        Q.    And do you believe it is in Ms. Orr's

31:42 21   case?

31:42 22        A.    For her with the notes that I have has

31:48 23   been a fluctuating condition that the last time she

31:53 24   was the worst that I've seen her.  I cannot say if

32:00 25   it's going to be progressive in the future or not.

GILBERT & JONES

132

32:04  1    But it is not uncommon for CRPS based in the

32:07  2    literature that there's some studies that go several

32:11  3    years and they show that some patients get better.

32:14  4    Some stay the same.  Some get worse.

32:17  5         Q.    Now, if it is progressive in her case,

32:19  6    would you expect to see more frequent signs such as

32:25  7    swelling, allodynia, hyperalgesia?

32:31  8         A.    Hyperalgesia.

32:33  9         Q.    Hyperalgesia, the redness, the change in

32:38 10    skin tone, the nails, the hair, would you expect to

32:44 11    see an increase in all those?

32:46 12         A.    You could see an increase in that.  You

32:48 13    could also see an increase just from disuse, that a

32:53 14    patient doesn't use the arm or the upper extremity

32:55 15    and then you could see possible findings of some

33:00 16    muscle atrophy just because of disuse.  Possibly down

33:05 17    the road you can see some contractures if the patient

33:08 18    doesn't do range of motion.  You can see that down

33:25 19    the road as well.

33:25 20         Q.    Have you ruled out myofascial pain with

33:31 21    radial flexis?

33:34 22         A.    With the what?

33:34 23         Q.    Radial flexis?

33:37 24         A.    Radial flexis.

33:39 25         Q.    Maybe I'm saying it wrong.  Radiating?

133

33:40  1        A.    Oh, radiating.  Clinically there's likely

33:46  2  some part of my -- myofascial pain by itself just

33:49  3  means pain from muscle and soft tissue.

33:53  4        Q.    Uh-huh.

33:53  5        A.    So if you define it like that, you would

34:00  6  say it would be expected.  Now, if you want to call

34:03  7  myofascial pain syndrome the way she presented

34:09  8  localized in the area where she had it, it would be

34:12  9  less likely.  There's no, there's no test, objective

34:17  10 test that you get a blood draw or an X-ray or an

34:20  11 ultrasound to rule out myofascial pain.

34:23  12       Q.    In your experience, how often do the

34:34  13 patients show a sign of either the hot or cold

34:40  14 changes in their skin when they've been diagnosed

34:43  15 with CRPS?

34:43  16       A.    In my experience, a lot of patients report

34:48  17 it.  And in my experience, patients even report it

34:53  18 sometimes when you put your fingers on, you don't

34:57  19 feel it.  They still report it historically that they

35:01  20 have it and they still report, Doctor, look at this.

35:05  21 This feels cold and this feels hot.  And I put my

35:09  22 finger on it, I can't feel a difference.  So a lot of

35:14  23 patients report it.  Clinically I don't find it as

35:19  24 often.  You do -- I do find it, but not all the time.

35:24  25 Clearly not.

134

35:24  1      Q.     Same question for hair and nails.

35:32  2      A.     Especially with the hair, if you believe

35:39  3  in these stages that we talked about.  There's one

35:41  4  stage where the hair grows more and there's one stage

35:45  5  where the hair kind of grows less.  It's a very

35:47  6  subjective measurement.  I do see some patients that

35:51  7  have more hair loss and really shiny skin with, looks

35:58  8  like the hair is just not there anymore.

36:02  9        The nail growth I do see once in a while.

36:08 10  Not very frequent.

36:10 11      Q.     Okay.  Assuming a patient has been

36:21 12  diagnosed with CRPS, how often would you expect that

36:26 13  patient to exhibit the signs and symptoms necessary

36:30 14  to support a diagnosis under the Budapest criteria

36:36 15  when that patient is examined by a physician?

