IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| JACQUELYN ORR and WILLIAM ORR, | |
| Plaintiffs, | |
| v. | Civil Action File No: 4:16-cv-00052-WTM-GRS |
| MACY'S RETAIL HOLDINGS, INC. | |
| Defendant. | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO EXCLUDE EXPERT WITNESS TESTIMONY OF LAMAR BLOUNT**

COMES NOW, Macy's Retail Holdings, Inc., Defendant in the above-styled civil action, and files this Response to Plaintiffs' Motion to Exclude Expert Witness Testimony of Lamar Blount, as follows:

**I.   Introduction / Statement of Facts**

The above-referenced matter is a personal injury action in which the Plaintiffs allege that Plaintiff Jacquelyn Orr suffered severe and serious physical injuries when a fitting room door fell on her on April 2, 2015. Plaintiff William Orr brings a loss of consortium claim. (Second Amended Complaint, Document 25, ¶¶ 15, 19-20). Plaintiff Jacquelyn Orr has testified that, as a result of her alleged

injuries, she has pain in her fingertips which runs up through her shoulder, into the side of her neck and up through her face, eye and eyebrow area. (Deposition of J. Orr, p. 79:14-24). One of Mrs. Orr's treating physicians, Dr. Marcus Niederwanger, has recommended that Mrs. Orr undergo course of treatment that includes the implantation of a spinal cord stimulator. (Plaintiffs' Motion to Exclude; Doc. No. 66; Ex. 1, p. 12). Dr. Niederwanger estimates that the costs related to this course of treatment total $149,774. (Report of Dr. Niederwanger; Doc. No. 66-1, p. 12).

Defendant Macy's retained L. Lamar Blount, CPA/CFF, FHFMA, to independently review and assess the reasonableness of Mrs. Orr's projected medical charges, including the spinal cord stimulator, when compared to the 80th percentile of usual, customary and reasonable charges in the Savannah area, at the Medical University of South Carolina, and when compared to the Georgia state-wide average. (Expert Report of L. Lamar Blount, Doc. No. 66-9). During his more than 30 years of experience in the healthcare industry, Mr. Blount has served as a CPA and consultant to multiple healthcare providers, government agencies, and insurance carriers.[1] (Expert Report of L. Lamar Blount, Doc. No. 66-9, p. 2).

---

[1] Mr. Blount has provided financial statement audit services, financial advisory services, reimbursement consulting, and litigation consulting for over 500 healthcare clients since 1974. (Expert Report of L. Lamar Blount, Doc. No. 66-9,

Mr. Blount has also served as a consultant and expert witness in over 200 cases or projects, testified in over 50 cases, and been admitted as a medical billing, healthcare financial and reimbursement expert in multiple federal and state courts. (Expert Report of L. Lamar Blount, Doc. No. 66-9, pp. 2-3).  Despite his wealth of experience in researching what constitutes a reasonable rate to charge for a medical service, and his reliance in this case upon data collected by the federal government, Plaintiffs claim that Mr. Blount's opinions should be excluded because they are not based upon a reliable methodology and would not assist the trier of fact.

As discussed in his report, In formulating his opinions in this case, Mr. Blount:  (1) compared the amounts projected by Dr. Niederwanger to publicly available medical charge data for the same types of services billed by other medical providers; and (2) relied upon his more than 30 years of experience and expertise in the fields of medical billing and accounting.  (Expert Report of L. Lamar Blount, Doc. No. 66-9, pp. 4-6).  His methodology is described in detail in the 13 separate steps set forth in his expert report.  (Id.).  Significantly, this methodology is consistent with the methodology he has used in similar engagements and is generally accepted in the healthcare industry.  (Id.).  Among

---

p. 2).  In addition, he has managed and directed charge master and fee schedule rate setting projects and resolved complex payment disputes between healthcare providers and payors. (Expert Report of L. Lamar Blount, Doc. No. 66-9, p. 2).

other things, Mr. Blount relied upon data from the American Hospital Directory, the U.S. Department of Veteran Affairs, The Physicians' Fee Reference book, the Practice Management Information Corporation medical fees book ("PMIC"), and data summarizing charges billed to Medicare patients. (Depo. of L. Lamar Blount; Doc No. 66-3, p. 40). As discussed below, Mr. Blount's opinions survive Daubert scrutiny and Plaintiffs' motion should be denied.