36:38 16      A.     I cannot say.  I don't know.  I don't know

36:45 17  if you can say you have to, every three visits you

36:48 18  have to see all the signs and symptoms.  Oftentimes

36:54 19  in followup visits, you don't ask for all the

36:59 20  symptoms again because you've established symptoms

37:01 21  already.  You look for other things.  You look for

37:05 22  how do you -- the patient react to medications.  What

37:08 23  kind of changes do we have to make?  What kind of

37:11 24  treatment can we make?

37:14 25       So I can't, I can't answer that.  As a

135

37:18   1    physician you don't do a full history and physical

37:21   2    every single time a patient comes.  You do that

37:23   3    typically more detailed in the first visit and then

37:26   4    as the clinical course dictates.  Some visits are

37:32   5    really just to see if you start a patient on a new

37:36   6    medication, you really focus on, okay, what is the

37:39   7    result of the medication.  Any side effects?  Is

37:42   8    there any benefit?  Is there any, you know, reason to

37:47   9    continue the medication, discontinue the medication,

37:49  10    do a different medication?

37:51  11            So at that point you wouldn't look at all

37:53  12    the historical signs and symptoms again necessarily.

37:55  13        Q.    Okay.

37:56  14        A.    So it's very difficult to say how often do

37:59  15    you expect to fulfill all the criteria versus not.

38:04  16        Q.    Okay.  Do you think that it is not

38:09  17    important to verify that a patient is still suffering

38:15  18    from a condition for which they are being treated?

38:17  19        A.    That was a double negative.  Do you think

38:24  20    that it is not important.

38:25  21        Q.    Let me ask it this way.

38:27  22        A.    Do you think it is important?

38:29  23        Q.    Let me ask it this way:  Isn't it

38:30  24    important for you as a treating physician to verify

38:31  25    that the patient you are treating is still suffering

136

38:34  1    from the condition that you're treating them for?

38:36  2        A.    Correct.  It's important.

38:39  3        Q.    Okay.

38:42  4        A.    Meaning that once we establish a diagnosis

38:47  5    and the patient comes and tells you some symptoms

38:50  6    still and pain, you go from there.  You don't

38:53  7    reestablish a diagnosis every single time.

38:55  8        Q.    Okay.  But if you were uncertain in your

38:58  9    initial diagnosis, you'd certainly want to follow

39:01  10   up --

39:01  11       A.    Yes.

39:02  12       Q.    -- and do a thorough and complete physical

39:05  13   examination each time until your diagnosis was

39:09  14   verified?

39:09  15       A.    You treat the patient; correct.  Yes.

39:18  16             MR. MEADER:  Okay.  That's all I've got.

39:19  17             MR. KRAEUTER:  I've got a couple

39:21  18       followups.

39:21  19                      EXAMINATION

39:22  20   BY MR. KRAEUTER:

39:22  21       Q.    Doctor, there are some questions about

39:24  22   blood testing to try to establish CRPS.  Are you

39:30  23   aware of the Mayo Clinic doing some blood testing --

39:33  24       A.    Yes.

39:33  25       Q.    -- on Ms. Orr?

GILBERT & JONES

137

39:34  1      A.    Yes.

39:35  2      Q.    And did those blood test results further

39:41  3  confirm your belief that she has CRPS Type 1?

39:44  4      A.    Well, the blood testing is truly done to

39:47  5  rule out any other explanation.

39:49  6      Q.    Uh-huh.

39:50  7      A.    The blood test itself doesn't establish

39:52  8  CRPS.

39:52  9      Q.    Okay.

39:53 10      A.    At all. So in my clinical opinion when I

39:57 11  saw her, I did not feel it with necessary to get any

40:00 12  blood tests. The Mayo Clinic as part of their

40:04 13  standard protocol or their treatment, they wanted a

40:09 14  set of blood values.

40:10 15      And, again, for me it wouldn't have been

40:15 16  necessary to do at the current time. Now that it's

40:19 17  been done and we have the results, the blood test

40:23 18  showed that there's not any inflammatory process

40:26 19  going on when I looked at them. I looked at them

40:29 20  today for the first time. Just glanced. And as far

40:33 21  as I can tell, no autoimmune markers were positive.