## II.     Argument and Citation to Authority

### A.     Applicable Legal Standard

Under Rule 702, relevant expert testimony is admissible only if the trial court finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue. McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir.2002) (citation omitted). "The subject of an expert's testimony must be 'scientific ... knowledge.' The adjective 'scientific' implies a grounding in the methods and procedures of science." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-90 (1993).

When evaluating the reliability of scientific expert opinion, the trial judge must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592–93. To evaluate the reliability of scientific expert opinion, the court considers, to the extent practicable: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique, and (4) whether the technique is generally accepted in the scientific community. Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir.2003) (citing McCorvey, 298 F.3d at 1256). These factors are illustrative, not exhaustive.

B.  Mr. Blount's Opinions Satisfy Daubert.

As noted above, under Daubert, the Court may consider the following factors: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique, and (4) whether the technique is generally accepted in the scientific community. Here, Plaintiffs contend that Mr. Blount's opinions should be excluded because his methodology has not been submitted for peer review and because he does not know the error rate

for his opinions or for the data contained in the databases that he relied upon in formulating his conclusions. (Plaintiffs' Motion to Exclude; Doc. No. 66, p. 8).

Plaintiffs' contention that Mr. Blount's opinions should be excluded because his methodology has not been peer-reviewed is without merit. The methodology used by Mr. Blount is generally accepted in the healthcare industry. (Expert Report of L. Lamar Blount, Doc. No. 66-9, pp. 6-7). Moreover, the data that he replied upon in forming his opinions was studied and reviewed by the U.S. Government Accountability Office (GAO). (Id.). This data was collected by the United States Department of Veterans Affairs at the direction of the United States Congress. (Id.). The GAO has determined that the Veterans Administration used a sound methodology in its collection of data. (Id.). The methodology utilized by Mr. Blount is not novel, it is generally accepted in the healthcare industry and is based upon data that the federal government has determined to be reliable.

Plaintiffs also contend that Mr. Blount's opinion should be excluded because he does not know the error rate for his opinions or for the data upon which they are based. Mr. Blount did not testify that he did not know the error rate associated with his opinions. Rather, he testified that he as not aware of any errors (i.e. a zero error rate) associated with his opinions. (Depo. of L. Lamar Blount; Doc No. 66-3, p. 39). Mr. Blount deposed, as follows:

> Q:   Do you know what the rate of error is for your opinions?
>
> A:   No. I don't know of any errors.

Mr. Blount's opinions are reliable and his methodology is generally accepted in the healthcare industry. Accordingly, the <u>Daubert</u> criteria are satisfied and Plaintiffs' Motion should be denied.

### C.   Mr. Blount's Opinions are Based Upon Good Grounds.

Plaintiffs further contend that Mr. Blount's opinions are unreliable because: (1) his reliance upon DRG 029 is improper; (2) the Medicare/CMS database is limited in its scope of data; (3) the VA Reasonable Charge Data does not provide a reliable basis for Mr. Blount's methodology; and (4) the journals relied upon by Mr. Blount do not support his methodology.[2] As discussed below, Mr. Blount's opinions are predicated upon "good grounds" and Plaintiffs' challenges go more to the credibility or weight to be given by the jury to his opinions and not to their admissibility.

"The assessment process, that is, the process of examining whether 'good grounds' exist, focuses on the methodologies the witness used to reach the opinion he or she will express, not the scientific correctness of the opinion. It is not part of

---

[2] Plaintiff also contends that any opinion regarding DRG 520 is unreliable. However, while Mr. Blount was asked about DRG 520 at his deposition, he relies upon DRG 029 in his expert report.

the trial judge's gatekeeping role to determine whether the proffered opinion is scientifically correct or certain in the way one might think of the law of gravity. The gatekeeping role is addressed to mere evidentiary admissibility; it is the fact-finder's role (usually a jury) to determine whether the opinion is correct or worthy of credence. For the trial court to overreach in the gatekeeping function and determine whether the opinion evidence is correct or worthy of credence is to usurp the jury's right to decide the facts of the case. All the trial judge is asked to decide is whether the proffered evidence is based on 'good grounds' tied to the scientific method." Globetti v. Sandoz Pharm., Corp., 111 F. Supp. 2d 1174, 1177 (N.D. Ala. 2000).