40:37 22  But, again, I did not see every little single value.

40:42 23      Q.    Sure. So that would tend to rule out

40:44 24  cellulitis, arthritis, Raynaud's syndrome?

40:46 25      A.    Raynaud's syndrome is ruled out

138

40:50  1    clinically.  You don't need a blood test specifically

40:53  2    for that.  Cellulitis, you would typically expect

40:58  3    increased inflammatory markers.  So the blood test

41:05  4    shows there's no inflammatory process going on.

41:07  5         Q.    Okay.

41:08  6         A.    And it's a very unspecific blood test, not

41:11  7    for one specific diagnosis, but overall for any

41:13  8    inflammatory process.

41:15  9         Q.    And in this case, you ruled out Raynaud's

41:17 10    syndrome clinically?

41:18 11         A.    Yes.

41:19 12         Q.    Okay.  And how do you do that?

41:20 13         A.    Typically Raynaud's syndrome you would

41:24 14    know by history and physical exam.  And for

41:26 15    Raynaud's, the history is very important.  They

41:29 16    typically would tell you that based on the

41:32 17    temperature, they would have changes in their skin

41:36 18    coloring, changes in pain, and she did not report any

41:41 19    of that.

41:42 20         Q.    Okay.  And you ruled out cellulitis in

41:44 21    this case?

41:45 22         A.    I did not see any evidence of cellulitis;

41:48 23    correct.

41:48 24         Q.    Okay.  And if she came to see you the

41:53 25    first time in October of 2015 after an injury in

139

41:58  1     April of 2015, you wouldn't expect cellulitis to

42:03  2     exist that long?

42:06  3          A.    There's some patients that have cellulitis

42:10  4     come on for a long time.  But the clinical picture

42:12  5     was not consistent with cellulitis.

42:13  6          Q.    For Ms. Orr?

42:15  7          A.    Correct.

42:16  8          Q.    Okay.  Arthritis, you already talked about

42:18  9     how the fact you don't get arthritis in the middle of

42:21  10    your forearm.

42:21  11         A.    Correct.  And there was no indication for

42:24  12    arthritis.

42:24  13         Q.    So you're able to rule that out

42:26  14    clinically?

42:26  15         A.    Correct.

42:27  16         Q.    Okay.

42:29  17         A.    But she did have some X-rays done before

42:32  18    that didn't show any abnormalities.

42:34  19         Q.    Okay.  And that would also rule out

42:36  20    arthritis?

42:36  21         A.    Yes.

42:37  22         Q.    Okay.  The duplex scanning, that would

42:43  23    test for DVTs?

42:45  24         A.    Yes.

42:46  25         Q.    And that's, what is that, deep vein

140

42:49  1    thrombosis?

42:50  2          A.    Yes; correct.

42:51  3          Q.    Or peripheral arterial obstruction?

42:53  4          A.    Possibly if you look at that specifically,

42:58  5    yes.  The typical doppler ultrasound, in order for

43:14  6    evaluation for blood clot, that's what it looks for

43:17  7    if there's a blood clot.  So you want to rule out a

43:21  8    blood clot with that.

43:21  9          Q.    And you were able to rule out deep vein

43:25  10   thrombosis clinically?

43:26  11         A.    Clinically I did not feel that there is

43:29  12   any criteria that I would associate with blood clots.

43:33  13         Q.    Okay.  Same thing for peripheral arterial

43:36  14   obstruction?  Did you rule that out clinically?

43:38  15         A.    Correct.

43:39  16         Q.    In this case?

43:40  17         A.    Correct.

43:40  18         Q.    You did, in fact, rule it out clinically

43:43  19   in this case?

43:44  20         A.    Correct.

43:44  21         Q.    Okay.  I want to go to page, and it looks

43:49  22   like marked 125 of your expert report for these

43:56  23   attached articles.