Plaintiffs contend that Mr. Blount's reliance upon DRG 029 results in an apples to oranges comparison when comparing charges for spinal cord stimulators. (Plaintiffs' Motion to Exclude; Doc. No. 66, p. 9). Plaintiffs argue that because DRG 029 could include procedures other than the implantation of spinal cord stimulators, DRG 029 should not have been relied upon by Mr. Blount. Notably absent from Plaintiffs' brief is Mr. Blount's explanation of why it is appropriate to rely upon DRG 029, which appears in both Mr. Blount's deposition and in his expert report. As explained by Mr. Blount:

Q: And some for [sic] procedures that may not even include the implantation of a spinal cord stimulator?

A: That's possible.

Q: It's possible because you just don't know the answer to that?

A: No. That DRG includes neurostimulator implants as well as certain other back procedures. But the way that DRG system works, as I explained in our report, is that it is designed to represent relatively homogeneous utilization of resources within that DRG. So even though it may not include a specific neurostimulator device, all the patients in that DRG should be using the same or similar amounts of resources. And so you would expect the charges to be similar. (Depo. of L. Lamar Blount; Doc. No. 66-4, p. 26, lines 11-25)[3].

Thus, because DRG 029 includes a group of patients who use the same, or similar, amounts of resources, it is appropriate to use this DRG as a basis for assessing the reasonableness of Plaintiffs' estimated future medical expenses.[4]

---

[3] Mr. Blount's report makes this same point. (Expert Report of L. Lamar Blount, Doc. No. 66-9, p. 7, para.8).

[4] See Pleasant Valley Biofuels, LLC v Sanchez-Medina, 2014 WL 2855062 (S.D. Fla. 2014)("reliability" under Daubert... goes more to an expert's methodology than the correctness of underlying assumptions"), citing Quiet Tech DC-8, Inc., v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003); Ad-Vantage Tel. Directory Consultants, Inc. v. GTE Directories Corp., 943 F.2d 1511 (11th Cir.

Plaintiffs' brief fails to disclose Mr. Blount's explanation for relying upon this DRG and their position is without merit.

Plaintiffs also contend that the Medicare/CMS database is "severely" limited in the scope of its data. Plaintiffs point to a statement contained in the Medicare/CMS Overview which advises readers that the data set has some limitations. Mr. Blount explained these limitations, as follows:

> Q: And you agree with that statement?
>
> A: Yes. And what that means is that, for instance, a procedure that would be performed possibly only on children is not going to be in this database because, you know, basically children aren't covered by Medicare Part A.
>
> Q: The fact of the matter is a lot of people in the United States are not covered by Medicare Part A?
>
> A: That's true. But it is the largest segment, I think, in the United States. And, you know, the fact remains that hospitals charge Medicare the same way they charge other patients. They don't have difference charge masters for different types of payors. They have only one charge master. And those charges are uniformly applied

---

1991) (appropriate to consider evidence that is indirect and based on estimates and assumptions, so long as the assumptions rest on adequate data).

> regardless of the financial classification of the patient, so what's billed to a Medicare patient for one service would be billed to any other patient for that same service. What they collect is different depending upon the contractual relationships, but here we're talking about charges. And so the sticker price is the same regardless of the payor.
>
> (Depo. of L. Lamar Blount; Doc. No 66-4, pp. 80-81).

Nowhere in the Medicare/CMS Overview does it state that the data set is "severely" limited and at no point does Mr. Blount ever testify that the data set is "severely" limited. Further, Plaintiffs have not tendered an expert who has opined that the data set is "severely" limited. The basis for Plaintiffs' contention that the data set is "severely" limited is unclear and it appears that they have simply taken great liberties with the plain language contained in the Medicare/CMS overview and Mr. Blount's testimony.