44:16  24         A.    Okay.

44:16  25         Q.    So I want to draw your attention to this

141

44:19  1    part right here where it says, "Additional objective

44:20  2    testing (thermography, triple phase bone scan,

44:26  3    quantitative pseudomotor axon reflex test or a trial

44:30  4    sympathetic ganglion block) is not necessary to make

44:33  5    the diagnosis."  Do you agree with that statement?

44:35  6        A.    A hundred percent correct, yes.

44:37  7        Q.    Okay.  And in this particular case, or as

44:42  8    I think you testified earlier, the triple phase bone

44:45  9    scan is no longer part of the diagnostic criteria at

44:47 10    this time?

44:47 11        A.    It's not part of the Budapest diagnostic

44:53 12    criteria; correct.

44:53 13        Q.    And the trial sympathetic ganglion block

44:56 14    also not part of the diagnostic criteria at this

44:58 15    time?

44:58 16        A.    Correct.

44:58 17        Q.    Okay.  The quantitative pseudomotor axon

45:08 18    reflex test -- let me go to the other section of the

45:10 19    literature.  Let's go to page 112, in the first

45:24 20    column.  I'll show you where it is when you get

45:27 21    there.  This is the section I'm looking at.  Down at

45:30 22    the bottom paragraph it says these tests are rarely

45:32 23    used in practice.  Do you agree with that statement?

45:34 24        A.    Correct.  They're very rarely used in

45:38 25    clinical practice.  Correct.

GILBERT & JONES

142

45:39 1    Q.    And, Doctor, when you diagnose a patient

45:53 2    with CRPS Type 1, do you just look at one exam in

45:59 3    isolation or do you look at the total course of

46:01 4    treatment to assist in the diagnosis?

46:04 5    A.    I try to do the total course of treatment

46:12 6    to come to a conclusion.

46:15 7    Q.    Okay.  And then on page 7 of your report,

46:32 8    you were asked some questions about myofascial

46:36 9    pain --

46:37 10   A.    Uh-huh.

46:37 11   Q.    -- by defense counsel.  And that defines

46:42 12   myofascial pain syndrome; is that correct?

46:45 13   A.    Correct.

46:45 14   Q.    Okay.  And you assessed that or considered

46:53 15   that in your differential diagnosis of Ms. Orr; is

46:56 16   that correct?

46:56 17   A.    Yes.

46:56 18   Q.    And were you able to rule that out

46:59 19   clinically?

46:59 20   A.    Yes.  Her overall signs and symptoms were

47:05 21   not consistent with myofascial pain syndrome;

47:09 22   correct.

47:09 23        MR. KRAEUTER:  Okay.  All right.  I think

47:11 24        that's all I have.

47:11 25                    EXAMINATION

GILBERT & JONES

143

47:12  1   BY MR. MEADER:
47:12  2       Q.    Have you ever been disclosed as an expert
47:15  3   witness?
47:15  4       A.    Tell me the definition of expert witness.
47:23  5       Q.    Kind of like what we're here doing today
47:26  6   where you've been retained by either a plaintiff or
47:28  7   defendant to offer testimony?
47:30  8       A.    No.  No.
47:31  9       Q.    First time?
47:31  10      A.    Yes.
47:32  11      Q.    Okay.
47:34  12      A.    I've had one case, but I assume it was
47:40  13   more just a lawyer asking me questions with no
47:42  14   stenographer there.  And it was just a catalog of
47:46  15   questions I answered.  So I don't know if you say
47:49  16   that's an expert witness.  I think it's not.  It was
47:52  17   a patient I was treating.  It was a half hour meeting
47:55  18   one time.
47:55  19      Q.    Okay.  Good deal.  One last question.  On
47:58  20   this page 125, I just want to make sure I get
48:04  21   everything in here.  It says additional --
48:08  22      A.    Okay.
48:08  23      Q.    -- additional objective testing and it
48:11  24   goes to is not necessary to make the diagnosis but it
48:15  25   goes on to say, and this wasn't read, but in some

GILBERT & JONES

144.