Plaintiffs next contend that the VA Reasonable Charge data does not provide a basis for a reliable methodology for Mr. Blount's opinions. (Plaintiffs' Motion to Exclude; Doc. No. 66, pp. 17-18). Plaintiffs argue that because Mr. Blount cannot say how many entries in the VA database came from the Savannah, Georgia area, his conclusions must be unreliable

because they do not reflect the average charge data for an area reasonably close to Savannah, Georgia.

This is simply not true. Mr. Blount deposed that he applied the appropriate geographic adjustment factor for Savannah, which is .82, to the 80th percentile of usual, customary, and reasonable charges for the procedure at issue. Mr. Blount took the geographic location of Plaintiffs into account when he arrived at his conclusions and it is unclear why Plaintiffs have failed to recognize and acknowledge this in their brief.

Finally, Plaintiffs argue that the peer-reviewed articles referenced by Mr. Blount do not support his opinions. Specifically, Plaintiffs take issue with the age of several of the articles and appear to suggest that because some of the data is several decades old, it must be unreliable. (Plaintiffs' Motion to Exclude; Doc. No. 66, pp. 17-18). However, Mr. Blount deposed that prices for implantable medical devices have a history of declining over time – something which would actually weigh in favor of Plaintiffs in the event Mr. Blount has relied upon old data to form his opinions. (Depo. of L. Lamar Blount; Doc. No. 66-4, p. 37, lines 1-4). Further, Plaintiffs fail to explain how reliance on any specific peer-reviewed article caused Mr. Blount to form an opinion based upon unreliable methodology. As

discussed in his report, Mr. Blount relied upon numerous sources of information, as well as his own training and experience, when he formed his opinions. Plaintiffs' position is without merit and their motion should be denied.

### III. Conclusion

The methodology of Mr. Blount is sufficiently reliable to withstand scrutiny under Daubert. Plaintiffs' attacks on the foundations of Mr. Blount's opinions go to the weight, not the admissibility, of his testimony. Accordingly, Plaintiffs' Motion to Exclude the Expert Witness Testimony of L. Lamar Blount should be denied.

This 14th day of April, 2017.

                                                    DREW ECKL & FARNHAM, LLP

                                                    *s/ Garret W. Meader*
                                                    Stevan A. Miller
                                                    ***Georgia Bar No. 508375***
                                                    Jeffrey S. Ward
                                                    ***Georgia Bar No. 737277***
                                                    Garret W. Meader
                                                    ***Georgia Bar No. 142402***
                                                    Lisa R. Richardson
                                                    ***Georgia Bar No. 604074***

880 W. Peachtree St. NW (30309)
P.O. Box 7600
Atlanta, GA 30357-0600
Telephone: (404) 885-1400
Facsimile: (404) 876-0992
E-mail: smiller@deflaw.com
E-mail: jward@deflaw.com
E-mail: gmeader@deflaw.com
E-mail: lrichardson@deflaw.com
***Attorneys for Defendant***

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| JACQUELYN ORR and WILLIAM ORR,<br><br>    Plaintiffs,<br><br>    v.<br><br>MACY'S RETAIL HOLDINGS, INC.<br><br>    Defendant. | Civil Action File No:<br>4:16-cv-00052-WTM-GRS |

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I am counsel for Defendant, and that I have this day served *Defendant's Motion to Quash and for a Protective Order.* upon all parties to this matter by filing with the Court's CM/ECF system, which will automatically deliver e-mail notification of same to counsel of record:

This 14th day of April, 2017.

- 2 -

                DREW ECKL & FARNHAM, LLP

                *s/ Garret W. Meader*
                Garret W. Meader
                ***Georgia Bar No. 142402***

880 W. Peachtree St. NW (30309)
P.O. Box 7600
Atlanta, GA 30357-0600
Telephone: (404) 885-1400
Facsimile: (404) 876-0992
E-mail: smiller@deflaw.com
E-mail: jward@deflaw.com
E-mail: gmeader@deflaw.com
E-mail: lrichardson@deflaw.com
***Attorneys for Defendant***