48:17 1    cases may be used to support a clinical diagnosis?

48:21 2    Do you agree with that?

48:22 3        A.    Well, not if you go by the formal

48:29 4    criteria.

48:29 5        Q.    By the Budapest criteria?

48:32 6        A.    Correct.

48:33 7        Q.    I think what it's saying, and I'm just

48:35 8    trying to summarize here, but the more information

48:37 9    you have, the better to make a diagnosis?  Would you

48:39 10   agree with that proposition?

48:40 11            MR. KRAEUTER:  Object to the form.

48:46 12       A.    In general, the answer is yes.

48:53 13       Q.    (By Mr. Meader) All right.

48:53 14       A.    If you have more information, you can make

48:58 15   an informed decision.

49:00 16       Q.    All right.

49:01 17       A.    Yes.

49:03 18            MR. MEADER:  Let's get out of here.

49:05 19            MR. KRAEUTER:  One last followup.

49:06 20                    EXAMINATION

49:06 21   BY MR. KRAEUTER:

49:06 22       Q.    Doctor, in this particular case, do you

49:08 23   believe you had sufficient information based on the

49:10 24   tests that you had at your disposal and your clinical

49:14 25   evaluation of Ms. Orr to make the diagnosis that

GILBERT & JONES

145

you've made in this case?

    A.   Yes.

    Q.   Okay.

    A.   I did not see the need for any of these additional tests.  And I'm familiar with all these tests except for your alcohol test that I don't know about.  But all the other tests I'm familiar with and know how they're used, when they're used, and I did not feel the need to do any extra additional testing to compare what I already had.

    MR. MEADER:  All right.

    MR. KRAEUTER:  Okay.  Thank you.

    (Deposition concluded at 8:05 p.m.)

    (Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e), signature of the witness has been reserved.)

GILBERT & JONES

146

1                    CERTIFICATE OF COURT REPORTER

2

3      STATE OF GEORGIA:

4      COUNTY OF CHATHAM:

5

6                    I hereby certify that the foregoing
       transcript was reported as stated in the caption and
7      the questions and answers thereto were reduced to
       writing by me; that the foregoing 145 pages represent
8      a true, correct, and complete transcript of the
       evidence given on Monday, June 20, 2016, by the
9      witness, MARKUS NIEDERWANGER, M.D., who was first
       duly sworn by me.

10                   I certify that I am not disqualified
11     for a relationship of interest under
       O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
12     Reporter here as an employee of Gilbert & Jones, Inc.
       who was contacted by Garrett Meader, Esquire, to
13     provide court reporting services for the proceedings;
       I will not be taking these proceedings under any
14     contract that is prohibited by O.C.G.A. 15-14-37(a)
       and (b) or Article 7.C. of the Rules and Regulations
15     of the Board; and by the attached disclosure form I
       confirm that neither I nor Gilbert & Jones, Inc. are
16     a party to a contract prohibited by
       O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the
17     Rules and Regulations of the Board.

18                   This 10th day of July, 2016.

19

20

21

22

23                      _____
24                      Annette Pacheco, CCR-B-2153

25

147

## DISCLOSURE OF NO CONTRACT

1
2          I, Debbie Gilbert, do hereby disclose
3   pursuant to Article 10.B of the Rules and Regulations
    of the Board of Court Reporting of the Judicial
    Council of Georgia that Gilbert & Jones, Inc. was
4   contacted by Garrett Meader, Esquire, to provide
    court reporting services for these proceedings and
5   there is no contract that is prohibited by O.C.G.A.
    15-14-37(a) and (b) or Article 7.C. of the Rules and
6   Regulations of the Board for the taking of these
    proceedings.

          There is no contract to provide reporting
8   services between Gilbert & Jones, Inc. or any person
    with whom Gilbert & Jones, Inc. has a principal and
9   agency relationship nor any attorney at law in this
    action, party to this action, party having a
10  financial interest in this action, or agent for an
    attorney at law in this action, party to this action,
11  or party having a financial interest in this action.
    Any and all financial arrangements beyond our usual
12  and customary rates have been disclosed and offered
    to all parties.

          This 10th day of July, 2016.

_____
Debbie Gilbert, FIRM
REPRESENTATIVE
Gilbert & Jones, Inc.

GILBERT & JONES

148

1   DEPOSITION OF:  MARKUS NIEDERWANGER, M.D./AP

2       I do hereby certify that I have read all
    questions propounded to me and all answers given by
3   me on June 20, 2016, taken before Annette Pacheco,
    and that:

4   _____ 1)   There are no changes noted.
5   _____ 2)   The following changes are noted:

6       Pursuant to Rule 30(e) of the Federal Rules of
    Civil Procedure and/or the Official Code of Georgia
7   Annotated 9-11-30(e), both of which read in part:
    Any changes in form or substance which you desire to
8   make shall be entered upon the deposition...with a
    statement of the reasons given...for making them.
9   Accordingly, to assist you in effecting corrections,
    please use the form below:

10

11  Page No. _____ Line No. _____ should read:_____

12  _____
    Page No. _____ Line No. _____ should read:_____
13  _____

14  Page No. _____ Line No. _____ should read:_____
15  _____
    Page No. _____ Line No. _____ should read:_____
16  _____

17  Page No. _____ Line No. _____ should read:_____
18  _____
    Page No. _____ Line No. _____ should read:_____
19  _____

20  Page No. _____ Line No. _____ should read:_____
21  _____
    Page No. _____ Line No. _____ should read:_____
22  _____

23  Page No. _____ Line No. _____ should read:_____
24  _____
    Page No. _____ Line No. _____ should read:_____
25  _____

GILBERT & JONES

149

DEPOSITION OF:  MARKUS NIEDERWANGER, M.D./AP

Page No. _____ Line No. _____ should read:_____

_____

Page No. _____ Line No. _____ should read:_____

_____

Page No. _____ Line No. _____ should read:_____

_____

Page No. _____ Line No. _____ should read:_____

_____

Page No. _____ Line No. _____ should read:_____

_____

Page No. _____ Line No. _____ should read:_____

_____

Page No. _____ Line No. _____ should read:_____

_____

Page No. _____ Line No. _____ should read:_____

_____

If supplemental or additional pages are necessary,
please furnish same in typewriting annexed to this
deposition.


_____
MARKUS NIEDERWANGER, M.D.

Sworn to and subscribed before me,
This the _____ day of _____, 20___.

_____
Notary Public
My commission expires: _____


Please forward corrections to:

Gilbert & Jones, Inc.
P. O. Box 14515
Savannah, GA 31416
(912) 355-0320

GILBERT & JONES

148

DEPOSITION OF:   MARKUS NIEDERWANGER, M.D./AP

I do hereby certify that I have read all questions propounded to me and all answers given by me on June 20, 2016, taken before Annette Pacheco, and that:

_____ 1)   There are no changes noted.
___X___ 2)   The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. _15_ Line No. _23_ should read: _when I headed out the door, that's_

Page No. _16_ Line No. _22_ should read: _delete " otherwise"_

Page No. _18_ Line No. _11_ should read: _Stuttgart_

Page No. _21_ Line No. _7_ should read: _saw (instead of "knew")_

Page No. _23_ Line No. _21_ should read: _characteristics_

Page No. _24_ Line No. _22_ should read: _necessarily (instead of "as early")_

Page No. _31_ Line No. _24_ should read: _IASP_

Page No. _34_ Line No. _16_ should read: _don't want to tell_

Page No. _37_ Line No. _14_ should read: _Sudomotor (instead of "pseudomotor")_  } multiple times ruled in transcript

Page No. _37_ Line No. _18_ should read: _- "_

149

DEPOSITION OF:   MARKUS NIEDERWANGER, M.D./AP

Page No. 39 __ Line No. 17 ___ should read: _Sudomotor_

Page No. 40 __ Line No. 9 ___ should read: _-11-_

Page No. 43 __ Line No. 11 ___ should read: _nerve_
_(instead of "serve")_

Page No. 52 __ Line No. 8 ___ should read: _Could_
_(instead of "couldn't")_

Page No. 62 __ Line No. 7 ___ should read: _Yet_
_(instead of "that")_

Page No. 64 __ Line No. 13/14 should read: _It was thought_
_that the sympathetic nerve system is causing RSD._

Page No. 65 __ Line No. 10 ___ should read: _Sudomotor_

Page No. 66 __ Line No. 18 ___ should read: _11_


If supplemental or additional pages are necessary,
please furnish same in typewriting annexed to this
deposition.  _See additional sheets attached 149/A_
_and 149/B_

_____
MARKUS NIEDERWANGER, M.D.

Sworn to and subscribed before me,
This the 3 __ day of Aug ___, 20__

_____
Notary Public
My commission expires: _2-17-20_

Please forward corrections to:

Gilbert & Jones, Inc.
P. O. Box 14515
Savannah, GA 31416
(912) 355-0320

148
149/A

DEPOSITION OF:  MARKUS NIEDERWANGER, M.D./AP

    I do hereby certify that I have read all
questions propounded to me and all answers given by
me on June 20, 2016, taken before Annette Pacheco,
and that:

_____ 1)   There are no changes noted.
___X___ 2)   The following changes are noted:

    Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure and/or the Official Code of Georgia
Annotated 9-11-30(e), both of which read in part:
Any changes in form or substance which you desire to
make shall be entered upon the deposition...with a
statement of the reasons given...for making them.
Accordingly, to assist you in effecting corrections,
please use the form below:

Page No. _67_ Line No. _22_ should read: _is medicated through the_

Page No. _68_ Line No. _20_ should read: _After "Okay" here should be. my remark " Are you familiar with that?" towards the attorney and in Line 22 McMeans answers " I'm not" and states " Okay go ahead"_

Page No. _69_ Line No. _23/24_ should read: _"that is possibly the reason that CRPS doesn't have the "sympathetic" in it anymore_

Page No. _78_ Line No. _19_ should read: _joint (instead of "choice")_

Page No. _78_ Line No. _22_ should read: _does not accept (instead of "is")_

Page No. _78_ Line No. _19_ should read: _outside facility_

Page No. _83/84_ Line No. _3_ should read: _" (he/she/she) and " (after syndrome )_

Page No. _90_ Line No. _24_ should read: _patient reported_

Page No. _105_ Line No. _21_ should read: _remove " and left"_

Page No. _119_ Line No. _13_ should read: _earlier than in the past_

149/B ~~148~~

DEPOSITION OF:  MARKUS NIEDERWANGER, M.D./AP

I do hereby certify that I have read all questions propounded to me and all answers given by me on June 20, 2016, taken before Annette Pacheco, and that:

_____ 1)  There are no changes noted.
__X__ 2)  The following changes are noted:

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. _120_ Line No. _14_ should read: _difficult (instead of typical)_

Page No. _121_ Line No. _12_ should read: _problems (instead of promise)_

Page No. _121_ Line No. _18_ should read: _reassigned_

Page No. _125_ Line No. _10_ should read: _And it is not_

Page No. _130_ Line No. _18_ should read: _mirror (instead of mural)_

Page No. _131_ Line No. _4_ should read: _Mirror_

Page No. _135_ Line No. _21/22_ should read: _delete line 21 & 22 (I don't believe I answered as quoted in line 22)_

Page No. _____ Line No. _____ should read:_____

Page No. _____ Line No. _____ should read:_____

Page No. _____ Line No. _____ should read:_____

Page No. _____ Line No. _____ should read:_____

GILBERT & JONES